UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GREG ADKISSON, et al.,          )
                                )
        Plaintiffs,             )
                                )
v.                              )        No.:   3:13-CV-505-TAV-HBG
                                )
JACOBS ENGINEERING GROUP, INC., )
                                )
        Defendant.              )

_____

KEVIN THOMPSON, et al.,         )
                                )
        Plaintiffs,             )
                                )
v.                              )        No.:   3:13-CV-666-TAV-HBG
                                )
JACOBS ENGINEERING GROUP, INC., )
                                )
        Defendant.              )

_____

JOE CUNNINGHAM, et al.,         )
                                )
        Plaintiffs,             )
                                )
v.                              )        No.:   3:14-CV-20-TAV-HBG
                                )
JACOBS ENGINEERING GROUP, INC., )
                                )
        Defendant.              )

## MEMORANDUM OPINION

These three actions, which all relate to defendant Jacobs Engineering Group, Inc.'s

post-spill clean-up removal and recovery of fly ash at the Tennessee Valley Authority

("TVA") Kingston Fossil Fuel Plant (the "KIF Plant") following the coal ash spill that occurred when a containment dike at the KIF plant failed on December 22, 2008 (the "ash spill"), have been consolidated by order of the Court [Doc. 35].[1]  Prior to consolidation, defendant moved, in each case, to dismiss all of the claims by all the plaintiffs pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the basis of derivative discretionary function immunity.  For the reasons that follow, the Court will grant those motions and dismiss plaintiffs' claims.

## I.    Plaintiffs' Lawsuits

In Case Number 3:13-CV-505-TAV-HBG, *Adkisson v. Jacobs Engineering Group, Inc.*, plaintiffs include individuals who allegedly "worked long hours per day in close proximity with toxic fly ash constituents" and some of their spouses [Doc. 1 ¶ 61]. They make allegations that defendant did not monitor the fly ash in violation of federal and state law, did not adequately train plaintiffs about the hazards associated with fly ash, did not adequately monitor plaintiffs' medical conditions, did not provide plaintiffs with safety equipment, did not dispose of toxic substances properly, and did not admit that plaintiffs had been exposed to hazardous substances, despite knowing the toxic nature of fly ash [*Id.* ¶¶ 53–70].  Plaintiffs claim that they have suffered negative health impacts as a result of defendant's conduct, including eye problems, sinus problems, pulmonary problems, heart problems, and other health-related problems [*Id.* ¶¶ 71–72].  On the basis

---

[1] The Court refers to the docket entries in *Adkisson v. Jacobs Engineering Group Inc.*, Case No. 3:13-CV-505-TAV-HBG, unless otherwise indicated.

2

of their allegations, they assert the following claims: outrageous conduct, battery, negligence, negligence per se, intentional and/or reckless failure to warn, reckless infliction of emotional distress, fraud, misrepresentation/fraudulent concealment, and strict liability for ultrahazardous or abnormally dangerous activity [*Id.* ¶¶ 73–139]. Defendant has moved to dismiss the action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure [Doc. 10] and to strike part of plaintiffs' response to that motion [Doc. 25].

In Case Number 3:13-CV-666, *Thompson v. Jacobs Engineering Group, Inc.*, plaintiffs are Shaun Travis Smith, Kevin Thompson, and Kevin Thompson's wife, Joy Thompson [Case No. 3:13-CV-666 Doc. 1 ¶¶ 1–2[2]]. Plaintiffs Shaun Travis Smith and Kevin Thompson allegedly worked on the KIF site during TVA's post-spill clean-up and remediation efforts at and around the KIF plant [*Id.* ¶¶ 4, 15]. Plaintiffs make allegations that defendant did not monitor the fly ash in violation of federal and state law, did not adequately train plaintiffs about the hazards associated with fly ash, did not adequately monitor plaintiffs' medical conditions, did not provide plaintiffs with safety equipment, did not dispose of toxic substances properly, and did not admit that plaintiffs had been exposed to hazardous substances, despite knowing the toxic nature of fly ash [*Id.* ¶¶ 9–19]. Plaintiffs have allegedly suffered negative health impacts as a result of defendant's conduct, including eye problems, sinus problems, pulmonary problems, heart problems, and other health-related problems [*Id.* ¶ 23]. On the basis of these allegations, they assert

---

[2] There are two paragraphs in the complaint identified as paragraph number two.

the following claims: outrageous conduct, battery, negligence, negligence per se, intentional and/or reckless failure to warn, reckless infliction of emotional distress, fraud, misrepresentation/fraudulent concealment, and strict liability for ultrahazardous or abnormally dangerous activity [*Id.* ¶¶ 24–90]. Defendant has moved to dismiss the action pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure [Case No. 3:13-CV-666 Doc. 7] and pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure [Case No. 3:13-CV-666 Doc. 16]. Plaintiffs have filed two motions to amend [Case No. 3:13-CV-666 Docs. 20, 29].[3]

In Case Number 3:14-CV-20, *Cunningham v. Jacobs Engineering Group, Inc.*, plaintiffs are Joe Cunningham and his wife, Taylor Cunningham [Case No. 3:14-CV-20 Doc. 1 ¶¶ 2–3]. Plaintiff Joe Cunningham allegedly worked on the KIF site during TVA's post-spill clean-up and remediation efforts [*Id.* ¶ 5]. Plaintiffs claim Joe Cunningham "unintentionally brought home toxins from fly ash that he was told [were] safe" [*Id.*]. Plaintiffs make allegations that defendant did not monitor the fly ash in violation of federal and state law, did not adequately train plaintiff Joe Cunningham about the hazards associated with fly ash, did not adequately monitor plaintiff Joe Cunningham's medical conditions, did not provide plaintiff Joe Cunningham with safety equipment, did not dispose of toxic substances properly, and did not admit that plaintiff Joe Cunningham had been exposed to hazardous substances, despite knowing the toxic nature of fly ash [*Id.* ¶¶ 12–21]. Plaintiff Joe Cunningham has allegedly suffered

---

[3] Because of the Court's findings related to Rule the 12(b)(1) motion, the Court does not address defendant's Rule 12(b)(5) motion.

negative health impacts as a result of defendant's conduct, including eye problems, sinus problems, pulmonary problems, heart problems, and other health-related problems [*Id.* ¶¶ 22–23]. Plaintiff Taylor Cunningham had a miscarriage allegedly as a result of plaintiff Joe Cunningham's exposure to toxic substances and the carrying home of those substances [*Id.* ¶ 24]. On the basis of these allegations, they assert the following claims: outrageous conduct, battery, negligence, negligence per se, intentional and/or reckless failure to warn, reckless infliction of emotional distress, fraud, misrepresentation/fraudulent concealment, and strict liability for ultrahazardous or abnormally dangerous activity [*Id.* ¶¶ 25–90]. Defendant has moved to dismiss the action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure [Case No. 3:14-CV-20 Doc. 6].

