**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| GREG ADKISSON, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 3:13-CV-505-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
| Defendant. | ) | *Lead case consolidated with* |
| | ) | |
| KEVIN THOMPSON, ET AL., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 3:13-CV-666-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
| Defendant. | ) | |
| | ) | *as consolidated with* |
| JOE CUNNINGHAM, et al, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 3:14-CV-20-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
| Defendant. | ) | |
| | ) | |
| BILL ROSE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:15-CV-17-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
| Defendant. | ) | |
| | | |
| CRAIG WILKINSON, ET AL., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No.: 3:15-CV-274-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
| Defendant. | ) | |
| | | |
| ANGIE SHELTON, as wife and next of kin | ) | |
| on behalf of Mike Shelton, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No.: 3:15-CV-420-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
| Defendant. | ) | |
| | | |
| JOHNNY CHURCH, | ) | |
| Plaintiff, | ) | |
| v. | ) | No.: 3:15-CV-460-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
| Defendant. | ) | |

| | |
|---|---|
| DONALD R. VANGUILDER, JR., )<br>Plaintiff, )<br>v. )<br>JACOBS ENGINEERING GROUP, INC., )<br>Defendant. )<br>)<br>JUDY IVENS, as sister and next of kin, )<br>on behalf of JEAN NANCE, deceased, )<br>Plaintiff, )<br>)<br>v. )<br>JACOBS ENGINEERING GROUP, INC., )<br>Defendant. )<br>)<br>PAUL RANDY FARROW, )<br>Plaintiff, )<br>)<br>v. )<br>JACOBS ENGINEERING GROUP, INC., )<br>Defendant. )<br>) | No. 3:15-CV-462-TAV-HBG<br><br><br><br><br><br>No. 3:16-CV-635-TAV-HBG<br><br><br><br><br>No. 3:16-CV-636-TAV-HBG |

---

**MEMORANDUM OF LAW IN SUPPORT OF
JACOBS ENGINEERING GROUP, INC.'S
MOTION TO EXCLUDE EXPERT OPINIONS ON GENERAL CAUSATION**

---

James F. Sanders, No. 005267
J. Isaac Sanders, No. 029372
Marie T. Scott, No. 032771
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, Tennessee 37203

*Attorneys for Defendant
Jacobs Engineering Group, Inc.*

Jefferson C. Orr, No. 12743
S. Joe Welborn, No. 21747
Joshua K. Chesser, No. 27993
SMITH CASHION & ORR, PLC
231 Third Avenue North
Nashville, Tennessee 37201

Date: March 19, 2018

Jacobs submits this Memorandum of Law in Support of its Motion to Exclude Expert Opinions on General Causation.

## INTRODUCTION

Plaintiffs disclosed nine expert witnesses on May 1, 2017. It was readily apparent from the experts' reports that their opinions on general causation were inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and that Plaintiffs had not complied with Fed. R. Civ. P. 26. The Court ordered Plaintiffs to supplement the disclosures, but they failed to comply with that Order. [*See* Doc. 162 ("the June 12 Order").][1] Jacobs disclosed its experts on August 18, 2017, and filed its original Motion for Partial Summary Judgment on General Causation on October 6, 2017. [Doc. 191.] With their Response, Plaintiffs produced supplemental reports for three experts; however, those reports also did not comply with Rule 26 or the June 12 Order, and the opinions disclosed also did not meet the requirements of *Daubert* and Rule 702.

The opinions of Plaintiffs' experts pertaining to general causation should be excluded for several reasons. All of the disclosed opinions pertaining to general causation are speculative, as they are purportedly based upon studies that have not yet been completed. In addition, the opinions at issue have not been adequately explained or properly supported through references or citations to legitimate scientific research, studies, or other materials. Even if the studies Plaintiffs' experts have proposed were completed, they would not provide a proper foundation for the opinions the experts purport to hold, because the methodologies they have proposed (to the extent that they have identified any methodology) are clearly improper. Therefore, the opinions should be excluded under *Daubert* and Rule 702.

---

[1] This Memorandum refers to the docket entries in *Adkisson v. Jacobs Engineering Group Inc.*, Case No. 3:13- CV-505-TAV-HBG.

1

Plaintiffs' experts should also be excluded based upon Plaintiffs' failure to comply with Rule 26 and the June 12 Order. Plaintiffs' experts have failed to set forth with the specificity required by Rule 26(a) the "basis and reasons" for, or the "facts and data" supporting their opinions. The reports do not reference specific exhibits. The reports do not identify any methodology utilized in reaching the opinions disclosed. The reports do not disclose the results of any testing that the experts performed or relied upon. Plaintiffs were given ample warning by the Court that their expert disclosures did not comply with Rule 26, but they failed to correct the deficiencies in their disclosures. [*See* Doc. 162.] The failure to comply with Rule 26 and the June 12 Order was neither harmless nor substantially justified. Therefore, the experts should be excluded. Fed. R. Civ. P. 37 (b)(2)(A)(ii); *see Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004).

## BACKGROUND AND RELEVANT PROCEDURAL HISTORY

Plaintiffs are fifty-two individuals who worked on TVA's fly ash clean-up, removal and recovery project at the Kingston Fossil Plant following the December 22, 2008 ash spill, along with some of their spouses and next of kin. [*See generally* Doc. 59, Am. Compl.] Plaintiffs assert various claims against Jacobs, the construction manager hired by TVA in 2009 to provide project planning, management, and oversight to assist TVA in the overall recovery and remediation of the site. [*See* Doc. 11-1 Ex. A at p. 2.] Plaintiffs filed their original complaints between August 2013 and January 2014. These cases were consolidated on July 10, 2014. [Doc. 35.]

