# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

GREG ADKISSON, et al.,      )
      Plaintiffs,      )
v.      )    No.:  3:13-CV-505-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
      Defendant.      )
_____)   *Lead case consolidated with*

KEVIN THOMPSON, et al.,    )
      Plaintiffs,      )
v.      )    No.:  3:13-CV-666-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
      Defendant.      )
_____)   *as consolidated with*

JOE CUNNINGHAM, et al.,    )
      Plaintiffs,      )
v.      )    No.:  3:14-CV-20-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
      Defendant.      )
      )

BILL ROSE,      )
      Plaintiff,      )
v.      )    No.:  3:15-CV-17-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
      Defendant.      )
_____)

CRAIG WILKINSON, et al.,    )
      Plaintiffs,      )
v.      )    No.:  3:15-CV-274-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
      Defendant.      )
_____)

ANGIE SHELTON, as wife and next of kin )
on behalf of Mike Shelton, et al.,  )
      Plaintiffs,      )
v.      )    No.:  3:15-CV-420-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
      Defendant.      )
_____)

JOHNNY CHURCH,                          )
        Plaintiff,                          )
v.                                      )     No.:   3:15-CV-460-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
        Defendant.                          )
_____)
DONALD R. VANGUILDER, JR.,              )
        Plaintiff,                          )
v.                                      )     No.:   3:15-CV-462-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
        Defendant.                          )
_____)
JUDY IVENS, as sister and next of kin,  )
on behalf of JEAN NANCE, deceased,      )
        Plaintiff,                          )
v.                                      )     No.:   3:16-CV-635-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
        Defendant.                          )
_____)
PAUL RANDY FARROW,                      )
        Plaintiff,                          )
v.                                      )     No.:   3:16-CV-636-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
        Defendant.                          )
_____)

## <u>MEMORANDUM OPINION & ORDER</u>

A chess game between grandmasters Friedrich Sämisch and Aron Nimzowitsch, played in Copenhagen in 1923, is called the "Immortal Zugzwang Game." Zugzwang, a German word roughly translated as "compulsion to move," refers to a situation in chess where a player's obligation to move results in a serious and often decisive disadvantage, because each possible move puts the player in a worse position than the one occupied at the beginning of the turn.[1]

---

[1] Edward Winter, *Zugwang* (1997), http://www.chesshistory.com/winter/extra/zugzwang.html.

Defendant Jacobs Engineering Group (Jacobs) now argues, after a four-week Phase I jury trial, that it must receive a new one or else Phase II will eventually turn into exactly the kind of lose-lose situation epitomized by zugzwang. Jacobs's argument goes like this: either the Phase II juries reexamine the negligence of its conduct in violation of its Seventh Amendment rights, or else any potential judgment against Jacobs will be deficient as a matter of law for not establishing the required link between any plaintiffs' purported disease-causing exposure and Jacobs's negligent conduct. But Jacobs's Seventh Amendment reexamination concerns are overstated and avoidable by carefully structuring Phase II, and its speculation about what plaintiffs will have failed to prove after an eventual Phase II is premature. For these and other reasons Jacobs's motion for a new trial will be denied [Doc. 439].[2] Because Jacobs's other arguments—pertaining to its motion for judgment as a matter of law—are similarly unavailing, that motion will also be denied [Doc. 437].

## I.    Background

These consolidated cases are before the Court on Jacobs's two post-trial motions: one for judgment as a matter of law [Docs. 437, 438], and one for a new trial [Docs. 439, 440]. Plaintiffs have responded to each [Docs. 450 (JMOL), 451 (new trial)], and Jacobs has replied [Docs. 455 (new trial), 456 (JMOL)].

---

[2] All citations refer to the docket of *Adkisson et al. v. Jacobs Engineering Group, Inc.,* 3:13-cv-505-TAV-HBG.

The facts of these cases are well-known, but some brief background is warranted here. Jacobs was hired by the Tennessee Valley Authority (TVA) to manage cleanup and remediation efforts at the Kingston Fossil Fuel Plant following the December 2008 coal-ash spill. TVA and Jacobs entered into a contract, according to which Jacobs developed a comprehensive Site Wide Safety and Health Plan (SWSHP) governing the site. The plaintiffs here are individuals who worked on the remediation efforts, plus some of their spouses. The workers suffer from a variety of medical conditions, which they claim were caused by Jacobs's negligence with respect to air monitoring, dust control, the use of personal protective equipment, and worker training, all in violation of Jacobs's contract with TVA and the SWSHP.

In 2014 this Court dismissed plaintiffs' claims for lack of subject-matter jurisdiction, holding that, due to its contractual relationship with TVA, Jacobs was entitled to derivative immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). The Sixth Circuit reversed, holding that *Yearsley* immunity is not jurisdictional, and remanded with the following instruction about the scope of discretionary-function immunity (which informs the scope of *Yearsly* immunity):

> The district court, in holding that the discretionary-function exception applied, found that various regulations, contractual provisions, and the SWSHP all failed to prescribe a specific course of action that Jacobs had to follow. But just because certain conduct fails to be specifically mandated does not necessarily mean that the government contractor is protected from liability. Discretionary conduct may fall outside the protection of the discretionary-function exception if the conduct is not a "deliberate or necessary result of a discretionary general policy"; in other words, government conduct "does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy

4

provided the opportunity for the negligent act." *Bultema v. United States,* 359 F.3d 379, 383–85 (6th Cir. 2004) (holding that the prison staff's alleged failure to carry out the prison's bunk-pass-notification policy was not protected by the discretionary-function exception because, even if the policy allowed for discretion, the staff's alleged negligence was "not a necessary concomitant of the prison's notification policy").

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 648–49 (6th Cir. 2015).

On remand, this Court denied Jacobs's motion to dismiss, which was converted to one for summary judgment [Doc. 137]. The Court held that "there is a material question of fact as to whether Jacobs acted within the scope of its authority when performing the alleged acts that give rise to plaintiffs' claims," and explained as follows:

Namely, there is evidence in the record that defendants would be acting contrary to the will of the government if it: (1) did not randomly select workers for mobile monitoring; (2) manipulated the monitoring results; (3) did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash; (4) did not honor prescriptions for dust masks or respirators; (5) communicated to workers that fly ash was safe to consume; and/or (6) threatened workers when they asked for dust masks or respirators.

[Doc. 137].