## II.    Standard of Review[4]

A motion to dismiss on the basis of discretionary function is appropriately made under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Hatcher v. United States*, 512 F. App'x 527, 528–29 (6th Cir. 2013). In consideration of a motion brought pursuant to Rule 12(b)(1), a court may review extra-complaint evidence and resolve factual disputes. *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915–16 (6th Cir. 1986). "Moreover, on the question of subject matter jurisdiction[,] the court is not limited to jurisdictional allegations of the complaint but may properly consider whatever evidence is submitted for the limited purpose of ascertaining whether subject matter jurisdiction

---

[4] Plaintiffs do not contest defendant's characterization of the standard of review [Doc. 17], with which the Court agrees.

exists." *Pryor Oil Co., Inc. v. United States*, 299 F. Supp. 2d 804, 807 (E.D. Tenn. 2003) (citing *Rogers*, 798 F.2d at 915–16) (other citations omitted).

Because defendant's motions are properly brought pursuant to Rule 12(b)(1), the Court considers the affidavits and documents submitted in support and opposition of dismissal. Plaintiffs ask the Court to allow discovery to further contest defendant's motions [*See* Doc. 16], but the Court finds that request unwarranted. When sovereign immunity is an issue, the D.C. Circuit has noted that "jurisdictional discovery should be carefully controlled and limited" "to avoid burdening a sovereign that proves to be immune from suit." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Upon review of the parties' submissions, and for reasons apparent from the Court's analysis regarding application of derivative discretionary function immunity below, the Court does find that discovery would aid in determining whether derivative discretionary function immunity applies here.[5]

## III. Background[6]

TVA is a corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933 (the "TVA

---

[5] Moreover, even if the parties supplement the record with affidavits and other proof, it does not thereby convert the Rule 12(b)(1) motion into one for summary judgment under Rule 56. *Rogers*, 798 F.2d at 916. And to the extent the Court would even construe plaintiffs' request for additional discovery as one made pursuant to Rule 56(d), the Court would find that plaintiffs have not met their burden of demonstrating why discovery is necessary. *See Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004) (stating that "[b]are allegations or vague assertions of the need for discovery are not enough").

[6] The relevant background for each complaint is substantially similar and is primarily taken from materials submitted by defendant, which, in large part, is uncontested by plaintiffs.

6

Act"). *See* 16 U.S.C. §§ 831 *et seq.*; *see also Hill v. U.S. Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995). TVA was created by Congress "in the interest of the national defense and for agricultural and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins." 16 U.S.C. § 831. Through amendments to the TVA Act, Congress extended TVA's purposes to "law enforcement . . . in the area of jurisdiction," *id.* § 831c-3(a), and "[t]o aid further the proper use, conservation, and development of the natural resources of the Tennessee River drainage basin and of such adjoining territory as may be related to or materially affected by the development consequent to this chapter, and to provide for the general welfare of the citizens of said areas . . . ." *Id.* § 831u; *see also U.S. ex rel. Tenn. Valley Auth. v. Welch*, 327 U.S. 546, 553–54 (1946). The TVA Act also specifically authorizes TVA "[t]o produce, distribute, and sell electric power." 16 U.S.C. § 831d(*l*); *see also Memphis Power & Light Co. v. City of Memphis*, 112 S.W.2d 817, 822 (1937) (stating that "[t]he TVA is a public instrumentality and holds the electric energy generated at its dams in trust for the people of the whole country"). In addition, the TVA Act gives TVA the power to exercise the right of eminent domain, to acquire real estate, and to take title to real estate in the name of the United States to accomplish the purposes of the TVA Act, including "the construction of dams, reservoirs, transmission lines, power houses, and other structures, and navigation projects . . . ." 16 U.S.C. §§ 831c(h)–(i).

TVA owns, operates, and manages the KIF plant. *Chesney v. Tenn. Valley Auth.*, 782 F. Supp. 2d 570, 572 (E.D. Tenn. 2011). On December 22, 2008, one of the containment dikes that retained a pond used to dispose of coal ash sludge produced at the KIF plant failed. 782 F. Supp. 2d at 573. The burning of coal at the KIF plant's coal-fired electricity generation plant created the coal ash sludge. As a result of the dike failure, approximately 5.4 million cubic yards of coal ash sludge spilled from the 84-acre containment pond to an adjacent area of about 300 acres, consisting of primarily the Watts Bar Reservoir, the Clinch and Emory Rivers, and government and privately owned shoreline properties. *Id.*

Following the coal ash spill, TVA and the Environmental Protection Agency (the "EPA"), responded pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 103 *et seq.*, ("CERCLA"), and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. pt. 300 (2008) (the "NCP"). *See Mays v. Tenn. Valley Auth.*, 699 F. Supp. 2d 991, 998 (E.D. Tenn. 2010). During the initial emergency response phase, and pursuant to CERCLA, Executive Order No. 12,580, and the NCP, the EPA delegated its authority to TVA to engage in coal ash removal actions. *Id.* (citing 42 U.S.C. §§ 9604(a)–(b); 42 U.S.C. § 9615 (authorizing the President to delegate duties and powers under CERCLA); 40 C.F.R. § 300.5). The EPA terminated the initial emergency response phase on January 11, 2009, and transferred lead agency authority to TVA for further clean up, removal, and remediation actions. *Id.* Since this time, all coal ash response and removal actions have

8

been within TVA's delegated authority under CERCLA and Executive Order No. 12,580. *Id.*

On January 12, 2009, in a "coordinated oversight approach" adopted by the Tennessee Department of Environment and Conservation ("TDEC") and the EPA, TDEC ordered TVA to comply with an order directing it to engage in various spill response and remediation efforts, implement removal measures, assess all of TVA's coal ash disposal facilities, submit reports detailing and analyzing the causes of the dike failure at the KIF plant, and submit a Corrective Action Plan (the "CAP"). The TDEC order directed TVA as follows:

> 5. Within 45 days after the receipt of this Order, the Respondent shall prepare and submit to the Department a Corrective Action Plan ("CAP"). The CAP shall include:
>
> A. a plan for the comprehensive assessment of soil, surface water, and ground water; remediation of impacted media; and, restoration of all natural resources damaged as a result of the coal ash release;
> B. a plan for monitoring the air and water in the area during the cleanup process;
> C. a plan to ensure that public and private water supplies are protected from contamination and that alternative water supplies are provided if contamination is detected,
> D. a plan addressing both the short term and long term management of coal ash at the Kingston Plant, including remediation and stabilization of the failed ash waste cells, proper management of the recovered ash, and a revised closure plan for the Class II ash disposal facility; and,
> E. a plan to address any health or safety hazards posed by the ash to workers and the public.
>
> . . .