Plaintiffs claim that while working at the site, as a result of Jacobs' conduct: (1) they were "exposed to arsenic, . . . mercury, barium, strontium, thallium, lead, silica-quartz, asbestos, radioactive material, selenium, aluminum oxide, iron oxide, calcium oxide, boron and other hazardous substances associated with the toxic fly ash[;]" and (2) that as a result of that exposure

they "suffered personal injuries [including] pulmonary injuries, [] leukemia, sinus injuries, skin problems, [and] other personal injuries . . . ." [Doc. 59, ¶¶ 48, 89.] Plaintiffs assert several causes of action against Jacobs: (1) negligence, (2) negligence per se, (3) reckless failure to communicate and warn, (4) reckless/intentional infliction of emotional distress, (5) fraud, (6) misrepresentation/ fraudulent concealment, (7) strict liability, and (8) assault/battery. [*See id.*, at 18-33.]

On January 30, 2017, the Court ordered that the trial in these consolidated cases would be bifurcated. [Doc. 136, at 7.] The Court ordered that Phase I would "involve issues and evidence relating to: (1) whether defendant owed plaintiffs a legal duty; (2) whether defendant breached that duty; and (3) whether defendant's breach was capable of causing plaintiffs' alleged injuries." [*Id.*] The Phase I trial was originally scheduled to begin on January 29, 2018. [Doc. 138.]

The Court set May 1, 2017 as the deadline for Plaintiffs to identify and disclose experts pursuant to Fed. R. Civ. P. 26(a)(2). [*Id.*] On that date, Plaintiffs disclosed nine expert witnesses, but produced reports for only six of them: Dr. William J. Rea, Dr. John W. Ellis, Roy D. Hudgens, Collen Landaiche, Bobby Williams, and Frances A. Draughon, Ph.D. Plaintiffs did not produce expert reports for Dr. Paul Terry, Dr. Rajiv Dhand or Dr. John Hill. [*See* Doc. 162.]

On May 18, 2017, the Court held a discovery conference, during which Jacobs averred that the expert reports of Dr. Rea and Dr. Ellis were insufficient and that written reports from Dr. Terry and Dr. Dhand were required. [*See* Doc. 162, at 2-3, 5-14.] The Court ordered Plaintiffs to supplement the reports of Dr. Rea and Dr. Ellis on or before July 14, 2017. [*Id.* at 15.] The Court ordered that "[t]he reports must include an explained basis for the conclusions reach[ed], the facts or data considered, including any test results and findings from '[r]eliable physical and toxicological examinations,' and exhibits that will be used." [*Id.*] The Court also ordered that

"[t]o the extent that Dr. Terry and Dr. Dhand will be called as witnesses at trial, a written report must be provided . . . ." [*Id.*] Jacobs' expert deadline was extended to August 18, 2017. [*Id.*]

On July 14, 2017, notwithstanding the direction and warnings given by the Court, Plaintiffs supplemented their disclosures to provide some but not all of the information addressed in the June 12 Order. Instead, Plaintiffs produced: (a) progress notes, hair testing results, antigen/intradermal testing results, urine test results, and a report from Dr. Rea indicating he reached a diagnosis of "toxic encephalopathy," based upon his encounters with just three Plaintiffs; (b) a two page signed statement from Dr. Terry that did little more than reiterate the assertions in his original disclosure; and; (c) a report from a previously unidentified individual, Dr. Cole, concerning property values. Plaintiffs did not provide a report for Dr. Dhand, and withdrew Dr. Ellis as an expert.

Jacobs disclosed its experts on August 18, 2017. Plaintiffs did not serve any rebuttal expert reports. Jacobs filed its original Motion for Partial Summary Judgment on October 6, 2017. [Doc. 191, 192.] The expert disclosure and fact discovery deadlines expired on October 13, 2017. [*See* Doc. 57, 86, 122, 138, 162.] Plaintiffs submitted their Response to Jacobs' Motion on October 27, 2017. [Doc. 205.] Plaintiffs attached to that Response supplemental disclosures for Dr. Terry and Mr. Williams, and a declaration from Mr. Hudgens. [Doc. 205-06, 205-07, 205-08.]

Shortly after Jacobs filed its prior summary judgment motion, Plaintiffs also moved to continue the trial, and requested that the Court reopen all discovery, including expert discovery. [*See* Doc. 200.] The Court granted that motion, in part, on November 9, 2017, and ordered that the trial would be continued to April 16, 2018. [Doc. 215.] In its Order, the Court denied, without prejudice, Jacobs' Motion for Partial Summary Judgment on General Causation. [*Id.*] The Court did not, however, set any new deadlines for fact discovery or the disclosure of experts. [*See* Doc.

215, 230, at 5.] On November 29, 2017, the Court again reset the trial date, to September 17, 2018, after Plaintiffs informed the Court that there had been a fire at their office.[2] [Doc. 220.]

Plaintiffs subsequently indicated that they wished to disclose additional experts, even though their expert disclosure deadline had already expired. At the Court's direction, the parties submitted briefs addressing that request. [*See* Doc. 223, 230, 233, 234.] In their Report, Plaintiffs identified three entirely new experts who purportedly intended to introduce both a new epidemiological study and a new theory as to general causation. The Court denied Plaintiffs' request to introduce those new experts and new opinions. [Doc. 235.]

Jacobs filed its Renewed Motion for Partial Summary Judgment on General Causation on March 9, 2018. [Doc. 237.] In that Motion, Jacobs substantively addressed Plaintiffs' expert proof on general causation, and moved to exclude Plaintiffs' experts under *Daubert* and Rule 702, and based upon Plaintiffs' failure to comply with Rule 26 and the June 12 Order. [*See id*.] On March 13, 2018, the Court directed Jacobs to file a separate motion addressing its request to exclude Plaintiffs' expert proof. [Doc. 239.] Jacobs has filed the instant motion pursuant to that Order.