While the parties were litigating Jacobs's immunity this Court also granted Jacobs's motion to bifurcate the trial proceedings into two phases:

**Phase I** will be a consolidated trial for all cases and will involve issues and evidence relating to: (1) whether defendant owed plaintiffs a legal duty; (2) whether defendant breached that duty; and (3) whether defendant's breach was capable of causing plaintiffs' alleged injuries.

**Phase II** will involve issues and evidence relating to: (1) specific causation with respect to individual plaintiffs; (2) each plaintiff's alleged injuries; and (3) the extent to which individual plaintiffs are entitled to damages.

[Doc. 136]. The cases thus proceeded through discovery and made their way to trial.

Some time later Jacobs moved for summary judgment, this time on the issue of general causation. The Court denied that motion, too, mostly agreeing with plaintiffs' definition of general causation. The Court held, for Phase I purposes, that "it is enough for plaintiffs to show that the amount of toxic constituents generally present in the fly ash at the Kingston site was capable of causing the complained-of diseases," that plaintiffs "have done more than enough to demonstrate exposure sufficient to overcome summary judgment on general causation," and that there was a factual dispute about whether "the chemical constituents found in the Kingston fly ash are capable of causing most of the complained-of diseases" [Doc. 307].

The cases proceeded to trial on Phase I. During those four weeks, the jury heard evidence that, among other things, employees of Jacobs:[3]

- Manipulated monitoring results by watering down stationary monitors and taking readings only when wet or raining [Doc. 412, Tr. Vol II at 156:18–157:1][4];
- Tampered with personal dust monitors by "tapping out" the contents [Doc. 411, Tr. Vol I at 95:13–24]];
- Failed to provide decontamination stations for workers [Doc. 411, Tr. Vol I at 77:2];
- Did not allow workers to wear dust masks, threatening to fire those who did [Doc. 413, Tr. Vol. III at 391:9–15; 450:20–24; 459:11–23], taking dust masks away from employees who wore them [Doc. 414, Tr. Vol. IV at 561:23–24], and destroying dust masks that were available on the site [Doc 411, Tr. Vol. I at 85:7-13; 87:4–88:9];
- Did not warn workers about the dangers of exposure to fly ash [Doc. 411, Tr. Vol. 1 at 70:20–71:18; 72:3–16; 73:2–8; 74:13–15; Doc. 412, Tr. Vol. 2 151:4–152:5; 154:1–155:22; 189:5–19];

---

[3] The posture of this case requires that the court view evidence in favor of the plaintiffs. *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991).

[4] Citations to the trial transcript use the pagination running consecutively through all volumes.

- Told workers that fly ash was safe to consume [Doc. 414, Tr. Vol IV at 701:11–702:22], which is not true [Tr. Vol. VIII at 1958:22–1960:9].

Also presented was testimony and evidence about the large amount of fly ash—even airborne clouds of it—present at the site [*e.g.*, Tr. Vol. III at 328:21-25; Pls. Exs. 334, 337, 328, 327]. And plaintiffs' expert witness, epidemiologist Dr. Paul Terry, testified that fly ash exposure is capable of causing the diseases from which plaintiffs claim to suffer [Doc. 421, Tr. Vol. 421, at 1482–1631].

Toward the end of the trial, Jacobs filed four written motions for judgment as a matter of law arguing that: (1) plaintiffs failed to prove breaches of professional standards of care [Doc. 388]; (2) plaintiffs failed to prove duty, breach, and causation [Doc. 389]; (3) plaintiffs failed to prove misrepresentations and reliance [Doc. 390]; and (4) plaintiffs failed to prove specific theories of negligence [Doc. 391]. At the close of proof Jacobs also orally moved for judgment as a matter of law on three additional grounds: plaintiffs' (1) failure to prove each plaintiff worked at the Kingston ash cleanup site; (2) failure to present evidence showing which plaintiff is claiming which medical condition; and (3) failure to establish plaintiff's spouses' claims for "take-home" ash exposure. [Doc. 420, Tr. Vol. XII at 2743–46]. The Court denied each of these motions for various reasons (except for the ones about misrepresentation and take-home exposure, which were granted as unopposed) [Doc. 406; Doc. 424, Tr. Vol. XIV at 2893–2913].

The Court then ruled on several matters relating to the jury instructions and verdict form. Earlier on, the parties had proposed radically different verdict forms. Plaintiffs asked the Court to give the jury a simple, two-question verdict form that did little more

than ask whether plaintiffs had met their burden to show that Jacobs had breached a duty, which was capable of causing plaintiffs' conditions. Jacobs's version was substantially more complex: spanning fourteen pages and twenty questions (several with multiple subsections), it asked the jury whether Jacobs breached its duty to plaintiffs with respect to air monitoring, dust control, the use of personal protective equipment, or worker training and education, and it then asked whether *each particular type of breach* was capable of causing each of the conditions from which plaintiffs claim to suffer. The disagreement was pointed: Jacobs argued that if the verdict form did not specify what conduct constituted a breach, subsequent Phase II juries would "be invited to reweigh [] and consider all ten [of plaintiffs' theories of breach]," which would effectively make Jacobs "strictly liable for the consequences of anything the plaintiffs claim we did wrong in this case," even though the jury "may have found in Jacobs' favor on nine of the ten [theories of breach]" [Doc.422]; plaintiffs argued that, due to its complexity, Jacobs's version risked confusing and misleading the jury and would have no impact on the proof in Phase II proceedings because "you can't tease out which [breach of] duty caused which exposure" [*Id.*].

After hearing argument on the competing proposals, the Court submitted to the jury a verdict form that asked: (1) whether Jacobs violated its contract with TVA; (2) whether Jacobs failed to exercise reasonable care in carrying out the duties owed to plaintiffs; and (3) whether that breach was capable of causing each of ten medical conditions [Doc. 408]. The jury answered "yes" to all and returned a verdict for plaintiffs [*Id.*].

Which brings this case to the present. Shortly after trial plaintiffs filed a motion for reference to mediation, which Jacobs opposed in part due to the pending dispositive post-trial motions currently being considered. The Court granted plaintiffs' motion at a January 11, 2019, status conference and memorialized that ruling in a January 18, 2019, order [Doc. 459]. The parties were given thirty days to select a mediator (or mediators), and the Court took the instant motions under advisement. In a joint motion recently granted by the magistrate judge [Doc. 461], the parties stated that "they have been earnestly working together to identify a mediator or mediators they can agree upon and believe that with additional time they will be able to do so" [Doc. 460]. Because the post-trial motions will be denied, the parties can now engage in that and other parts of the mediation process unencumbered by looming post-trial litigation.