9

> 7. Upon approval by the Department, the Respondent shall implement the CAP according to the schedule approved by the Department.

[Doc. 11-2 at 8–9].

Pursuant to a written contract with an effective date of February 6, 2009, TVA engaged defendant to provide professional services associated with management of the fly ash recovery project (the "Jacobs/TVA contract") [Doc. 11-1 Ex. A]. The Jacobs/TVA contract identifies as its purpose to provide "for project planning, oversight and environmental services to assist TVA in the Kingston Dredge Cell Incident recovery and remediation" and designates defendant as TVA's "prime contractor providing project planning, management and oversight to assist TVA in overall recovery and remediation associated with this incident" [*Id.* at 2].

The Jacobs/TVA contract divides defendant's scope of work and professional consulting services to TVA into two phases [*Id.*]. The first phase (Phase 1) of the work called for defendant to provide assistance to TVA in (1) developing the CAP ordered by the TDEC, (2) reviewing and providing input on the Phase 1 dredging plan and engineering the Phase 2 dredging plan, (3) defining the project management structure for drainage management and ash recovery, and (4) reviewing TVA's public relations and community relations plans and developing/revising those plans [*Id.*].

On March 2, 2009, TVA, with assistance from defendant, submitted its proposed CAP for the ash spill to TDEC [Doc. 11-2 at 15–87]. TVA's CAP is organized into six sections that set forth the removal and remediation plans for the ash spill [*Id.*]. They

10

include plans for Comprehensive Assessment [*Id.* at 36–56]; Environmental Monitoring During Cleanup [*Id.* at 57–60]; Management of the Coal Ash [*Id.* at 68–77]; and Health and Safety to address any health or safety hazards posed by the ash to workers and the public [*Id.* at 78–84].

The second phase of defendant's scope of work (Phase 2) is set out in Amendment 4 of the Jacobs/TVA contract [*See* Doc. 11-1 at 45–50]. Amendment 4 provides that defendant is to develop and implement a Project Management Plan for TVA that will include all services necessary for execution of the KIF Dredge Cell Incident Recovery Program (the "Program") [*Id.* at 49]. Defendant's scope of work in generalized terms is defined to include all facets of the Program, including project management with TVA oversight, engineering, environmental, community, and construction management services for all work associated with the Program [*Id.*]. Phase 2 also calls for defendant to address within the Program all "monitoring, processing, remediation, removal, hauling, and disposal of fly ash both on and off TVA property" [*Id.*].

TVA contracted with defendant to evaluate the potential hazards to human health and safety associated with the work to be performed in execution of the ash recovery and removal Program and then to "prepar[e] and submit[] for approval by TVA a written site specific safety and health plan at least thirty (30) days prior to the start of the work under the contract" [Doc. 11-1 at 28]. In conformance with its contractual obligations to TVA and as expressly authorized by TVA in the Jacobs/TVA contract, defendant prepared and provided to TVA for review and approval a comprehensive Site Wide Safety and Health

11

Plan ("SWSHP") [Docs. 11-3, 11-4, 11-5]. The SWSHP was approved by the EPA and TVA on June 30, 2009 [*Id.*]. The SWSHP has been revised at least five times since originally published in March 2009 [Case No. 3:13-CV-666 Doc. 17-3 ¶ 7]. Each time the SWSHP has been revised, it has been approved and adopted by TVA and the EPA [*Id.*].

The SWSHP was written to apply to all site general construction activities as well as CERCLA remediation activities in accordance with EPA's *Standard Operating Safety Guide* and 29 C.F.R. § 1910.120 concerning hazardous waste operations and emergency response [*Id.*]. The SWSHP addresses both site safety hazards and worker health hazards and compliance with TVA and OSHA standards as found in 29 C.F.R. Part 1910 [*Id.* ¶ 8]. The SWSHP describes the potential hazards at the site, the health hazard monitoring at the site, and personal protective equipment required for the protection of workers at the site [*Id.*; *see also* Case No. 3:13-CV-666 Docs. 17-4, 17-5, 17-6, 17-7]. The SWSHP also addresses work zones, site control, personal hygiene, medical surveillance, training, hazard communication, and emergency response [*Id.*]. The SWSHP provides the safety and health framework for site-specific plans and health and safety procedures, including job-specific hazard analysis, meetings, logs, reports, and recordkeeping, including the requirement that all site workers require forty-hour initial training and eight-hour annual refresher training, as well as a site specific safety orientation, which outlines site hazards and controls established to mitigate those hazards [*Id.*].

12

The SWSHP also identifies various hazards found on site. Section 4.2.1 of the SWSHP notes that fly ash from coal combustion will be the principal material to be processed and handled during the project [Case No. 3:12-CV-666 Doc. 17-4 at 26]. Regulations for airborne contaminants (respirable dust, total dust, crystalline silica, and metals) and their action levels and permissible site exposure limits were identified and incorporated into the SWSHP [Case No. 3:12-CV-666 Doc. 17-3 ¶ 9]. The OSHA Permissible Exposure Limits ("PEL"), the Tennessee OSHA ("TOSHA") PEL, the NIOSH Recommended Exposure Limits ("REL") and the American Conference of Governmental Industrial Hygienists ("ACGIH") Threshold Limit Values ("TLV") were all evaluated for use at the site [*Id.*]. The PEL is that limit assigned for a constituent by OSHA whether it is federal or state OSHA [*Id.*]. Thus, the PEL is the regulatory limit [*Id.*].