## EXPERT OPINIONS AT ISSUE

### I. OPINIONS OF PLAINTIFFS' EXPERTS

#### A. Dr. Paul Terry

Plaintiffs produced a two-page report for Dr. Terry on July 14, 2017 [Doc. 0237-01], and attached his supplemental report to their Response to Jacobs' prior summary judgment motion. [Doc. 205-06.] In his original report, Dr. Terry stated that he would testify as to statistical data, odds ratios, and "an unusually high occurrence of diseases found in the remediation workers that

---

[2] The Court also again reset the dispositive motion deadline. [*See id*. at 3]

include leukemia, skin problems, lung cancer, other cancers, low testosterone, sinus, heart, pulmonary, breathing problems, neurological, and intestinal problems, including an environmental association of other health conditions and the statistical odds of these conditions caused, aggravated or contributed by fly ash exposure." [Doc. 0237-01, at 1.] He stated that he had compared his data with the "population as a whole or a control group of similar workers who were not exposed to fly ash." *Id.* That report did not describe the type of study conducted, or his methodology. [*See id.*, at 1-2.]

In his supplemental report, Dr. Terry provides limited additional information about a planned but incomplete study. [Doc. 205-06, at 1.] He claims that he will "estimate the association between exposure and disease" using a "[r]etrospective observational/cohort study." [*Id.* at 1-2.] Participants were selected "based on exposure to fugitive dust at the KIF facility," and "detailed . . . questionnaires" were administered to each. [*Id.*] He does not describe how the control group was selected. [*Id.*] Dr. Terry states, without further explanation, that "[a]t this point in time, the data suggests that the alleged injuries of the plaintiffs being caused by extended exposure to fly ash is biologically plausible because exposed workers have higher occurrences of several diseases and health conditions compared with the general population and our control group." [*Id.*]

Dr. Terry has not produced <u>any</u> of the data pertaining to his study, or <u>any</u> of the questionnaires that were purportedly filled out by the individuals involved. He has not identified <u>any</u> of the health conditions that he claims are more commonly found in his test group. It appears that Dr. Terry has not conducted a dose-response analysis for any Plaintiff, and that he has not personally examined any Plaintiff. [*See id.*; *see also* Doc. 237-08, Hoel Dec., Report, at 4; 8; and 9.] He has not explained how he reached his conclusion regarding biological plausibility. [*Id.*]

## B.    Roy D. Hudgens

Mr. Hudgens states that he has a master's degree in chemistry.   [Doc. 0237-02, Hudgens Report.]  His only opinion in that report that appears to address general causation is that "repeated exposure causes serious health problems in long weekly shifts."  [*Id*. at 1.]  In his Declaration, he provides additional opinions criticizing Jacobs' efforts to monitor workers' exposure to fly ash at Kingston.  [Doc. 205-07, at 1-3.]  Mr. Hudgens also states that he had fly ash "from the area known as the ball field at KIF tested by means of x-ray fluorescence, electron microscope/SEM imaging, and laser particle size analyzer analyzed for the elemental composition as well as particulate size." [*Id*. at 1.]  He states that "results from said testing were that approximately 10% were less than 3 microns in size making some of the ash very inert particulate matter."  [*Id*.]  He states, purportedly based upon his "training and years of experience[, that] it is dangerous to inhale particles of this size because they stay in your lungs and body."  [*Id*.]  He opines that "these particles even when not toxic are known in the scientific community to cause inflammation, lung problems, negative immune response and disease."  [*Id*. at 1-2.]  He states that "these particles presented an excessive danger to human health because based upon the MSD data and Jacobs [sic] reference to the hazardous toxins contained in the ash along with its radioactivity created a situation where the hazardous nature of the particulate was enhanced by its own constituents."  [*Id*. at 2.]

Mr. Hudgens states that he will, at some point, identify "authoritative scientific literature" and "data results" that support his opinions, but he has not yet done so.  [*Id*.]  He has not produced any documents relating to his purported study of the fly ash from Kingston, including any chain of custody or any data relating to the study.[3]  He does not identify any methodology he used.  [*Id*.]

---

[3] Jacobs has repeatedly requested the opportunity to inspect the fly ash that Mr. Hudgens purportedly examined, but has not yet been given the opportunity to do so.

7

He has not attempted to quantify any particular individual's level of exposure to any substance. [*Id*.]  He does not offer any explanation as to biological plausibility.  [*Id*.]  He does not suggest that he has any education or experience relevant to the diagnosis of any health condition.  [*Id*.]

## C.  Bobby Williams

Mr. Williams states that he has a degree in nuclear engineering.  [Doc. 237-03, Williams Report, at 1.]  In his original report, he states that he will opine on eleven general topics including, among others: (1) hazardous evaluation of chemicals, metals, elements, particulates, and toxins; (2) heavy metal combination toxicity; and (3) hazardous constituent containment.  [*Id*. at 3.]  He also states that he will testify that the environment at Kingston was hazardous to human health. [*Id*.]  In his supplemental disclosure, Mr. Williams adds "radioactivity" to the prior list of general topics.  [Doc. 205-08, at 1.]  Mr. Williams further states, based upon his understanding of the environment and the work performed at Kingston, that there was "a situation where more nondischargeable PM 2.5 particulate matter is stored in the lungs." [*Id*. at 2.]  He offers criticisms of alleged failures by Jacobs to properly assess and monitor the risks associated with exposure, as well as failures to properly educate workers regarding the risks of such exposures.  [*Id*.]  Mr. Williams concludes that the air monitoring data for the site is unreliable.  [*Id*. at 2.]  Mr. Williams also concludes, based entirely upon his review of "pictures of the site with visible foggy airborne fly ash," that "fly ash on those instances was beyond PEL's [sic]." [*Id*. at 1, 3.]