## II.     Motion for a New Trial

A jury's verdict cannot be set aside unless the trial court is left with a definite and firm conviction that a mistake resulting in plain injustice has been committed or the verdict is contrary to all reason. *McCurdy v. Montgomery Cty., Ohio*, 240 F.3d 512, 517 (6th Cir. 2001). A prejudicial error of law can require a new trial. *See* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2805 (3d ed. 2012). The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *Clarksville–Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991).

As an initial matter, plaintiffs are correct that trial courts have vast discretion with respect to the form and contents of jury instructions and verdict forms. *See, e.g.*, *Pivnick v. White, Getgey & Meyer Co.*, 552 F.3d 479, 488 (6th Cir. 2009) ("[I]nquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion."); *Jarrett v. Epperly*, 896 F.2d 1013, 1020–21 (6th Cir. 1990) ("[Defendants] object to the form of the verdict submitted to the jury. They argue that it was error to use a general verdict form, rather than a special verdict in the form of interrogatories. However, the form of jury verdict is within the discretion of the trial judge, and is not ordinarily reviewable."). Jacobs's problem here, however, is not with the jury instructions and verdict form per se, but rather is that those items combined with the bifurcated trial plan will inevitably lead to a Seventh Amendment violation. And, of course, this Court (like all others) has no discretion to violate the Seventh Amendment.

Jacobs's argument is twofold. A new trial must be granted, so it goes, or else one of two things will happen: either the Phase II juries will reexamine what conduct by Jacobs constituted a breach of duty, or else plaintiffs will have failed to show—in either phase—that their disease-causing fly-ash exposures were attributable to Jacobs's negligent conduct, as opposed to its non-negligent conduct (or even to serendipity).

To the first argument, the Reexamination Clause of the Seventh Amendment is not, and likely will not be, violated in this case. The clause provides that "no fact tried by a jury[] shall be otherwise re-examined in any Court of the United States, than according to

the rules of the common law." U.S. Const. amend. VII.  There is clearly no Reexamination

Clause violation right now, because, even on Jacobs's theory, one would occur only after

a Phase II jury reconsidered a factual finding of the Phase I jury.

There is Sixth Circuit precedent for not deciding this issue until the Seventh

Amendment violation has, or at least clearly will, occur.  In *Martin v. Behr Dayton Thermal*

*Prod. LLC,* 896 F.3d 405 (6th Cir. 2018), defendant argued on appeal that the district

court's class-certification decision, which "mentioned the possibility of using a Special

Master to resolve the individualized issues remaining after the certified issues have been

resolved by a jury," violated the Reexamination Clause.  *Id.* at 416.  The Sixth Circuit

rejected the argument, noting that, "[a]t this stage, the district court has not formalized any

procedures for resolving either the common issues or the remaining individualized

inquiries," and that "because the district court has not settled on a specific procedure, no

constitutional infirmities exist at this time."  *Id.* at 417.  So too here: although this trial has

been bifurcated, nearly all of the nuts-and-bolts, logistical issues pertaining to Phase II have

yet to be decided.  Constitutionally infirm reexamination is thus by no means a certain

consequence of the bifurcated proceedings in this case.

That said, the Court is confident that Phases I and II are sufficiently distinct that no

reexamination will occur in the future, either.  The bifurcation order makes plain what

issues fall within each phase:  Phase I addressed "(1) whether defendant owed plaintiffs a

legal duty; (2) whether defendant breached that duty; and (3) whether defendant's breach

was capable of causing plaintiffs' alleged injuries," and Phase II will address : "(1) specific

causation with respect to individual plaintiffs; (2) each plaintiff's alleged injuries; and (3) the extent to which individual plaintiffs are entitled to damages" [Doc. 136]. The Phase II jury will be instructed that the verdict of the Phase I jury—that Jacobs breached duties owed to plaintiffs, resulting in exposure that was capable of the alleged diseases—is binding. Put differently, Phase I dealt with Jacobs's conduct, and Phase II will deal with the effects of that conduct on individual plaintiffs. The task for the Phase II jury, then, will be determining whether an individual plaintiffs' exposure actually did cause the plaintiffs' disease, and if so, the resulting damages, which does not overlap with any Phase I issues.

This is true regardless of whether there might be some evidentiary overlap between Phase I and subsequent Phase II trials:

> The existence of common factual issues is to be distinguished from the existence of overlapping evidence. For purposes of the Seventh Amendment, the question is whether factual issues overlap, thus requiring one trier-of-fact to decide a disputed issue that must be decided by a subsequent jury, not whether the two fact-finders will merely have to consider similar evidence.

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 423 n.21 (5th Cir. 1998). The Sixth Circuit has noted on more than one occasion that "if done properly, bifurcation will not raise any constitutional issues," *Martin*, 896 F.3d at 417 (quoting *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 n.6 (6th Cir. 2004)), and "[l]eading class action treatises agree," *id.* (citing 2 Newberg on Class Actions § 4:92 (5th ed. 2010)). Thoughtful Phase II jury instructions and evidentiary rulings will likely prevent a Seventh Amendment violation from ever occurring. And if, after all of that, Jacobs still contends that a violation has occurred, it

will more appropriately be analyzed on a fully developed record rather than the product of before-the-fact speculation.

Jacobs cites two main cases to the contrary but each is readily distinguishable. In *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999), a prison-litigation case under § 1983, the Second Circuit reversed the judgment of the district court following a classwide plaintiffs' verdict for liability and two individual plaintiffs' verdicts on damages. As "an alternative ground for reversal," the court concluded that "[t]he bifurcation ordered by the district court allowed the damages juries to reexamine issues decided by the liability jury and thereby violated the Seventh Amendment." *Id.* at 268. The Phase I jury there, which decided liability, was charged with determining whether certain acts constituted "reprisals," and the Phase II jury was also asked to "judg[e] whether any particular act was a reprisal." *Id.* at 269. According to the Second Circuit, "This of course created the real possibility—amounting to a probability—that acts found to be 'reprisals' by the liability jury were different from the acts found to be 'reprisals' by the damages juries." *Id.*

The situation here is far different, though. Unlike in *Blyden*, where the two juries were tasked with determining literally the exact same factual issue—whether certain acts counted as reprisals—here there is no fatal factual overlap between the issues tried in Phase I (duty, breach, and general causation) and those to be tried in Phase II (specific causation, injuries, and damages). Moreover, the Phase II jury instructions in *Blyden*, which made clear that the juries considered the same issue, were crucial to court's analysis there. *Id.* But the Phase II juries here (which, unlike in *Blyden*, have not been impaneled) will not be

instructed to determine what of Jacobs's conduct constituted a breach of its duties to plaintiffs, as Jacobs appears to suggest. Instead, proof in Phase II will consist primarily of medical evidence concerning individual plaintiffs' exposures and diagnoses, not Jacobs's conduct.[5] Thus, contrary to *Blyden*, where, after the district court's having gone through both phases of bifurcation, the Second Circuit could say that the procedure "clearly violated the Seventh Amendment," here it is far from clear that a constitutional violation will ever occur. *Blyden* therefore does not compel a new trial.