In Revisions 3 of the SWSHP approved and adopted by TVA and the EPA on June 30, 2009 (and each of the SWSHPs approved and adopted by TVA and the EPA thereafter), the site adopted the more conservative of the applicable OSHA or TOSHA PEL as the Occupational Exposure Limit ("OEL"), except in the case of quartz silica where the REL of 0.05mg/m3 was utilized as the site OEL [*Id.*]. This NIOSH REL of 0.05mg/m3 is 1/2 the TOSHA PEL of 0.1mg/m3 [*Id.*]. Table 4-1 of the SWSHP sets forth in more detail the Fly Ash Constituent Information including the constituent's site action level and site exposure limits [*Id.*; Case No. 3:13-CV-666 Doc. 17-4 at 27]. As referenced in Table 4-1 of the SWSHP, in addition to setting Site OELs for fly ash

13

constituents at the more conservative of the PEL standards set by OSHA or TOSHA, defendant set the site action level for fly ash constituents at fifty percent of the applicable PEL [*Id.*].

IH monitoring at the site has been performed by two contract partners to TVA [Case No. 3:13-CV-5666 Doc. 17-3 ¶ 10]. From December 30, 2008, through May of 2010, EnSafe, Inc. ("EnSafe") performed the IH monitoring pursuant to its own IH Monitoring Plan [*Id.*]. From July of 2010 to the present, defendant has performed the IH monitoring utilizing and following the protocols for IH monitoring as set forth in the SWSHP [*Id.*]. Protocols and processes for IH monitoring are set forth in Appendix K of the October 2010 SWSHP (Revision 5) [Case No. 3:13-CV-666 Doc. 17-7]. Defendant's IH monitoring has undergone numerous internal and third-party reviews and is performed in accordance with the Jacobs/TVA contract and the SWSHP [Case No. 3:13-CV-666 Doc. 17-3 ¶ 10].

Appendix K in the October 2010 SWSHP (Revision 5) sets forth the expectations for the ongoing IH monitoring [*Id.* ¶ 14; Case No. 3:13-CV-666 Doc. 17-7]. These expectations and procedures have been followed by defendant's personnel [Case No. 3:13-CV-666 Doc. 17-3 ¶ 14]. IH monitoring is ongoing, and has been since the initial coal ash spill occurred [*Id.*]. According to defendant, data collected to date by EnSafe and defendant, for personnel exposure, consistently show that regulatory standards as set forth in the SWSHP have not been exceeded, and personnel exposure to trace elements in the ash has been below any established action limits as set forth in Table 4-1 of the

SWSHP [*Id.*].  The results of IH monitoring from both EnSafe and defendant indicate the same results [*Id.*].

Section 8.0 and Appendix I of the SWSHP (Revisions 3–6) set forth the site procedures and protocols for site control, work zones, and personal hygiene [Case No. 3:14-CV-20 Doc. 7-5 ¶¶ 17–19].  These procedures include the deployment of hand washing stations, boot cleaning locations and other decontamination activities as warranted to minimize the dispersion of fly ash to personal vehicles, worker residences and support [*Id.*].  Section 8.0 further provides that workers who are exposed to fly ash and dust at levels above the PEL may be expected to wear coveralls and dedicated boots to avoid transferring materials offsite or to their personal vehicles [*Id.*].

In connection with these procedures, the site was divided into zones that delineate the boundaries of the ash spill [*Id.*].  The Exclusion Zones ("EZ") would be where the fly ash was handled, stockpiled, or otherwise actively manipulated [*Id.*].  The Contamination Reduction Zones ("CRZ") would be areas where personnel/equipment cleaning and/or decontamination would take place as you exit the EZ [*Id.*].  The Support Zones would be outside of the EZ and CRZ, and include office areas, equipment storage areas, public roads, or other areas not meeting the definition of an EZ or CRZ [*Id.*].

Pursuant to the the SWSHP, personal protective equipment ("PPE") requirements for site access [Doc. 11-3 at 36–37] include standard work clothing of long pants and shirt with sleeves, steel toe work boots, safety glasses with side shields, hard hat, and high visibility reflective vest [Case No. 3:13-CV-666 Doc. 17-3 ¶ 17].  Gloves are

required for hands on work [*Id.*]. Section 6.0 of the SWSHP describes the methods for selection of PPE on site as well as the risk based process for determining the appropriate PPE that will be protective of the worker without creating a new hazard [*Id.*]. Defendant's safety and management personnel have prescribed the use of respirators for workers within a particular similar exposure group ("SEG") when data from IH sampling for that SEG is elevated and cannot be controlled with engineering controls, work practices, or administrative methods [*Id.* ¶ 18].

## IV.    Preliminary Procedural Issues

While the issue of whether derivative discretionary function immunity applies across the board, the Court must examine some preliminary matters before addressing whether defendant is entitled to that immunity.  They include the motion to strike filed by defendant in *Adkisson* and the motions to amend filed by plaintiffs in *Thompson*.[7]

With respect to the motion to strike, the Court finds it is moot in light of the Court's analysis below, *supra* Section V.   Regarding motions to amend, the Court recognizes that "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).[8]  "The court should freely give leave," however, "when justice so requires."   *Id.*   Leave is appropriate "[i]n the absence of . . . undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

---

[7] Granting a motion to dismiss before addressing a pending motion to amend can be an abuse of discretion.  *Thompson v. Superior Fireplace Co.*, 931 F.2d 372, 374 (6th Cir. 1991).

[8] The Court finds that Federal Rule of Civil Procedure 15(a)(1) has no application here.

16

opposing party by virtue of allowance of the amendment, [or] futility of the amendment."

*Leary v. Daeschner*, 349 F.3d 888, 905 (6th Cir. 2003) (quoting *Foman v. Davis*, 371

U.S. 178, 182 (1962)); *see also Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625,

633 (6th Cir. 2009). "Amendment of a complaint is futile when the proposed amendment

would not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun Cnty.*,

408 F.3d 803, 807 (6th Cir. 2005) (citing *Neighborhood Dev. Corp. v. Advisory Council*

*on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980)).

The Court finds no indication of undue delay, bad faith, dilatory motive, or a

repeated failure to cure deficiencies by amendments previously allowed on the part of the

*Thompson* plaintiffs, and the Court does not find that undue prejudice to defendant will

result from allowing the amendment. Thus, absent futility, granting leave to amend is

appropriate.