Mr. Williams does not attempt to quantify Plaintiffs' levels of exposure, and does not address biological plausibility.  [*See id*.]  Mr. Williams has not described the reasoning behind any opinion.  [*See id*.]  He purports to base his opinions on his education, experience, and materials provided in discovery, but has not specifically identified any of the facts, data, research, testing or documents upon which he relies.  [*See id*.; Doc. 237-03, at 1.]

8

**D. Dr. William J. Rea**

Dr. Rea states that he is a physician. [Doc. 237-04, (original) Rea Report, at 1-4).] He purports to have examined three individuals who worked at the Kingston site. [*Id*. at 1.] He states that he "will opine on the link between fly ash exposure and the correlation and effects of MDS." [*Id*. at 1.] He states that he "will testify that fly ash constituents are toxic and, in certain instances, carcinogenic." [*Id*. at 2.] He states that he will opine about personal protective equipment. [*Id*.] His supplemental disclosure references a diagnosis of "toxic encephalopathy," even though no Plaintiff alleges such a diagnosis or condition. [*See* Doc. 199.]

Dr. Rea has not produced any data or information demonstrating the nature or extent of the Plaintiffs' actual exposure to the potentially toxic constituents in fly ash. [*See* Doc. 237-04.] He does not explain how the constituents become unbound or dissolved from the ash, or how those constituents could be absorbed by the body. [*See id*.] He provides no evaluation of dose or a dose-response relationship for any of the Plaintiffs, and has not conducted any testing relevant to that issue. [*See id*.] He does not suggest that he has conducted a differential diagnosis of any Plaintiff. [*See id*.] He has not specifically identified any literature that addresses Plaintiffs' injuries. [*See id*.] He has not yet addressed the purported link between fly ash exposure and the effects of MDS. [*See id*.] He has not disclosed any methodology that he utilized in reaching his opinions. [*See id*.]

**E. Frances A. Draughon, Ph.D.**

Dr. Draughon, who has a degree in Food Science, states that she will opine as to the constituents found in fly ash. [Doc. 237-05, Draughon Report.] She states that "respirable particles should not be inhaled or ingested." [*Id*. at 1.] She also states that fly ash can cause cancer and "the same types of health problems" alleged in this case. [*Id*.] Dr. Draughon has not disclosed

the reasoning behind any of her opinions. [*See id.* at 1-2.] She has not identified the facts, data, testing, or literature she considered, or any methodology she used. [*See id.*]

## F. Colleen Landaiche

Ms. Landaiche holds a degree in aerospace engineering. [Doc. 237-06, Landaiche Report.] None of her opinions appear to relate to general causation. [*See id.*]

## II. RELEVANT OPINIONS OF JACOBS' EXPERTS

Jacobs disclosed five expert reports. On the issue of general causation, Jacobs' disclosed the reports of Scott D. Phillips, MD, FACP, FACMT, FAACT and David G. Hoel, Ph.D.

## A. Scott D. Phillips, MD, FACP, FACMT, FAACT

Dr. Phillips is board certified in internal medicine and medical toxicology, and is licensed in Colorado and Washington. [Doc. 237-07, Phillips Dec., Report, at 2.] Dr. Phillips opines that in order to offer a "scientifically defensible conclusion," Plaintiffs must follow a valid procedure:

> Appraisal of adverse toxicological risk probability requires knowledge of (1) the chemicals that posed intrinsic hazard(s), and (2) the dose or concentration to which an individual is exposed, and (3) illness caused by absorbed dose that is demonstrated in the medical literature. Moreover, for all individuals, other reasonable causes of claimed health effect(s) must be ruled out before chemical causation can definitively be ruled in.

[*Id.* at 8.] Dr. Phillips explains that the process of ruling out other reasonable causes of claimed injuries before ruling in causation by a particular chemical is known as "differential diagnosis." [*Id.* at 14.] "[A]lternative causes for a diagnosis must [also] be considered." [*Id.*] Then, the Bradford Hill criteria must be used to evaluate the data. [*Id.* at 16-17.][4]

---

[4] The Bradford-Hill Criteria are: (1) strength of association; (2) consistency of the association; (3) specificity of association; (4) temporality of the association; (5) biological gradient observed; (6) biologic plausibility; (7) coherence; (8) experimental or intervention effect; and (9) analogy. *Id.*

10

## B.    David G. Hoel, Ph.D.

Dr. Hoel received a Ph.D. from the University of North Carolina, and completed a post-doctoral fellowship in preventive medicine at Stanford University.  [Doc 237-08, Hoel Dec., Report, at 1.]  Dr. Hoel opines that there are several types of valid epidemiological studies that can be used to analyze causation.  [*Id.* at 4.]  In a cohort study, "a defined group of individuals is followed over time and their health outcomes are analyzed."  [*Id.* at 4.]  "The exposures of interest, as well as known or other possible risk factors are determined at the beginning and throughout the study."  [*Id.*]  There are also case control studies, in which "cases of the disease are identified in the population and a group of non-diseased individuals are chosen which closely match the cases by age and gender."  [*Id.*]  In addition, there are ecological studies, in which "[r]ates of disease, as well as exposures are calculated at the group or population level.  These prevalence levels are compared among different geographic areas or different time periods."  [*Id.*]  An epidemiological study is used to "compare the incidence of disease among various groups of individuals . . . [and] provide[] knowledge about both what the risk factors for a disease are, and quantitatively how great a risk the risk factors are."  [*Id.* at 3.]  Dr. Hoel also opines that in considering causation, generally, the Bradford Hill criteria are used to evaluate the data and determine if a "particular exposure is truly a risk factor or causative agent for the disease . . . ."  [*Id.* at 4.]