The circumstances of *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), the other case on which Jacobs heavily relies, are different enough from those here to make that case practically inapposite. There the district court partially certified a nationwide class of plaintiffs who alleged that they had become infected with HIV as a result of using a drug manufactured by the defendant. *Id.* at 1296. The district court planned to try the issue of the defendant's negligence to one jury, which was somehow to be instructed on the "merged" negligence standards of all fifty states and the District of Columbia. *Id.* at 1300. That verdict would then, via collateral estoppel, bind state and federal courts across the country, where individual class-member plaintiffs would file suit. *Id.* at 1297. Problems abounded: the Seventh Circuit's concerns with the district court's trial plan included, among others, the defendants' having "to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even

---

[5] Moreover, even proof of Jacobs's conduct would not violate the Reexamination Clause, so long as the Phase II jury was not charged with "decid[ing] a disputed issue" already decided in Phase I. *See Allison*, 151 F.3d at 423 n.21 (quoted at length *supra*).

if they have no legal liability," with the jury charged with "a legal standard that does not actually exist anywhere in the world," especially when "preliminary indications [were] that the defendants [were] not liable." *Id.* at 1299. But the main problem, as far as the Reexamination Clause is concerned, was that each subsequent jury, in addition to damages, was also to try the issues of comparative negligence and proximate causation, which, as a matter of basic tort law, "overlap the issue of the defendants' negligence" determined by the first jury. *Id.* at 1303. Because, as explained above, there will be no issue overlap vis-à-vis the juries in this case, the Seventh Amendment analysis of *Rhone-Poulenc* is of limited relevance here.

That leaves Jacobs's second argument, which is that "Plaintiffs cannot possibly satisfy" their Phase II burden of "showing their exposures and illnesses and showing that acts or omissions by Defendant actually did cause those illnesses," without "telling the jury what Jacobs did that was allegedly negligent" [Doc. 455]. In other words, because "the essence of tort liability" is "a finding that the defendant is to blame for the plaintiff's harm," so Jacobs argues, and because the Phase I verdict form will leave subsequent Phase II juries "in the dark" about what of Jacobs's conduct was negligent, without proof of negligence in Phase II, plaintiffs will have failed to establish the requisite "link" between Jacobs's negligent conduct (Phase I) and plaintiffs' injury-causing exposures (Phase II). *Id.* Put one more way, Jacobs argues that because the "initial jury verdict form is so vague . . . that subsequent juries must determine for themselves factual issues already adjudicated, the

combination of the bifurcation procedure and the deficient verdict form clearly violates the Seventh Amendment" (internal quotations omitted). *Id.*

Jacobs's concerns do not equate to a Reexamination Clause problem. According to Jacobs, the Phase II juries, "to make their own findings . . . will be forced to decide again: How did Jacobs breach the contract or violate the Safety and Health Plan? How did Jacobs fail to exercise reasonable care? And which act was capable of causing those ten medical conditions?" [Doc. 440]. But this is not correct. As stated above, the Phase II juries will not be charged with making any of those determinations, so strictly speaking, no factual finding of the Phase I jury will be reexamined by any other jury. And just because the possibility remains that a second or subsequent Phase II jury could potentially *find specific causation and damages for* exposures attributable to conduct for which the Phase I jury did not find negligence, does not necessarily mean that Jacobs *will be held liable for* said non-negligent conduct. This is because, of course, specific causation and damages do not equate to liability, but are merely part of defendant's liability (recall that the other parts were decided in plaintiffs' favor in Phase I). So, even assuming that there could be some (implicit) inconsistency between verdicts—a Phase II jury's finding specific causation and damages for conduct not found negligent by the Phase I jury—the Reexamination Clause would not be violated because the Phase I and Phase II issues do not overlap at all.[6]

---

[6] If it were not for the Reexamination Clause, this would not even be an issue because Phase II juries could simply reconsider the negligence of Jacobs's conduct. But just because, in this limited sense, the Reexamination Clause creates this conundrum, does not mean that the Reexamination Clause will be violated. It will not.

If, after a hypothetical Phase II, defendant still thinks it has been held liable for conduct that the Phase I jury did not find negligent and moves for relief on that basis, the inconsistency between verdicts will need to be reconciled. The parties have not cited, and the Court has not found, any cases addressing the issue that would then be presented: implied inconsistency—but not outright conflict—between two jury verdicts in a bifurcated case. When the verdict of a single jury, in an ordinary case, is inconsistent, the rule is straightforward: courts are "constitutionally required under the Seventh Amendment to adopt a view of the case that makes the jury's answers consistent," *Hiltgen v. Sumrall*, 47 F.3d 695, 701 (5th Cir. 1995) (citing *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963)), which means that, "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way," *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962). The Court sees no reason to follow a different rule here. Thus, rather than dooming the Phase I verdict, right now the Seventh Amendment appears to suggest exactly the opposite: that any speculative, implicit inconsistency between the Phase I verdict and any hypothetical Phase II plaintiffs' verdict be resolved in favor of effectuating liability where a reasonable juror could have so found. This competing Seventh Amendment interest—giving effect to the Phase I plaintiffs' verdict—weighs in favor of not granting a new trial now and thus proceeding to Phase II.