In the motions to amend, the *Thompson* plaintiffs seek to add two claims for relief:

TENTH CLAIM FOR RELIEF:

90 (a) Due to defendant's negligent, reckless and intentional failure
to follow the Site Wide Safety and Health Plan ("SWSHP") relative
to toxic substance monitoring of fly ash substances and the duty to
provide appropriate safety equipment such as respirators to plaintiff,
Kevin Thompson, and plaintiff, Shawn Travis Smith, defendant
intentionally, negligently and recklessly thereby exposed the
plaintiffs to toxic levels of contaminants which has caused
permanent injury.

ELEVENTH CLAIM FOR RELIEF:

90 (b) Retaliatory discharge. The plaintiffs were terminated as the
sole cause of their termination or alternatively as a substantially
contributing factor due to their exercise of statutory rights granted

17

pursuant to the Workers' Compensation Act of the State of Tennessee.

90 (c) After reporting Workers' Compensation claims and safety concerns, the plaintiffs were subjected to retaliation and disparaging treatment which resulted in the termination of their employment. For instance, when plaintiffs and other claimants reported that they had concerns regarding work-related low testosterone levels, field manager Duane Rushing, third in command of the Site, reported that he "would take care of the workers' wives if they were unable." The plaintiffs likewise were followed closely when exercising their duties in retaliation for seeking workers' compensation benefits and then were terminated.

[Case No. 3:13-CV-666 Doc. 29]. For reasons discussed later in this memorandum opinion, the Court finds that the tenth claim for relief is futile, *see supra* Section V. And the Court finds the eleventh claim for relief futile because the *Thompson* plaintiffs have not alleged that they were employed by defendant.

To state a claim for workers' compensation retaliation in Tennessee, plaintiffs must plead four elements: (1) they were employed by defendant when injured; (2) they made a claim against defendant for workers' compensation benefits; (3) defendant "terminated [their] employment; and (4) the claim for workers' compensation benefits was a substantial factor in [defendant's] motivation to terminate [their] employment." *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993), *overruled on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010). As alleged in the *Thompson* plaintiffs' complaint, plaintiffs Kevin Thompson and Shaun Smith "worked for other employers at KIF" [Case No. 3:13-CV-666 Doc. 1 ¶¶ 6, 25, 28, 32, and 43]. Accordingly, an essential element of plaintiffs' proposed claim for workers

18

compensation retaliation is absent. For this reason alone, plaintiffs' proposed claim for relief would not survive a motion to dismiss under Rule 12(b)(6).

## V.    Derivative Discretionary Function Immunity Analysis[9]

In *Mays v. Tennessee Valley Authority*, the Court held that while TVA may be liable to plaintiffs in tort through the "sue and be sued" clause of the TVA Act, the discretionary function doctrine insulates TVA from liability if the conduct challenged by a plaintiff is discretionary conduct grounded in considerations of public policy and involves the permissible exercise of policy judgment. 699 F. Supp. 2d at 1004–11, 1016, 1019, 1022. Relevant to this case, the Court also determined that the discretionary function applies to TVA's coal ash removal and remediation conduct following the ash spill. *Id.* at 1022–23. Subsequently, the Court issued a decision in *Chesney v. Tennessee Valley Authority*, in which it applied the derivative sovereign immunity doctrine of *Yearsley v. W. A. Ross Construction Co.*, 309 U.S. 18 (1940), to claims against two professional engineering contractors that provided engineering consultant services and advice to TVA. Defendants urge the Court to find defendant is likewise entitled to the benefit of derivative discretionary function immunity.

---

[9] The Court recognizes that in determining whether discretionary function immunity applies, courts engage in a two-step analysis. The first step involves a determination of "whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997). The second step involves a determination of "whether the conduct is 'of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991)). Given the nature of the allegations, the parties' briefs, and the Court's previous decisions related to the ash spill, the Court unconventionally begins with the second step.

19

For a government contractor to qualify for derivative discretionary function immunity, "the authority to carry out the project [must have been] validly conferred and . . . within the constitutional power of Congress." 782 F. Supp. 2d at 582 (citations omitted). "A government contractor purporting to act on the government's behalf will be held liable, however, when the grounds for liability are that the contractor either exceeded his or her authority or that the authority was not validly conferred." *Id.* To put it another way, "a contractor will qualify for derivative sovereign immunity *only* if the contractor executed the will of the government and did not exceed its authority." *Id.*[10]

None of the allegations of any of the complaints alleges that defendant exceeded any scope of authority granted to it by TVA, nor that any authority TVA granted to defendant was not validly conferred. And there are no allegations that TVA lacked the authority to award the contract to defendant, that defendant deviated from the scope of

---

[10] The Court finds that all of plaintiffs' claims are subject to dismissal if the doctrine of derivative discretionary function immunity applies. It appears that the doctrine applies to all types of state tort-law claims, including those where state law would classify the situation as involving inherently dangerous activities, non-delegable duties, negligence per se, or purposeful conduct, and plaintiffs have not pointed the Court to any contrary authority. *See, e.g., Myslakowski v. United States*, 806 F.2d 94, 97–99 (6th Cir. 1986) (reversing district court judgment against the government in a wrongful death case and holding that the Postal Service's decision to sell vehicles with a dangerous rollover propensity to the public without any warning of the danger was protected by the discretionary function doctrine "whether purposeful or negligent"); *Jackson v. United States*, 77 F. Supp. 2d 709, 714 (D. Md. 1999) ("The Court holds that a FTCA plaintiff must first overcome the discretionary function 'hurdle' before the Court will consider intentional tort claims under § 2680(h)."); *Totten v. United States*, 618 F. Supp. 951, 954 (E.D. Tenn. 1985) (holding that discretionary function exception was applicable to wrongful death of a worker performing cleanup of ultrahazardous material on government premises, even though controlling military regulations were not followed, because, "while this may be evidence of negligence per se, the discretionary function exception . . . protects the United States from liability even when negligence can be proved"), *aff'd*, 806 F.2d 698 (6th Cir. 1986).

20

that contract, or that TVA refused to accept defendant's work.  Under *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196 (5th Cir. 2009), these omissions are problematic for plaintiffs and the Court could dismiss on this basis.