## RELEVANT LEGAL STANDARDS

## I.    *Daubert* and Fed. R. Evid. 702

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony

11

is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The Supreme Court has held that "[Rule] 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony. . . is not only relevant, but reliable.'" *Kuhmo*, 526 U.S. at 147 (citing *Daubert,* 509 U.S at 589). The Court explained that "as a matter of language, [Rule 702] applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope." *Id*. (citing Fed. R. Evid. 702). Under Rule 702, "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id*. (citing *Daubert*, 509 U.S. at 592). The Sixth Circuit has further held that under *Daubert*:

> [F]actors that a district court should consider when evaluating the scientific validity of expert testimony [include]: the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community.

*Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000).

"The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (*citing Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The expert must bring to the courtroom something more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. He must have independent verification of his opinions in the form of research, hard data, publications, testing, or other validation, done either by himself or others. *Id*. A court may conclude that there is "simply too great an analytical gap between the data and the opinion proffered[]" when the expert testimony is supported only by the conclusion of the expert. *Nelson v. Tenn. Gas Pipeline Co*., 243 F.3d 244,

247 (W.D. Tenn. 1998). Experts are not permitted to speculate, and an expert's failure to test his hypotheses in a reliable manner, or to validate his hypotheses by reference to scientific principles, renders his testimony unreliable. *Tamraz*, 620 F.3d at 671, 675.

## II. Fed. R. Civ. P. 26(a)(2)(B)(ii) and 37(c)(1)

Federal Rule of Civil Procedure 26(a)(2)(B) requires that a report from a retained or specially employed expert witness <u>must</u> contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B).

These requirements are strictly enforced, and failure to comply warrants exclusion of the expert under Rule 37(c)(1). As the Sixth Circuit has explained, "[t]he exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Dickenson*, 388 F.3d at 983; *see Sexton v. Uniroyal Chem. Co.,* 62 F. App'x 615, 620 (6th Cir. 2003) (Rule 26(a)(2)(B)'s requirements constitute a "mandate" for a "complete statement of all opinions to be expressed and the basis and reasons therefor . . . ."); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 905, 908, (N.D. Ohio, 2008), *aff'd*, 606 F.3d 262 (6th Cir. 2010) ("[Rule] 37(c)(1) requires absolute compliance with Rule 26(a)."); *Roberts ex rel. Johnson v. Galen of Virginia, Inc.,* 325 F.3d 776, 782 (6th Cir. 2003) (citation omitted) ("[Rule] 37(c)(1) 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.' ").

13

To determine whether a failure was substantially justified or harmless, the Sixth Circuit looks to five factors: (1) the surprise to the other party; (2) the other party's ability to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose. *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). The court has also explained that "[t]he advisory committee's note to Rule 37(c) 'strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'" *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (citation omitted). "The burden is on the potentially sanctioned party to prove harmlessness." *Jelsma v. Knox Cty., Tennessee*, 2017 WL 2589340, at *7 (E.D. Tenn. June 14, 2017) (citing *Hunt v. Hadden*, 127 F. Supp. 3d 780, 789 (E.D. Mich. 2015)).

## ARGUMENT

### I. THE OPINIONS OF PLAINTIFFS' EXPERTS ON GENERAL CAUSATION SHOULD BE EXCLUDED UNDER *DAUBERT* AND RULE 702.

#### A. Dr. Paul Terry

1. Dr. Terry's opinions should be excluded because they are purely speculative.

Even if the epidemiology study Dr. Terry has proposed would otherwise provide a proper foundation for his opinions,[5] his conclusions "[a]t this point in time" are inadmissible because they are not in final form, or to a reasonable degree of scientific certainty. [Doc. 205-06, at 2.] Dr. Terry readily admits that he has not completed his study, and a review of his report reveals that all of his opinions are preliminary. [Doc. 205-06, at 1-3.] For example, Dr. Terry states that "I anticipate that my findings will support what we already know from studying particulates including

---

[5] Dr. Terry's proposed study would not be a valid epidemiological study for several reasons, as further discussed *infra*, Section I (A)(2).

14

those from the burning of coal, coal by products [sic], and coal derivatives." [*Id.* at 4 (emphasis added).] He then states: "I also <u>anticipate</u> finding a correlation of disease to the toxic constituents but again my research is incomplete at the time of this report." [*Id.* (emphasis added).] Dr. Terry purports to opine on general causation, stating that "worker exposure to the ash more likely than not resulted in disease" based entirely upon what he "<u>anticipates</u>" his study will show. [*Id.* at 2, 4 (emphasis added).]

Dr. Terry also purports to hold several opinions regarding Plaintiffs' alleged "immunological/inflammatory response[s]." [*Id.*] Setting aside the fact that he has never actually examined any Plaintiff, these opinions are also speculative. Specifically, Dr. Terry states that "[b]ased on the evidence available it is <u>reasonable to be concerned</u> that these workers are suffering from an immunological response . . . ." [*Id.* (emphasis added).] He further opines that "[t]alc, asbestos, and soot are all analogous to fly ash in the exposure mechanism of injury"; however, that opinion is entirely rooted in his belief that his study "will support what we already know. . . ." [*Id.* at 4.] None of these opinions even approach the level of certainty required to be admissible.

On this basis, alone, the Court should conclude that Dr. Terry's testimony pertaining to his proposed study would be inadmissible under *Daubert* and Rule 702.

2. <u>Even if Dr. Terry were permitted to complete his proposed study, his opinions on general causation would still be inadmissible.</u>

It is apparent that the study that Dr. Terry proposes would not yield scientifically valid results, and that any opinions based upon that study would be inadmissible. Among other issues, Dr. Terry's proposed methodology is clearly improper, and his Supplemental Report is riddled with unsupported (and erroneous) assumptions and conclusions.