In this way, Jacobs's stated concern can also be viewed as a failure-of-proof or sufficiency-of-the-evidence argument with respect to this disputed aspect of its tort

liability: the so-called "link" between the negligent conduct of Jacobs and plaintiffs' disease-causing exposures to fly ash.  And the standard governing such an argument is familiar: relief is granted where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." Fed. R. Civ. P. 50(a)(1).  Moreover, in Tennessee, a general verdict like the one returned in Phase I, even if there is lack of material evidence to support one or more claims, "is nevertheless held to embrace every issue," so long as the record contains material evidence supporting at least one of the claims.  Tenn. Code Ann. §§ 20-9-502 & 20-9-503; *Adkins v. Ford Motor Co.*, 446 F.2d 1105, 1108 (6th Cir. 1971).  How these two standards apply —particularly in the context of this complex, bifurcated case that is (at most) halfway finished—is unclear.  But the Court does not think it fruitful to, through speculation, consider these standards with a less-than-complete evidentiary record; rather, they are best considered if at all, on a full record after entry of judgment.

Jacobs's hypothetical, which supposedly "illustrate[s] the error in Plaintiffs' reasoning" [Doc. 455], s unavailing.  Highlighting the cases of plaintiffs Brewer, who was allowed to wear a dust mask while working, and Wilkinson, whose preexisting medical conditions prevented him from wearing a dust mask or respirator while working, Jacobs contends that proceeding to Phase II risks its being held (essentially) strictly liable for any and all fly-ash exposure at the Kingston site.  According to Jacobs:

> [F]or all we know, the Phase I jury decided that the only theory it believed was that Jacobs "failed to comply with the provisions of the safety and health plan with respect to the voluntary use of dust masks" (Theory #3). [Doc. 424, 14 Trial Tr. at 3022, 3024.] Under that scenario, Plaintiffs Brewer and

Wilkinson cannot prevail against Jacobs even if it is true that "[a]ny one (or all) of [Jacobs'] breaches resulted in Plaintiffs' exposure to potentially harmful levels of fly ash or constituent elements found in fly ash," and even if medical evidence presented in Phase II establishes generally that "exposure to fly ash was a substantial factor in bringing about one or more of the diseases [of Plaintiffs Brewer and Wilkinson] for which general causation was found in Phase I." After all, the only thing Jacobs supposedly did wrong in this potential scenario was related to preventing workers from wearing masks. But Mr. Brewer was allowed to wear a dust mask, and Mr. Wilkinson could not wear a dust mask no matter what. Yet under Plaintiffs' purported theory of causation, both would be allowed to recover.

[Doc. 455]. But again, this concern is premature (if it even exists). First of all, Jacobs's liability is not "strict" as that term is normally understood. Recall that the Phase I jury returned a verdict, albeit a general one, finding a lot of what establishes negligence: that Jacobs breached duties that it owed to plaintiffs, which were capable of causing several diseases. Combined with a potential Phase II plaintiffs' verdict, Jacobs's liability, if ever imposed, would be anything but strict.[7] Second, Jacobs is potentially liable to plaintiffs Bewer and Wilkinson if and only if they are able to show disease-causing exposures to fly ash in Phase II (which is far from given). If, given that, Jacobs's parade-of-horribles scenario materializes, it can of course challenge the Phase II verdict for any number of reasons and can also challenge plaintiffs' ultimate burden of proof on their negligence claims on a full evidentiary record. In that scenario, Tennessee's general-verdict statute would apply, which states, "A general verdict, although it may not in terms answer every issue joined, is nevertheless held to embrace every issue," Tenn. Code Ann. § 20-9-503.

---

[7] Strict liability, of course, is "liability imposed without regard to the defendant's negligence or intent to cause harm." Restatement (Third) of Torts: Phys. & Emot. Harm (2010), at ch. 4 (scope note).

That would appear to effectuate liability if a Phase II jury *does find* specific causation and damages, and where a reasonable Phase I jury *could have found* an accordant duty, breach, and general causation.[8]  As explained above, those issues are best dealt with, if at all, on a full record, so the Court expresses no opinion on the merits of either.

An additional consideration weighs in favor of denying Jacobs's motion.  Jacobs wanted the verdict form to list out each theory of breach because it maintains that, during Phase II, plaintiffs must allocate how much of their disease-causing exposures were attributable to which of Jacobs's breaches of duty.  According to plaintiffs this is impossible:

> Jacobs argues that each Phase II plaintiff [] should have to prove which specific breach of Jacobs' duties caused his or her specific harm, as if their exposure to fly ash can possibly be allocated to each type of Jacobs' negligent conduct or as if their heart attack or leukemia comes labeled with Jacobs' specific breach of duty. This was never contemplated by the bifurcation order and would place an impossible burden on Plaintiffs. Any one (or all) of Defendant's breaches resulted in Plaintiffs' exposure to potentially harmful levels of fly ash or constituent elements found in fly ash.

[Doc. 451].  Plaintiffs' position is perhaps a bit overstated: there are scientists who can possibly make such estimates.  *See generally* Joseph V. Rodricks, Reference Guide on Exposure Science, *in* Reference Manual on Scientific Evidence 636 (Federal Judicial

---

[8] To the extent that Jacobs's motion can be construed as an as-applied Seventh Amendment challenge to Tennessee's general-verdict statue, the Court declines to address it at this time.  *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring) (cautioning courts from "anticipat[ing] a question of constitutional law in advance of the necessity of deciding it").

Center 3d ed. 2011). But whatever else the Seventh Amendment might do in this case, it does not impose a de facto requirement for such complex, cutting-edge expert proof.

No Seventh Amendment violation has occurred yet, and one will probably not occur in the future. Accordingly, Jacobs has not borne its burden of demonstrating that a manifest injustice will occur without a new trial, as is required for this Court to exercise its discretion to grant one. *See Clarksville–Montgomery Co. Sch. Sys.*, 925 F.2d at 1002. This motion will be denied.

## III. Renewed Motion for Judgment as a Matter of Law

Under Rule 50, a court should grant a motion for judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The same standard applies to a renewed motion under Rule 50(b). *See Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 157 (6th Cir. 1997) ("The standard for granting JNOV requires a finding that "viewing the admissible evidence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion." (quoting *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir. 1983))).