Yet, upon review of evidence in the record, the Court finds that the derivative discretionary function immunity doctrine applies nonetheless.  While plaintiffs frame their allegations against defendant in terms of a negligent, willful, and intentional failure to exercise due care with regard to warning and protecting plaintiffs from exposure to alleged hazardous materials and a negligent, willful, and intentional failure to advocate, implement, or recommend different or "safer" coal ash clean-up and disposal policies and procedures, fly ash sampling, and air and medical monitoring methods, this Court has previously held that "such allegations clearly challenge the policy decisions by TVA that are protected by the discretionary function doctrine." *Chesney*, 782 F. Supp. 2d at 585 (addressing allegations that contractor defendants failed to exercise due care, follow engineering best practices, and advocate or recommend different or "safer" manners of design, redesign, modifications, fixes, and coal ash disposal methods).  Concerning removal and remediation efforts of the ash spill, the Court has stated:

> [T]he Court notes that such activities involve considerations of where and how to remove the coal ash, the specific cleanup methods to be used at certain properties, and the interactions and communications of TVA, the EPA, and TDEC with one another and the surrounding communities regarding removal, remediation, and relief efforts.

*Id.* at 1022 (citations omitted).  Moreover, this Court has recognized that TVA is conducting its post-spill conduct pursuant to CERCLA and the NCP subpart involving

21

hazardous substances. *Id.* (citation omitted). The NCP subpart expressly recognizes that "[a]ctivities by the federal and state governments in implementing this subpart are discretionary governmental functions." *Id.* Thus, because any decisions regarding what rules and procedures would govern the safety of the site workers is a component of TVA's decisions about post-spill remediation activities, the Court finds that derivative discretionary function immunity applies with respect to plaintiff's claims.

Indeed, TVA tasked defendant to perform a specific discretionary function. Among other things, defendant was asked to (1) develop a SWSHP for the benefit of TVA and (2) manage that plan, with TVA oversight, during the post-spill fly ash clean-up, removal, and remediation process. Plaintiffs do not dispute that TVA had the ultimate authority to make final policy determinations concerning the safety plan and the manner in which that plan would be applied to the workers performing the clean-up, remediation, and disposal operation at the KIF plant. And the Court notes the SWSHP, and all revisions thereto, prepared by defendant was approved by both TVA and the EPA before going into effect. Moreover, the SWSHP includes determinations and procedures for handling the fly ash, air monitoring, medical monitoring, training, and the use of PPE, determinations that are the very matters plaintiffs now contest. Thus, it seems, plaintiffs' challenge is essentially a challenge to the plan itself.

In further support of the Court's finding that derivative discretionary function immunity applies here, the Court notes plaintiffs' allegations focus on defendant's response to what they contend was a known hazard to defendant as well as defendant's

22

decisions about whether to warn of dangerous conditions and whether to implement safety policies or measures to protect plaintiffs and other members of the public. When faced with analogous allegations, the Sixth Circuit has applied the discretionary function doctrine to the challenged conduct of the federal agency. In *Rosebush v. United States*, 119 F.3d 438, 443 (6th Cir. 1997), the court held the discretionary function exception precluded claims for serious personal injuries based upon Forest Service decisions about campground operation and management related to having open fire pits, the design of the pits, whether to enclose the pits with railings, and whether to warn of the dangers of such fire pits. *See also Rich v. United States*, 119 F.3d 447, 451 (6th Cir. 1997) (holding that decisions regarding whether and how to make federal lands and facilities safe for visitors are protected by the discretionary function doctrine); *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (holding that decisions concerning the proper response to hazards is a category of decisions protected from tort liability by the discretionary function doctrine). *Accord Sharp v. United States*, 401 F.3d 440, 443–48 (6th Cir. 2005) (holding that the discretionary function exception precluded a wrongful death case based on Forest Service decisions about the operation and management of Huron National Forest relating to hours of operation, lighting conditions, and law enforcement staffing); *Edwards v. Tenn. Valley Auth.*, 255 F.3d 318, 324–25 (6th Cir. 2001) (holding that the discretionary function doctrine precluded a wrongful death case based on TVA's decisions about the operation and management of the Fort Loudoun Hydroelectric reservation related to shoreline maintenance, safety warnings, and hydroelectric

23

generating operations); *Reetz v. United States*, 224 F.3d 794, 797 (6th Cir. 2000) (holding that the discretionary function exception precluded claims for serious personal injuries based on Forest Service decisions about the operation and management of trails and roads in the Manistee National Forest).

Thus, the Court finds that plaintiffs' challenges are of the kind that the discretionary function exception was designed to shield, and pursuant to *Yearsley* and *Chesney*, the immunity that would be afforded to TVA shall extend to defendant. *Accord Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1537–43 (10th Cir. 1992) (holding that discretionary function exception applied to decisions on how to clean up hazardous waste site).

That does not end the inquiry, though. Plaintiffs argue that defendant violated several mandatory directives, thus precluding it from taking advantage of the immunity, including directives set out in regulations, the Jacobs/TVA contract, the SWSHP, and defendant's website.

***Regulations.*** Plaintiffs assert that 29 C.F.R. § 1910.134(a)(2), 29 C.F.R. § 1910.1018, and 29 C.F.R. § 126.103[11] are mandatory regulations incorporated into the Jacobs/TVA contract that allow for no discretion on the part of defendant regarding

---

[11] Plaintiffs cite to 29 C.F.R. § 126.103; however, this regulation does not seem to exist. The correct citation appears to be 29 C.F.R. § 1926.103. That section states that "[t]he requirements applicable to construction work under this section are identical to those set forth at 29 CFR 1910.134 of this chapter." Accordingly, the Court's analysis regarding 29 C.F.R. § 1910.134(a)(2) applies with regard to 29 C.F.R. § 1926.103.

24

respiratory protection for site workers. And according to plaintiffs, defendant failed to provide plaintiffs with respirators as mandated by these provisions.

Section 1910.134(a)(2), which falls within the Occupational Safety and Health Act of 1970 ("OSHA") regulations, provides:

> (2) A respirator shall be provided to each employee when such equipment is necessary to protect the health of such employee. The employer shall provide the respirators which are applicable and suitable for the purpose intended. The employer shall be responsible for the establishment and maintenance of a respiratory protection program, which shall include the requirements outlined in paragraph (c) of this section. The program shall cover each employee required by this section to use a respirator.

29 C.F.R. § 1910.134(a)(2). On its face, this regulation dictates that a respirator shall be provided when a certain event occurs; that is, when a respirator is "necessary to protect the health of [an] employee." *Id.* The Court thus looks to the OSHA regulations to determine whether use of a respirator at the site was necessary.