First, and perhaps most troubling, it is clear from Dr. Terry's report that he has prejudged the outcome of his study. Dr. Terry has already offered opinions on general causation even though

15

he acknowledges that the data needed to properly support such conclusions is not yet available. In offering these preliminary conclusions before completing his study, Dr. Terry has revealed a bias that renders the entire process unreliable. This is particularly relevant given that the potential for bias is an inherent problem with the type of epidemiological study Dr. Terry purportedly intends to conduct. [*See* Doc. 205-08, Hoel Dec., Report, at 4.]

The second basic problem with Dr. Terry's proposed study is that it appears he has selected inappropriate "exposed" (test) and control groups. For the exposed group, in order to determine the incidence of the diseases at issue in the population of workers who were exposed to fly ash at Kingston, Dr. Terry should have started with all of the people who worked at Kingston during the relevant period, and either considered the health conditions of everyone in that group or a randomized sample of that population. Instead, it appears Dr. Terry has chosen a group that is entirely comprised of Plaintiffs or other "injured workers" (who are presumably at least considering lawsuits against Jacobs). [*See* Doc. 205-06, at 2-4 (relying upon "statements of plaintiffs" and referencing "injuries of the plaintiffs"); Doc. 201, at 8 (referring to "100 new questionnaires from injured workers").] Of course, choosing a subset of workers who have already indicated that they have the medical conditions at issue in this case virtually guarantees that his study will reveal a higher incidence of such diseases in the test/study group than in any control group he could find. Moreover, it appears that Dr. Terry has also chosen an inappropriate control group; rather than a group of individuals in a similar age group who perform similar types of work who were not exposed to fly ash, Dr. Terry has simply chosen "persons who have not been exposed to fly ash." [Doc. 205-06, at 1.] Dr. Terry does not provide any other information regarding how he selected the control group, so it is impossible to know what other limitations and variables he would need to account for in order to appropriately analyze causation. [*See id*.]

Third, Dr. Terry's study improperly assumes, absent any evidence, that: (1) the substances at issue are capable of causing the health problems alleged, regardless of exposure levels; and (2) that Plaintiffs were, in fact, exposed to such substances at levels that could have caused the health issues alleged. Dr. Terry does not identify any evidence that Plaintiffs were actually exposed to toxic levels of any constituent of fly ash.[6] Rather, in an effort to avoid that glaring gap in Plaintiffs' proof, Dr. Terry opines that it does not matter whether the fly ash at Kingston was actually toxic. Specifically, Dr. Terry states that "the fly ash does not need to have <u>any concentration of toxins or toxicity</u> in order to cause disease in the human body." [*Id*. at 3 (emphasis added).] He maintains that it was the size of the particles, rather than their toxic nature, that caused the Plaintiffs' alleged harm. He then broadly states that "[a] considerable number of studies and case reports strongly suggest that fly ash, with its constituents, particulate size and <u>regardless</u> of toxicity, is capable of causing the injuries [at issue]," and that there is a "growing body of evidence that exposure to even <u>inert</u> particulates that persist in the human body are capable of producing immunological/ inflammatory response capable of causing disease." [*Id*. (emphasis added).]

Dr. Terry has not provided any support for these opinions, because there is none. He has not performed any type of testing or examination establishing that any particulates have "persist[ed]" in these Plaintiffs. [*See id*.] He has not attempted to quantify any Plaintiff's level of exposure to these particulates. [*See id*.] He did not perform a differential diagnosis of any Plaintiff, did not account for background risk based on any Plaintiff's health and lifestyle, and did not

---

[6] Dr. Terry tacitly acknowledges the lack of proof on this issue in his Supplemental Report. [*See* Doc. 205-06, at 4 ("I also anticipate finding a correlation of disease to the toxic constituents [of fly ash] but again my research is incomplete at the time of this report.").]

consider the Bradford Hill criteria. [*See* Doc. 237-07, Ex. G, Phillips Dec., Report, at 6.][7]; *see Seaman*, 326 F. App'x at 727; *Knight*, 482 F.3d at 352-53; *In re TVA Ash Spill Litig.*, 805 F. Supp. 2d at 482; Fed. Jud. Center, *Ref. Manual on Scientific Evid.* 507; *Amorgianos v. National R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2nd Cir. 2002) (testimony on general causation meets *Daubert's* "fit" requirement only if it establishes that (1) exposure to the substance at issue, (2) in the dose to which the plaintiff was exposed, (3) for the duration in which plaintiff was exposed, (4) can cause the particular health condition(s) alleged.); *Rose,* 2009 WL 902311, at *13-14 (finding an "unsurmountable methodology problem," where the expert "discusse[d] the importance of demonstrating a dose-response relationship, but stop[ped] far short of establishing any kind of dose-response relationship . . . .").

While Dr. Terry refers to studies and case reports that allegedly support his opinions, he has identified only three articles. [Doc. 205-06, at 3-4.] The first two relate to talcum powder, and the third addresses a study linking scrotal cancer to exposure to coal byproducts. [*See id.*] Those articles have no ascertainable relevance here. Dr. Terry certainly has not provided enough information to support a conclusion that studies addressing talcum powder and scrotal cancer prove that exposure to fly ash could have caused the particular injuries these Plaintiffs have alleged. Rather, he has improperly (and incorrectly) assumed, based upon his very limited (and indirect) review of studies addressing <u>other substances and other injuries</u>, that exposure to fly ash and/or its constituents was capable of causing the injuries at issue in this case.