Judgment as a matter of law is appropriate "only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party," *Lowery v. Jefferson Cty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009); *Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000). A court must, however, give weight to "evidence supporting the moving party that is uncontradicted and

unimpeached." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). But as to disputed facts, "[t]he court should neither weigh the evidence, evaluate the credibility of the witnesses, nor substitute its judgment for that of the jury." *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir. 1994), *cert. denied*, 514 U.S. 1127 (1995). "Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant a motion for directed verdict." *Id.*

Because federal jurisdiction here is based on diversity of citizenship, Tennessee law applies. *K&T Enterprises, Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 176 (6th Cir. 1996). The state-law standard is not meaningfully different from those just described:

> [a] post-trial motion for the entry of judgment in accordance with a motion for directed verdict made during the trial must be gauged by the usual rules relating to directed verdicts. Those rules require that the trial judge, and the appellate courts, take the strongest legitimate view of the evidence in favor of the [opponent of the motion], allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Cansler v. Grove Mfg. Co.,* 826 F.2d 1507, 1510 (6th Cir. 1987) (quoting *Holmes v. Wilson,* 551 S.W.2d 682, 685 (Tenn. 1977) (emphasis added). Thus, even when there are disputed facts a case must not be taken away from the jury if reasonable people could come to different conclusions. *Upshaw v. Sunrise Cmty. of Tenn., Inc.,* 2017 WL 3525368 at *7 (Tenn. Ct. App. Aug. 16, 2017).

The ship has already sailed on Jacobs's first argument in support of this motion—that it is entitled to derivative governmental immunity—due primarily to the law of the

case doctrine.  Jacobs is entitled to immunity-writ-large, so its argument goes, because its contract with TVA and the SWSHP afforded it discretion about exactly how to carry out its air-monitoring and safety obligations.  But, and as Jacobs concedes, the lodestone for governmental-contractor liability is whether the contractor exceeded its delegated authority, *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 21 (1940), or put differently, Jacobs is entitled to immunity "only if [it] executed the will of the government and did not exceed its authority."  *Chesney*, 782 F. Supp. 2d at 582 (citing *Yearsley*, 309 U.S. at 20–21).  And this Court has explicitly held that:

> Namely, there is evidence in the record that defendants would be acting contrary to the will of the government if it: (1) did not randomly select workers for mobile monitoring; (2) manipulated the monitoring results; (3) did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash; (4) did not honor prescriptions for dust masks or respirators; (5) communicated to workers that fly ash was safe to consume; and/or (6) threatened workers when they asked for dust masks or respirators.

[Doc. 137].  In accordance with that ruling, the Court charged the jury with the following instruction (which was modified slightly to better conform with the evidence presented at trial):

> I have ruled that Defendant would be acting contrary to the will of the government and is not immune from suit if Defendant:
>
> (A)    Deliberately manipulated or tampered with any monitoring results or processes;
> (B)    Did not inform TVA safety officials or repeated complaints regarding health problems due to fly ash;
> (C)    Failed to comply with the provisions of the Safety and Health Plan with respect to voluntary use of dust masks;
> (D)    Threatened workers when they asked for dust masks or respirators;

23

> (E)    Communicated to workers that fly ash was safe to consume; or
>
> (F)    Otherwise failed to train or warn workers about the dangers of excessive fly-ash exposure.
>
> Again, Defendant is not entitled to immunity for any of these acts or omissions, which would be contrary to the will of the government and in violation of its obligations to TVA. Defendant is therefore potentially liable to Plaintiffs for any such violations, if you find by a preponderance of the evidence that any of them did, in fact, occur.

Doc. 424, Tr. Vol. XIV at 3022–23.

Jacobs did not object to this instruction [Doc 422, Tr. Vol. XII at 2832–33; Doc. 424, Tr. Vol. XIV at 3035], and has therefore forfeited any opposition to it. *See United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998) ("A party's failure to make a 'timely objection' to a jury instruction results in the forfeiture of his right to challenge that instruction." (quoting *United States v. Jones*, 108 F.3d 668, 672 (6th Cir.1997))). Moreover, even if the argument were preserved it would fail because the prior ruling remains the law of the case, and under it the conduct at issue falls outside the discretionary-function exception.[9] As the Supreme Court has explained, "[C]ourts should be loathe" to depart from the law-of-the-case doctrine "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)). Such circumstances are not present here.

---

[9] Which again informs the scope of Jacobs's immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). *See Adkisson*, 790 F.3d 641.

And the law-of-the-case doctrine aside,[10] Jacobs's argument does not get the discretionary-function exception quite right. Immunity under that doctrine requires two things: "First, the conduct must be 'discretionary,' not 'controlled by mandatory statutes or regulations.'" *A.O. Smith Corp. v. United States*, 774 F.3d 359, 364 (6th Cir. 2014) (citing *United States v. Gaubert*, 499 U.S. 315, 328 (1991)). The rulings cited above were based on this principle; Jacobs did not have discretion to violate the terms of its contract with TVA, so to the extent that it did, it is not shielded from liability.

But if the conduct *is* discretionary, the inquiry does not stop, like Jacobs appears to suggest. "Second, the exercise of discretion must be 'the kind that the discretionary function exception was designed to shield;' *i.e.*, it must be 'susceptible to policy analysis.'" *Id.* at 365 (citing *Gaubert*, 499 U.S. at 325).[11] Jacobs appears to agree that it would be liable for negligent or non-performance of conduct specifically mandated by the Jacobs-TVA contract, but not for any other conduct, all of which is assertedly discretionary and thus shielded from liability. But this understanding reads the second prong of *Gaubert* out of existence. Under that case there is of course a third category: discretionary (i.e., non-mandatory) conduct that is not susceptible to public-policy analysis. This is not only true

---

[10] The Court recognizes that, "At the trial court level, the doctrine of the law of the case is little more than a management practice to permit logical progression toward judgment. Prejudgment orders remain interlocutory and can be reconsidered at any time." *Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 589 (6th Cir. 1995).

[11] When conduct is discretionary under the first step, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. For the reasons that follow, this presumption is overcome here.

as a matter of logic, but was also spelled out very clearly in the Sixth Circuit's decision in this very case:

> The district court, in holding that the discretionary-function exception applied, found that various regulations, contractual provisions, and the SWSHP all failed to prescribe a specific course of action that Jacobs had to follow. But just because certain conduct fails to be specifically mandated does not necessarily mean that the government contractor is protected from liability. Discretionary conduct may fall outside the protection of the discretionary-function exception if the conduct is not a "deliberate or necessary result of a discretionary general policy"; in other words, government conduct "does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy provided the opportunity for the negligent act."