Looking at Part 1910 of Title 29 of the Code of Federal Regulations, the Court notes that it "contains occupational safety and health standards which have been found to be national consensus standards or established Federal standards." 29 C.F.R. § 1910.1(b).[12] Section 1910.1000 sets forth the PEL for employee exposure to air contaminants, including those fly ash constituents identified by defendant in the SWSHP and by plaintiffs in the complaints. "An employee's exposure to any substance listed in Tables Z-1, Z-2, or Z-3 of [section 1910.1000] shall be limited in accordance with the

---

[12] "Standard" includes that "which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 C.F.R. § 1910.2(f).

requirements of the following paragraphs of [section 1910.1000]." 29 C.F.R. § 1910.1000. In complying with this provision, the regulation directs that "administrative or engineering controls must first be determined and implemented whenever feasible." 29 C.F.R. § 1910.1000(e). The regulation further provides:

> *When such controls are not feasible to achieve full compliance*, protective equipment or any other protective measures shall be used to keep the exposure of employees to air contaminants within the limits prescribed in this section. Any equipment and/or technical measures used for this purpose must be approved for each particular use by a competent industrial hygienist or other technically qualified person. Whenever respirators are used, their use shall comply with 1910.134.

*Id.* (emphasis added).

Section 1910.120, which addresses hazardous waste operations and emergency response, governs the KIF site [*See* Doc. 11-3 at 6]. It provides that "[e]ngineering controls, work practices, personal protective equipment, *or* a combination of these shall be implemented in accordance with [section 1910.120(g)] to protect employees from exposure to hazardous substances and safety and health hazards." 29 C.F.R. § 1910.120(g) (emphasis added). Section 1910.120(g) further provides:

> (1) Engineering controls, work practices and PPE for substances regulated in subparts G and Z.

> (i) Engineering controls and work practices shall be instituted to reduce and maintain employee exposure to or below the permissible exposure limits for substances regulated by 29 CFR part 1910, to the extent required by subpart Z, except to the extent that such controls and practices are not feasible.

> Note to paragraph (g)(1)(i): Engineering controls which may be feasible include the use of pressurized cabs or control booths on

equipment, and/or the use of remotely operated material handling equipment. Work practices which may be feasible are removing all non-essential employees from potential exposure during opening of drums, wetting down dusty operations and locating employees upwind of possible hazards.

(ii) Whenever engineering controls and work practices are not feasible or not required, any reasonable combination of engineering controls, work practices and PPE shall be used to reduce and maintain employee exposures to or below the permissible exposure limits or dose limits for substances regulated by 29 CFR part 1910, subpart Z.

. . .

(2) Engineering controls, work practices, and PPE for substances not regulated in subparts G and Z. An appropriate combination of engineering controls, work practices and personal protective equipment shall be used to reduce and maintain employee exposure to or below published exposure levels for hazardous substances and health hazards not regulated by 29 CFR part 1910, subparts G and Z. The employer may use the published literature and SDS as a guide in making the employer's determination as to what level of protection the employer believes is appropriate for hazardous substances and health hazards for which there is no permissible exposure limit or published exposure limit.

Thus, section 1910.120(g) contemplates using engineering controls and work practices to reduce exposure prior to using PPE.

To the extent an employer elects to use PPE, section 1910.120(g) provides that PPE "shall be selected and used which will protect employees from the hazards and potential hazards they are likely to encounter as identified during the site characterization and analysis." 29 C.F.R. § 1910.120(g)(3). PPE "selection shall be based on an evaluation of the performance characteristics of the PPE relative to the requirements and limitations of the site, the task-specific conditions and duration, and the hazards and

27

potential hazards identified at the site." *Id.* And "[t]he level of protection provided by PPE selection shall be increased when additional information on site conditions indicates that increased protection is necessary to reduce employee exposures below permissible exposure limits and published exposure levels for hazardous substances and health hazards." *Id.* Finally, PPE "shall be selected and used to meet the requirements of 29 CFR part 1910, subpart I, and additional requirements specified in this section." *Id.*

Subpart I to Part 1910 sets forth the general guidelines for PPE, including respirators. Under section 1910.132, employers are to "assess the workplace to determine if hazards are present, or are likely to be present, which necessitate the use of [PPE]." 29 C.F.R. § 1910.132(d). The employer then may "[s]elect and have each affected employee use, the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment." *Id.* Thus, to the extent a hazard is present, the employer is afforded discretion in selecting the types of PPE that will protect employees from the hazard.

With this background in mind, the Court returns to the regulation plaintiffs cite as setting forth a mandatory directive. In full, the portion of the regulation plaintiffs rely upon, which is within Subpart I to Part 1910, provides:

> (a) Permissible practice.
>
> (1) In the control of those occupational diseases caused by breathing air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors, the primary objective shall be to prevent atmospheric contamination. This shall be accomplished as far as feasible by accepted engineering control measures (for example, enclosure or confinement of the operation, general and local

28

ventilation, and substitution of less toxic materials). When effective engineering controls are not feasible, or while they are being instituted, appropriate respirators shall be used pursuant to this section.

(2) A respirator shall be provided to each employee when such equipment is necessary to protect the health of such employee. The employer shall provide the respirators which are applicable and suitable for the purpose intended. The employer shall be responsible for the establishment and maintenance of a respiratory protection program, which shall include the requirements outlined in paragraph (c) of this section. The program shall cover each employee required by this section to use a respirator.

29 C.F.R. § 1910.134(a). Upon review of the entire regulatory scheme, the Court finds that this regulation does not mandate a specific course of conduct (i.e., providing or allowing employees to wear respirators) as plaintiffs argue. Only if "accepted engineering control measures" cannot prevent atmospheric contamination is there a requirement to provide respirators. Here, plaintiffs have not asserted that there were any impermissible exposures that lead to atmospheric contamination, and even if there were, that effective engineering control measures were not feasible to combat the exposure. Indeed, evidence submitted by defendant indicates that exposure levels have been below any established action limits set forth in the SWSHP [Case No. 3:13-CV-666 Doc. 17-3 ¶ 14].