---

[7] Other "fatal flaws" in Dr. Terry's report include: "no consideration of exposure, no indication of a specific toxin, no differential diagnosis or alternative etiology assessment, [and] no discussion of dose or dose-response as it pertains to the measurement of chemicals of potential concern (COPCs)." [*Id.*]

Dr. Terry also improperly assumes biological plausibility. On that issue, Dr. Terry states, absent any support, that he believes his causation opinions to be biologically plausible because the Plaintiffs have higher incidences of "several diseases and health conditions compared to the general population and our control group." [*Id.* at 2] He does not explain how the constituents of fly ash might have become unbound from the fly ash, or provide any other explanation as to how these substances became bioavailable. [*Id.*] Rather, Dr. Terry improperly suggests that if his inherently flawed study shows a higher incidence of illness in his exposure group than in other populations, the issue of biological plausibility can simply be assumed.

Finally, it is impossible to test the validity of any of Dr. Terry's opinions, because he has not produced any of the data upon which he purportedly relies. Notably, none of the "questionnaires" purportedly completed by the Plaintiffs for use in Dr. Terry's study have been produced. The questionnaires were identified in his initial report, which was produced on May 1, 2017. Since that date, Jacobs has repeatedly requested that Plaintiffs produce them. The issue was addressed at the Discovery Conference on May 18, 2017, and again on August 15, 2017. Plaintiffs' counsel indicated, by email, that the questionnaires would be produced on October 31, 2017. To date, Plaintiffs have still not produced <u>any</u> of these materials. As a result, Dr. Terry's opinions cannot be examined by this Court, Jacobs, or any other expert.

In sum, Dr. Terry's proposed methodology is clearly improper, and his conclusions are not supported by valid data or appropriate scientific literature, studies, or other authorities. Therefore, Dr. Terry's opinions should be excluded under *Daubert* and Rule 702. *See Kumho Tire Co.*, 526 U.S. at 147 (citing *Daubert,* 509 U.S. at 589); *Seaman*, 326 F. App'x at 727; *Knight*, 482 F.3d at 352-53; *In re TVA Ash Spill Litig.*, 805 F. Supp. 2d at 482; Fed. Jud. Center, *Ref. Manual on Scientific Evid.* 507; *Rose,* 2009 WL 902311, at *13-14; *Amorgianos*, 137 F. Supp. 2d at 163.

19

## B. Roy Hudgens

Mr. Hudgens's opinions on general causation should be excluded for similar reasons. First, he is clearly not qualified to offer any of the opinions he has disclosed regarding the alleged health effects of exposure to certain sizes of particulates. [Doc. 205-07, at 1.] Mr. Hudgens, who has a degree in chemistry, does not have any type of medical background or any other experience that would render him qualified to offer any opinions on the health effects of exposure to fly ash. [*Id.*] Insofar as his report discloses his qualifications, he is no more qualified to render such scientific/medical opinions than the proverbial "man on the street."

Mr. Hudgens has also failed to adequately support his opinions. He has not specifically identified <u>any</u> data, studies, or research that he relied upon in reaching his conclusions. [*See id.*] While Mr. Hudgens purportedly conducted some analysis of fly ash that allegedly came from the ballfield at Kingston, he has not produced any documents or data pertaining to that study.[8] To date, he has not conducted any study to determine the health effects of exposure to fly ash. [*See id.*] Mr. Hudgens has not provided any explanation as to how he arrived at his opinion that the "the hazardous nature of the particulates was enhanced by its own constituents" (which is not supported by any valid science). [*See id.*] Like Dr. Terry, his opinions regarding the alleged health effects of fly ash exposure appear to be largely based upon what he purportedly anticipates future testing will show. [*See id.*] And like Dr. Terry's proposed study, Plaintiffs have not provided any additional information, documents, or data pertaining to Mr. Hudgens' proposed study since his Supplemental Report was provided over four months ago.

In sum, Mr. Hudgens is not qualified to render the speculative opinions he has disclosed pertaining to general causation, and it is impossible to test any of his opinions because he has failed

---

[8] Jacobs requested the opportunity to inspect the fly ash that Mr. Hudgens purportedly examined, but has not yet been given the opportunity to do so.

20

to provide any of the data, research, or other materials he relied upon in reaching them. Therefore, his testimony on general causation should also be excluded under *Daubert* and Rule 702. *See Kumho Tire Co.*, 526 U.S. at 147 (citing *Daubert,* 509 U.S. at 589); *Seaman*, 326 F. App'x at 727; *Knight*, 482 F.3d at 352-53; *In re TVA Ash Spill Litig.*, 805 F. Supp. 2d at 482; *Rose,* 2009 WL 902311, at *13-14; *Amorgianos*, 137 F. Supp. 2d at 163.

C.     **Bobby Williams, Dr. William J. Rea, and Dr. Frances A. Draughon**

The opinions of Plaintiffs' remaining experts addressing general causation should also be excluded. None of the remaining experts identified or described any discernible methodology. [Doc. 205-07, Ex. G*,* Phillips Dec., Report, at 6, 26-27; *see* Doc. 205-03, 205-04, 205-05.] Nor do they claim to have performed a differential diagnosis, accounted for the background risk based on Plaintiffs' health and lifestyles, or considered the Bradford Hill criteria. [*See id*.] They have not provided explanations for their opinions, and have not cited to valid scientific research, studies, or other materials in support of those opinions. [*See id*.]

Dr. Rea, in particular, improperly engages in dose speculation in offering opinions connecting exposure to fly ash at Kingston and the injuries alleged. [Doc. 205-07, Ex. G, Phillips Dec., Report, at 18, 21.] And while he claims to have performed some type of evaluation of three of the Plaintiffs, his purported diagnosis of "toxic encephalopathy" does not match the conditions alleged by any Plaintiff, and is not supported by any data, study, or relevant literature. [*See* Doc 205-04; Doc. 199; *see generally* Doc. 59, ¶ 89.] And he does not explain how that alleged condition is capable of causing the particular health issues that Plaintiffs have alleged. [*See id*.]