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 648–49 (6th Cir. 2015).[12]

This must be so. Holding otherwise would give governmental contractors carte blanche to be negligent for all non-mandatory conduct, rather than carry out the goal of the discretionary-function exception: to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through . . . tort." *Gaubert*, 499 U.S. at 323. Such protection from liability is clear "[w]here a particular government action is a deliberate or necessary result of a discretionary general policy, such that a tort suit based on the particular act or omission would amount to a challenge to the protected across-the-board policy." *Bultema v. United States*, 359 F.3d 379, 383 (6th Cir.

---

[12] Although the law-of-the-case doctrine is technically discretionary with respect to this Court's decisions, *see supra* note 10, the same is not true for decisions of the Sixth Circuit (and especially in this case). "Determinations of the court of appeals of issues of law are binding on both the district court on remand and the court of appeals upon subsequent appeal." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) (citing *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir.1994)); *see also Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir. 1992), *cert. denied*, 506 U.S. 841 (explaining that "the trial court may consider those issues not decided expressly or impliedly by the appellate court or a previous trial court").

2004). On the other hand, "where a particular government action is not a necessary result of such a general policy, the act does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy provided the opportunity for the negligent act." *Id.* The Sixth Circuit went on to explain:

> Thus the United States can be liable for the Coast Guard's negligent maintenance of a navigational aid, even though the decision to employ such aids was an exercise of a discretionary function. *Indian Towing*, 350 U.S. at 69, 76 S.Ct. 122. Negligence in maintaining the aid is not a necessary concomitant of the decision to employ such aids. *A fortiori*, if a particular act violates a governmental policy, the act cannot be protected under the discretionary function exception by the fact that the violated policy itself was an exercise of a discretionary function.

*Bultema*, 359 F.3d at 383. In other words, the exception shields negligence whenever it was the result of, or part and parcel with, a decision that that is susceptible to public-policy analysis.

Whatever decisions that may have preceded the conduct at issue here were not.[13] Even if the conduct at issue was in fact discretionary under the first step of *Gaubert*, the Court nevertheless has no trouble concluding that it is not "the kind that the discretionary function exception was designed to shield," because it is not "susceptible to policy analysis." Indeed, it is hard to fathom what kind of "policy analysis," as this Court understands that term, would be relevant to, or implicated in, the categories of conduct submitted to the jury, on the basis of which it was permitted to find Jacobs non-immune. *See* Doc. 424, Tr. Vol. XIV at 3022–23 (quoted in full above).

---

[13] Because Jacobs's immunity is derivative of TVA's the Court need not decide, between those two entities, *whose* policy-based decision is at issue here.

Case law confirms this understanding. As the Sixth Circuit recounted in the prior appeal in this case, *Bultema* held "that the prison staff's alleged failure to carry out the prison's bunk-pass-notification policy was not protected by the discretionary-function exception because, even if the policy allowed for discretion, the staff's alleged negligence was 'not a necessary concomitant of the prison's notification policy.'" *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 649 (6th Cir. 2015). So too here, and if anything this is a far clearer case because Jacobs's conduct (as portrayed by plaintiffs) was actively detrimental to the purported policy aim of safety.[14] In contrast, the exception was properly applied to the failure of the FAA to inspect a particular aircraft because of the FAA's spot-check policy, *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 819–20 (1984), to the failure of Coast Guard maintenance personnel to adequately inspect electrical equipment in a lighthouse, *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955), to a particular failure of the Forest Service to mark an off-road-vehicle trail as closed, based on a policy of only marking open trials, *Reetz v. United States*, 224 F.3d

_____

[14] Nor should the immunity of Jacobs be "analyzed with the SWSHP's broad safety goals in mind," because doing so would allow the discretionary-function exception to swallow the rule of waiving liability. As Justice Scalia noted, writing separately in *Gaubert*, every action or inaction is, at some level of generality, susceptible to policy analysis: "[I]t is universally acknowledged that the discretionary function exception never protects against liability for the negligence of a vehicle driver," even though "[t]he need for expedition vs. the need for safety may well represent a policy choice, . . . the Government does not expect its drivers to make that choice on a case-by-case basis." *Gaubert*, 499 U.S. at 336 (Scalia, J., concurring). Holding otherwise would "not only eviscerate the second step of the analysis set out in *Berkovitz* and *Gaubert*, but it would allow the exception to swallow the FTCA's sweeping waiver of sovereign immunity." *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995). The pertinent question, then, is not whether there is any discretion at all, but whether the discretion is "grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325. And for the reasons explained in the main text, here it was not.

28

794, 795 (6th Cir. 2000), and to a Forest Service decision to not placing protective railings around campground fire pits, *Rosebush v. United States*, 119 F.3d 438, 443–44 (6th Cir. 1997). Each of those acts or omissions was at least ostensibly connected to an asserted policy consideration; the conduct at issue here was not.

Jacobs also argues that there was a failure of proof with respect to three of plaintiffs' theories of negligence. First Jacobs asserts that "Plaintiffs did not prove Jacobs violated any contract provision regarding the voluntary use of dust masks" [Doc. 438, at 5–6]. But the contract provided that "[r]espirator use is encouraged, even when exposures are below the exposure limit, to provide an additional level of comfort and protection for workers," [Pls. Ex. 5f, at Att. C-2-1], and there was evidence that Jacobs did the following things arguably to the contrary: threatening to discharge workers who wanted to wear masks [Doc. 413, Tr. Vol. III at 391:9–15; 450:20–24; 459:11–23], taking dust masks away from employees who wore them [Doc. 414, Tr. Vol. IV at 561:23–24], and destroying dust masks that were available on the site [Doc. 411, Tr. Vol. I at 85:7–13; 87:4–88:9]. Jacobs is not immune for negligence based on that conduct.

Jacobs also maintains that "Plaintiffs could not have proven that Jacobs violated any contract provision by failing to train or warn workers about the dangers of excessive fly ash" [Doc. 438, at 6–7]. However, the SWSHP lists among the "required elements of the information and training program" that Jacobs must communicate "an understanding of the health hazards of hazardous chemicals in the work area" and "how to recognize the symptoms of overexposure and how to protect against it" [Pls. Ex. 3c at 12-1]. There is

plenty of evidence in the record suggesting that Jacobs did not do that, at least with respect to fly ash [Doc. 411, Tr. Vol. 1 at 70:20–71:18; 72:3–16; 73:2-8; 74:13–15; Doc. 412, Tr. Vol. 2 151:4–152:5; 154:1–155:22; 189:5–19]. Jacobs (wisely) does not appear to dispute that the SWSHP required training about on-site hazards, but argues that it is immune because "the specific content of that training is not prescribed" in those documents. This argument misses the mark because the relevant policy-based decision (to which discretionary-function immunity would attach) was *whether* to warn of hazards on the site—a decision that was made in the SWSHP.[15] Jacobs did not have discretion to avoid that obligation by not training workers about the dangers of fly ash.