Plaintiffs also assert that defendant violated 29 C.F.R. § 1910.1018. That section relates to inorganic arsenic and provides that "[t]he employer shall assure that no employee is exposed to inorganic arsenic at concentrations greater than 10 micrograms per cubic meter of air (10 μg/m$^3$), averaged over any 8-hour period." 29 C.F.R. §

29

1910.1018(c).  It also sets forth "[m]ethods of compliance," which instruct employers to "institute at the earliest possible time but not later than December 31, 1979, engineering and work practice controls to reduce exposures to or below the permissible exposure limit, except to the extent that the employer can establish that such controls are not feasible." 29 C.F.R. § 1910.1018(g)(1)(i).  And "[w]here engineering and work practice controls are not sufficient to reduce exposures to or below the permissible exposure limit, they shall nonetheless be used to reduce exposures to the lowest levels achievable by these controls and shall be supplemented by the use of respirators in accordance with paragraph (h) of this section and other necessary personal protective equipment."  29 C.F.R. § 1910.1018(g)(1)(ii).  Thus, this section does not prescribe a specific course of conduct regarding use of respirators; rather, only that where engineering and work practice controls are insufficient to reduce exposure to inorganic arsenic are employers required to implement use of respirators, and even then, the use is to comply with 29 C.F.R. § 1910.1018(h).  Plaintiffs have not asserted that there were any impermissible exposures.  Indeed, evidence submitted by defendant indicates that exposure levels have been below any established action limits for inorganic arsenic [Case No. 3:13-CV-666 Doc. 17-3 ¶ 23].

   *Contract/SWSHP/Website Directives.*  Plaintiffs cite to the following provisions of the Jacobs/TVA contract as setting forth mandatory directives:

> (1) TVA believes that Safety and Health is its most important value and all injuries and most illnesses, both on and off the job, are preventable.  TVA is a zero injury culture company and expects its contractors and their subcontractors to be committed to a zero injury

work culture environment and that occupational accidents or other incidents in which human health or safety is jeopardized are never acceptable.

(2) Contractor will be proactive in taking necessary measures to avoid accidents or incidents which human health or safety is jeopardized. Contractor shall not permit any person employed by it or any subcontractors in the performance of work pursuant to this Contract at a project or worksite owned or controlled by TVA to work in surroundings or under working conditions which are unnecessarily dangerous to human safety or health.

[Doc. 11-1 at 30]. Plaintiffs also cite to provisions of the SWSHP, specifically sections 1.4 and 4.2. Section 1.4 provides:

Beyond Zero Performance describes a site approach and establishes expectations for both safety and project execution. We will achieve this level of performance excellence through teamwork and partnering with our client, site contractors and through the participation of every person on this project.

All site personnel are entitled to safe working environment, individually and collectively; we are responsible for our own safety and that of our fellow employees.

We believe the following:

All incidents are preventable through proper planning, tasking, and execution of plans as written.

Any goal less than Zero Incident Performance is unacceptable and sends the message that incidents cannot be prevented.

Active participation by all personnel is required to achieve Beyond Zero Performance. This includes all site personnel working collectively.

If any incident does occur, it must be reported and investigated to identify root causes, take corrective actions, and communicate the lessons learned.

31

Various Beyond Zero initiatives will be developed and rolled out with support and approval of key site management.

[Doc. 11-3 at 8]. And section 4.2 provides:

It should be noted that TVA has the following issues which are considered to be immediately dangerous to life and are "Zero Tolerance". Per the Zero Tolerance policy, violation will result in a 90 day termination for the first offense with more severe disciplinary action for repeat offenses. These are further discussed within this document where applicable and shall be addressed as appropriate for the task on all job safety analyses:

. . .

- Failure to wear required respiratory protection.

[Doc. 31-1]. Finally, plaintiffs cite to defendant's website, which states:

Most companies agree they have an obligation to provide their employees with a safe and secure work environment. They create safety programs, insist on employee training and have occasional meetings.

But at Jacobs, we take safety to the next level.

Our goal is to take safety to BeyondZero® by preventing even one accident from occurring. We put the personal health and safety of our employees first - wherever they are.

For us, safety is more than a policy or a training video; it's how we do business and it's how we live. Our people are our greatest asset and the basis for our success. We believe that we owe it to our employees to help keep them and their families, communities, our clients and our contractors healthy and happy.

When you join Jacobs, you join a culture of caring.

[Doc. 16-1].

32

The Court finds that these asserted directives do not prescribe a specific course of action that had to be followed so as to eliminate the applicability of derivative discretionary immunity. Instead, these asserted directives set forth general objectives or goals for defendant (i.e., a safe working environment) without any specific procedures for defendant to follow to achieve those objectives or goals. Courts across the country have made similar determinations. *See, e.g., Snyder v. United States*, 504 F. Supp. 2d 136, 141–43 (S.D. Miss. 2007), *aff'd* 296 F. App'x 399 (5th Cir. 2008) (finding that regulation that provided that "refuse, in any form, should not be disposed of where it may pollute surface or underground waters which are eventually to be used as drinking water" not a specific directive); *Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d 1194, 1199 (N.D. Cal. 2005) (finding that regulation requiring operator to "[t]ake all immediate steps necessary to protect public health and safety, and the environment" does not mandate a specific course of action but "calls for discretionary judgments as to the immediacy and nature of the risk—i.e. what, if any, 'immediate' steps are 'necessary' to 'protect public health and safety, and the environment'—and, if so, judgments as to the substance and timing of those specific steps"). And regarding specifically section 4.2 of the SWSHP, although plaintiffs assert some of them were prescribed respirators by their physicians, plaintiffs have made no assertion that they were "required" to wear respirators under the terms of the SWSHP or any other binding rule. Indeed, a prescription was not even necessary to wear a respirator on site [*See* Case No. 3:13-CV-666 Doc. 17-3 ¶ 21].

33

Accordingly, for all these reasons, the Court finds that derivative discretionary function immunity applies here. Plaintiffs have not identified a mandatory regulation or policy that allowed for no judgment or choice with respect to the allegations in the complaint and defendant's conduct is of the kind that the discretionary function exception was designed to shield.[13]

## VI. Conclusion

For the reasons explained in this memorandum opinion, the Court finds that derivative discretionary function immunity applies here. Thus, plaintiffs' claims will be **DISMISSED** and the Clerk of Court will be **DIRECTED** to **CLOSE** this consolidated action.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[13] The Court declines to address plaintiff's assertions that defendant created a climate of fear regarding use of respirators; these assertions are not relevant to determining whether defendant is entitled to immunity.