For all of these reasons, the opinions of Mr. Williams, Dr. Rea, and Dr. Draughon also do not meet the requirements of *Daubert* and Rule 702, and should be excluded. *See Kumho Tire Co.*, 526 U.S. at 147 (citing *Daubert,* 509 U.S. at 589); *Seaman*, 326 F. App'x at 727; *Knight*, 482

F.3d at 352-53; *In re TVA Ash Spill Litig.*, 805 F. Supp. 2d at 482; Fed. Jud. Center, *Ref. Manual on Scientific Evid.* 507; *Rose,* 2009 WL 902311, at *13-14; *Amorgianos*, 137 F. Supp. 2d at 163.

## II.     PLAINTIFFS' EXPERTS SHOULD ALSO BE EXCLUDED BASED UPON PLAINTIFFS' FAILURE TO COMPLY WITH RULE 26 AND THIS COURT'S ORDERS.

As the Court explained in its June 12 Order, following the May 18 discovery conference:

> Rule 26(a)(2)(B) requires a report to "be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *R.C. Olmstead, Inc.*[, 606 F.3d at 271] (quoting *Salgado* [*v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)]).  In other words, the "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Id.*

[Doc. 162, at 11.]

Plaintiffs failed to comply with Rule 26(a)(2)(B)(ii) and that Order.  In the interest of brevity, and to avoid repeating the obvious, Jacobs will not attempt to address every deficiency in these expert reports here.  However, in addition to the fact that Plaintiffs provided the current versions of three of their experts' reports months after Plaintiffs' expert disclosure deadline, even a brief review of the reports reveals that they have still not provided the information required.  In particular, Plaintiffs' experts have not: (1) described any basis or reasoning for the opinions reached; (2) disclosed the specific facts or data considered in forming their opinions; or (3) disclosed the exhibits they will use at trial to support their opinions.  [*See* Doc. 205-03, 205-04, 205-05.]  Plaintiffs were given ample warning by the Court that their reports did not comply with Rule 26, but failed to correct these obvious deficiencies.  [*See id*; Doc. 162.]

The failure to comply with Rule 26 and the Court's Order was neither harmless nor substantially justified.  Plaintiffs have not offered any explanation at all regarding their failure to produce reports that complied with Rule 26, or any of the data associated with their experts'

purported studies. Nor can there be any contention that Plaintiffs' failure to comply with Rule 26 was harmless, as there is no basis for concluding that the failure to correct these deficiencies was an "honest mistake." *See Sommer*, 317 F.3d at 692. Additionally, as stated, the opinions at issue cannot be reasonably examined or tested by this Court, Jacobs, or other experts, without the information that Plaintiffs have failed to provide. *Id.*

Under these circumstances, Plaintiffs' experts should be excluded. Fed. R. Civ. P. 37 (b)(2)(A)(ii) and (c)(1); *see also, e.g., Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 878 (S.D. Ohio 2010), *aff'd sub nom. Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509 (6th Cir. 2013) (holding that where the expert's reports only "vaguely indicate[d] his causation opinions and fail[ed] to clearly set forth the basis for his opinions," the "omission is almost *per se* prejudicial," and warrants exclusion); *Neal v. Fort*, 2017 WL 395006, at *4 (M.D. Tenn. Jan. 30, 2017) (citing *Salgado*, 150 F.3d at 741 n.6) (finding that the expert's report did not comply with Rule 26(a) because it failed to provide the "how and why" of his opinions, and excluding the report because there had been no showing that the violation was substantially justified or harmless); *Hardison v. Lois Wagstrom, MD. P.C.*, 2014 WL 7139997, at *6 (M.D. Tenn. Dec. 12, 2014) (excluding expert based upon failure to cure deficiencies in reports).[9]

---

[9] *Hardison* is analogous to the present case. There, the court concluded that the expert's disclosure did not comply with the expert disclosure requirements of Rule 26(a)(2)(B) because, among other issues, the plaintiffs' expert did not identify any exhibits, and did not clearly identify his opinions. 2014 WL 7139997, a *6. The court found that "even after being placed on notice, the plaintiff <u>still</u> has not made a disclosure that complies with Rule 26(a)(2)(B), and the plaintiff has never requested an extension from the court to correct his manifest non-compliance with Rule 26 or the CMO." *Id*. at *7 (emphasis in original). "These are not minor technical defects in a Rule 26 disclosure; they are failures to comply with court deadlines and essential expert disclosure requirements." *Id*. "In light of these considerations," the court held "that the plaintiff ha[d] not shown that the error was an 'honest mistake,'" and found that sanctions were appropriate. *Id*. The court also noted that the plaintiffs' "continuing non-compliance also justifie[d] exclusion of [the expert]." *Id*.

## CONCLUSION

For all of these reasons, the Court should exclude the opinions of Plaintiffs experts that purport to address the issue of general causation.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By: /s/ James F. Sanders

       James F. Sanders     No. 005267
       jsanders@nealharwell.com
       J. Isaac Sanders     No. 029372
       isanders@nealharwell.com
       Marie T. Scott     No. 032771
       mscott@nealharwell.com
1201 Demonbreun Street, Suite 1000
Nashville, Tennessee  37203
Telephone:  (615) 244-1713
Facsimile:  (615) 726-0573

**SMITH CASHION & ORR, PLC**
Jefferson C. Orr     (No. 12743)
jorr@smithcashion.com
S. Joe Welborn     (No. 21747)
jwelborn@smithcashion.com
Joshua K. Chesser     (No. 27993)
jchesser@smithcashion.com
231 Third Avenue North
Nashville, Tennessee  37201
Telephone:  (615) 742-8555
Facsimile:  (615) 742-8556

*Attorneys for Defendant*
*Jacobs Engineering Group, Inc.*

24

## CERTIFICATE OF SERVICE

I hereby certify that on this the 19th day of March, 2018, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

  /s/  James F. Sanders     