For a similar reason, Jacobs's argument that plaintiffs "could not have proven that Jacobs violated any contract provisions when an employee suggested that fly ash was safe to consume" [Doc. 438, at 7–8], also fails. Instead of providing workers with "an understanding of the health hazards of hazardous chemicals in the work area," as the SWSHP required [Pls. Ex. 3c at 12-1], Jacobs told them that it was safe to eat a pound of fly ash per day, something that Jacobs safety manager Sean Healey admitted was inaccurate and wrong [Doc. 413, Tr. Vol. VIII at 1958:22–1960:9]. And as the Court previously ruled,

---

[15] For this reason too *Rosebush*, 119 F.3d at 443, a case cited by Jacobs, is not instructive here. That case dealt with a failure by the Forest Service to equip a campsite's firepit with adequate protections. Unlike there, where "there [were] no regulations requiring the Forest Service to warn of the dangers of a fire pit," *id.* at 442, here the SWSHP clearly required Jacobs to warn of dangers, and as explained above there was evidence presented at trial that they did not meaningfully attempt to do that.

plaintiffs' failure to prove reliance does not prevent this conduct from being negligence, rather than a misrepresentation [Doc. 424, Tr. Vol XIV at 2907].

Jacobs's remaining arguments are also foreclosed by the law-of-the-case doctrine. First, Jacobs's argument that "Plaintiffs Could Not Prove That Jacobs Owed a Legal Duty to Protect Them Against All Exposure to Fly Ash" [Doc. 438, at 9–10], fails. It is axiomatic that duty is a question of law for the Court rather than something plaintiffs must prove. *Burroughs v. Magee*, 118 S.W.3d 323, 327 (Tenn. 2003). Accordingly, at trial the Court held as follows:

> [T]he Court has concluded and states for the record a finding that Defendant owed a duty of care to the plaintiffs in rendering certain professional services that were intended to prevent the workers at the Kingston site from being exposed to potentially harmful levels of fly ash or any constituent element found in fly ash
> Those obligations included, as provided in the contract and the safety and health plan, air monitoring dust control, the use of personal protective equipment at the site, and worker training.

[Doc. 424, Tr. Vol XIV at 2893]. That holding was reflected in the jury instructions [*Id.* at 3023]. Jacobs has not explicitly challenged that instruction in this motion and in any event has forfeited any right to do so by not objecting. *United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998) ("A party's failure to make a 'timely objection' to a jury instruction results in the forfeiture of his right to challenge that instruction." (quoting *United States v. Jones*, 108 F.3d 668, 672 (6th Cir.1997))). Moreover, plaintiffs have never contended that Jacobs is liable for all exposures, only excessive ones. Given the proof at trial and the adverse-inference instruction given to the jury, Jacobs is no longer entitled to avoid liability by invoking things like permissible exposure limits.

31

Second, as the court ruled at trial, [Doc. 424, Tr. Vol XIV at 2901–02], the argument that "Plaintiffs Failed to Offer the Necessary Expert Testimony to Prove That Jacobs Breached Any Duty It Legally Owed to Plaintiffs" [Doc. 438, at 10–13], is unavailing because the conduct at issue here is an obvious breach of the professional standard of care, and thus the common-knowledge exception applies. In Tennessee "expert testimony regarding the applicable standard of care and the breach thereof may be dispensed with when the acts of professional negligence are so obvious that they come within the common knowledge of lay persons." *Martin v. Sizemore*, 78 S.W.3d 249, 272–73 (Tenn. Ct. App. 2001); *see also Murphy v. Schwartz*, 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986) (holding that the negligence must be so obvious that "all mankind knows that such things are not done absent negligence"). Such negligence "must be 'as plain as a fly floating in a bowl of buttermilk' to trigger the common knowledge exception." *Id.* (quoting *German v. Nichopoulos*, 577 S.W.2d 197, 202–03 (Tenn. Ct. App. 1978)). The conduct at issue here falls under that exception.

Third, the argument that "Plaintiffs Failed to Offer Any Legally Relevant Proof Regarding General Causation" [Doc. 438, at 13–17], confuses general causation with specific and conflicts with this Court's summary judgment decision. Jacobs maintains that "Plaintiffs presented no evidence connecting any of Jacobs's alleged misconduct to Plaintiffs' alleged injuries" [Doc. 438, at 13], but that is of course part of specific causation, where plaintiffs must show that Jacobs's conduct actually caused their injuries. Here, Dr. Terry testified about exactly what this Court held that plaintiffs were required to show: that

"the amount of toxic constituents generally present in the fly ash at the Kingston site was capable of causing the complained-of diseases" [Doc. 307].

Finally, Jacobs has raised two more arguments that are also unavailing. Jacobs argues that, if judgment is not entered in its favor, these same arguments at least warrant a new trial because "this jury reached a 'seriously erroneous' result on each of the elements of Plaintiffs' negligence claims presented during the Phase I trial" [Doc. 456]. Of course, it is true that a new trial requires a lesser showing than judgment as a matter of law. *Compare Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (judgment as a matter of law is warranted when "viewing the evidence in the light most favorable to the nonmoving party. . . reasonable minds could come to but one conclusion, in favor of the moving party"), *with Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996) (a new trial is warranted when "the verdict [is] against the weight of the evidence"). But, for the same reasons stated above, Jacobs has not met the lesser new-trial standard, either. Jacobs also maintains that, because "[i]t is impossible to tell from the Phase I verdict form which of Plaintiffs' six disparate theories of wrongdoing the jury believed," if judgment as a matter of law is granted with respect to any one of plaintiffs' theories of breach, the Court must also order a new trial "because there would be no way for anyone to know whether that particular theory provided the sole basis for the Phase I jury's decision and thus the sole impermissible reason to proceed to Phase II" [Doc. 456]. But because none of Jacobs's judgment-as-a-matter-of-law arguments succeeds, this contingent argument is inapposite.

## IV. Conclusion

For the reasons explained, Jacobs's post-trial motions, one for judgment as a matter

of law [Doc. 437], and one for a new trial [Doc. 439], are hereby **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE