# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE DIVISION

GREG ADKISSON, ET AL., )
      Plaintiffs, )     No. 3:13-CV-505-TAV-HBG
v. )
JACOBS ENGINEERING GROUP, INC., )     *Lead case consolidated with*
      Defendant. )

_____

KEVIN THOMPSON, ET AL., )
      Plaintiffs, )     No. 3:13-CV-666-TAV-HBG
v. )
JACOBS ENGINEERING GROUP, INC., )     *as consolidated with*
      Defendant. )

_____

JOE CUNNINGHAM, ET AL., )
      Plaintiffs, )
v. )     No. 3:14-CV-20-TAV-HBG
JACOBS ENGINEERING GROUP, INC., )
      Defendant. )

_____

BILL ROSE, )
      Plaintiff, )
v. )     No. 3:15-CV-17-TAV-HBG
JACOBS ENGINEERING GROUP, INC., )
      Defendant. )

_____

CRAIG WILKINSON, ET AL., )
      Plaintiffs, )
v. )     No. 3:15-CV-274-TAV-HBG
JACOBS ENGINEERING GROUP, INC., )
      Defendant. )

_____

ANGIE SHELTON, as wife and next of kin )
on behalf of Mike Shelton, et al., )
      Plaintiffs, )     No. 3:15-CV-420-TAV-HBG
v. )
JACOBS ENGINEERING GROUP, INC., )
      Defendant. )

_____

JOHNNY CHURCH, )
      Plaintiff, )
v. )     No. 3:15-CV-460-TAV-HBG
JACOBS ENGINEERING GROUP, INC., )
      Defendant. )

_____

DONALD R. VANGILDER, JR.,                    )
         Plaintiff,                    )
v.                                                            )          No. 3:15-CV-462-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,        )
         Defendant.                    )

_____

JUDY IVENS, as sister and next of kin,        )
on behalf of JEAN NANCE, deceased,          )
         Plaintiff,                    )
v.                                                            )          No. 3:16-CV-635-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,        )
         Defendant.                    )

_____

PAUL RANDY FARROW,                             )
         Plaintiff,                    )
v.                                                            )          No. 3:16-CV-636-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,        )
         Defendant.                    )

_____

**PLAINTIFFS' SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW (ECF No. 545)**

**INTRODUCTION**

The Court directed Plaintiffs to provide supplemental briefing on the merits of Defendant's

Renewed Motion for Judgment as a Matter of Law, ECF No. 545. This Supplemental Response

addresses the substance of Defendant's argument that the U.S. Supreme Court's decision in

*Thacker v. TVA*, 139 S. Ct. 1435 (2019), should change this Court's decision that Jacobs would

not have derivative government contractor immunity for specific acts the jury found failed to

adhere to either the terms of Jacobs' contract with TVA or the requirements set forth in the

Sitewide Safety and Health Plan. Plaintiffs incorporate the arguments from their original response,

ECF No. 553, and offer this substantive response.

Despite Jacobs' argument to the contrary, the Supreme Court's decision in *Thacker* does

not affect this Court's ultimate determination that Jacobs is not immune from suit. The Court does

2

not need to determine whether TVA is immune from suit to decide Jacobs' motion, because the Court fully and correctly analyzed Jacobs' derivative government contractor immunity claim under *Yearsley* in its decision to deny Jacob's motion to dismiss and in its original decision on Jacobs' motion for judgment as a matter of law. Plaintiffs also provide additional law supporting the Court's decision based on Jacobs' role as a response action contractor under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA").

However, if the Court believes that *Thacker* would change the analysis of Jacobs' immunity by depriving TVA of discretionary function immunity, TVA nevertheless would still not have sovereign immunity under *Thacker*—and Jacobs would therefore not have derivative immunity. Pursuant to *Thacker*, TVA's coal ash disposal activities at the Kingston site, which ultimately caused the massive coal ash release and six-year cleanup, were part and parcel of the generation of electricity for sale to TVA customers—an undisputedly commercial function.

Finally, even if the Court finds under *Thacker* that TVA's coal ash cleanup was a governmental function, then the Court should not find TVA immune from suit because a lawsuit for personal injuries to workers involved in the cleanup poses no grave interference with such a governmental function. Accordingly, Jacobs has no basis for derivative governmental immunity, even pursuant to *Thacker*.

## ARGUMENT

## I.   THE *THACKER* DECISION DOES NOT CHANGE THIS COURT'S ANALYSIS OF DERIVATIVE GOVERNMENT CONTRACTOR IMMUNITY.

The Supreme Court's decision in *Thacker v. TVA*, 139 S. Ct. 1435 (2019), does not change the analysis of derivative government contractor immunity by this Court in any way. Specifically, *Thacker* does not deal with derivative government contractor immunity at all. The Supreme Court focused on TVA's claimed immunity and the TVA Act's "sue and be sued clause," holding that

3

there is no justification for "the wholesale incorporation of the discretionary function exception" as a limitation on that clause. *Id.* at 1443.

By concluding that discretionary function immunity does not act as a limitation on TVA's ability to be sued, the Supreme Court did not make any new rule about derivative government contractor immunity or change the analysis described in *Yearsley v. W.A. Ross Constr. Co*., 309 U.S. 18 (1940), on which this Court relied in analyzing whether Jacobs had immunity. While this Court considered and rejected Jacobs' arguments that discretionary function immunity shielded it from liability, it did not need to. The Court, instead, relied upon *Yearsley* to hold that Jacobs was not entitled to immunity for specific acts or omissions which would "be contrary to the will of the government and in violation of its obligations to TVA." *Adkisson v. Jacobs Engineering Group, Inc*., 370 F. Supp. 3d 826, 843 (E.D. Tenn. 2019).[1]

In considering Jacobs' discretionary function immunity argument, this Court followed the Sixth Circuit's decision earlier in this case, which created a two-part test for Jacobs' claim of derivative government contractor immunity, focusing first on *Yearsley*. In its remand to the District Court, the Sixth Circuit directed that "[t]he court specifically should consider whether, based on the pleadings, (1) Jacobs is eligible for government-contractor immunity under *Yearsley*, and [if so, whether] (2) Jacobs's conduct would fall under the corollary of the discretionary-function exception to the FTCA." *Adkisson v. Jacobs Engineering Group, Inc*., 790 F.3d 641, 649 (6th Cir. 2015).

This Court followed these remand instructions, and after determining that there were material issues of fact about whether Jacobs was eligible for government contractor immunity under *Yearsley*, did not need to address the discretionary function argument:

---

[1] ECF No. 462.

4

As the Court finds that there is a material question of fact as to whether defendant satisfies the prerequisites for *Yearsley* immunity, there is a material question of fact as to whether defendant should be protected by any derivative immunity. Consequently, the Court need not reach the question of whether defendant's actions are protected as discretionary functions.

*Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-505-TAV-HBG, 2017 U.S. Dist. LEXIS 231967, at *52 (E.D. Tenn. Feb. 15, 2017).[2] Thus, this Court's summary judgment decision[3] was not based on whether TVA or Jacobs was entitled to discretionary function immunity.

This Court incorporated its summary judgment decision into its jury instructions on Jacobs' derivative immunity, which Jacobs attempted to challenge in its Renewed Motion for Judgment as a Matter of Law. At Jacobs' invitation, the Court addressed Jacobs' discretionary function arguments in denying the Renewed Motion for Judgment as a Matter of Law after pointing to its decision under *Yearsley* that Jacobs is not entitled to immunity for specific acts or omissions which would "be contrary to the will of the government and in violation of its obligations to TVA." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 370 F. Supp. 3d 826, 843 (E.D. Tenn. 2019).[4] The Court thoroughly debunked Jacobs' discretionary function arguments, but because the Court had already decided that Jacobs did not satisfy the prerequisites for *Yearsley* immunity, the decision to deny Jacobs' motion did not depend on the rejection of the discretionary function argument. *Id.* at 843-47. In short, the Court answered the question of immunity in the negative on the first prong of the analysis, and had no occasion to—and still has no occasion to—reach the second prong of the analysis, which is what Jacobs' arguments would require.

---

[2] ECF No. 137.

[3] Jacobs' motions were converted from motions to dismiss to motions for summary judgment. *Adkisson*, 2017 U.S. Dist. LEXIS 231967, at *12.

[4] ECF No. 462.

5

It was the *Yearsley* analysis in the Court's summary judgment decision—not any discretionary function immunity analysis—that gave rise to the challenged jury instructions regarding Jacobs' immunity:

> I have ruled that Defendant would be acting contrary to the will of the government and is not immune from suit if Defendant:
> (A) Deliberately manipulated or tampered with any monitoring results or processes;
> (B) Did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash;
> (C) Failed to comply with the provisions of the Safety and Health Plan with respect to voluntary use of dust masks;
> (D) Threatened workers when they asked for dust masks or respirators;
> (E) Communicated to workers that fly ash was safe to consume; or
> (F) Otherwise failed to train or warn workers about the dangers of excessive fly-ash exposure.
> Again, Defendant is not entitled to immunity for any of these acts or omissions, which would be contrary to the will of the government and in violation of its obligations to TVA. Defendant is, therefore, potentially liable to Plaintiffs for any such violations if you find by a preponderance of the evidence that any of them did, in fact, occur.

*Id*. at 843.

The *Thacker* decision potentially obviates the second prong in the Sixth Circuit's two-part test for TVA contractor immunity, because a TVA contractor would not be able to argue discretionary function immunity if TVA itself cannot claim immunity on that basis. But the first prong of the test, whether the contractor meets the prerequisites for derivative immunity under *Yearsley*, has not changed. Because this Court determined that no *Yearsley* immunity applied to Jacobs, there is no occasion to reach the second prong of that test—and thus, *Thacker* will not impact this Court's ruling.

Jacobs erroneously argues that the "six fact issues submitted to the Phase I jury" do not have any bearing on derivative immunity under *Yearsley*. Def.'s Br. 7, ECF No. 546. But it is clear that these six issues resulted from the Court's *Yearsley* analysis of evidence presented from the

6

summary judgment decision through the trial and post-trial motions. The Court's decision based on *Yearsley* to deny Defendant's Renewed Motion for Judgment as a Matter of Law is still valid after *Thacker*.

## II. THE COURT'S LIST OF DEFENDANTS' SIX ACTS THAT DEFEAT DERIVATIVE IMMUNITY IS WELL SUPPORTED BY *YEARSLEY* AND *CAMPBELL-EWALD*.

The Court's listing of Jacobs' six acts that defeated derivative immunity, as presented in the jury charge, is well supported by *Yearsley* and the Supreme Court's more recent decision in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016), as well as this Court's previous analysis in its summary judgment decision. Under this Court's analysis, Jacobs is entitled to *Yearsley* immunity "only if it adhered to the terms of its contract with the government," and "executed the will of the government." *Adkisson*, 2017 U.S. Dist. LEXIS 231967, at *43 (citations omitted); *see also Adkisson*, 790 F.3d at 648 (finding allegations that Jacobs violated the scope of its agreement with TVA sufficient to defeat *Yearsley* immunity).

Jacobs argues "[t]here is no basis for concluding, that any [of] the six theories of wrongdoing presented to the jury would constitute a violation of an explicit federal law or government instruction." Def.'s Br. 9. However, this Court analyzed evidence supporting these six "theories" in detail in its summary judgment decision, and, prior to considering Defendant's motion for judgment as a matter of law, heard extensive testimony during the trial, which demonstrated that Jacobs' acts did not comply with directions in Jacobs' TVA contract and in the Site Wide Safety and Health Plan.

Jacobs argues that it "is entitled to derivative immunity . . . because it complied with all federal directions," and "[t]here is no evidence that Jacobs violated any specific directives issued by TVA or federal law." Def.'s Br. 7-8. However, as this Court is likely aware, Jacobs' arguments

belies the evidence presented at the Phase I trial and the jury's verdict. After considering all the evidence, the jury unanimously found that "Defendant failed to adhere to the terms of its contract with TVA, or the requirements set forth in the Site Wide Safety and Health Plan for the Kingston site." Verdict Form, ¶ 1, ECF No. 408. And the Court found ample evidence to support the jury's finding. ECF No. 462 at 6, 29-31.

Jacobs appears to be relying on its own alternative formulation of *Yearsley* immunity by arguing that TVA's instructions in Jacobs' contract and the Site Wide Safety and Health Plan were not specific or explicit enough. Def.'s Br. 8 (claiming that the contract and Site Wide Safety and Health Plan contained "broad guidelines"). However, it provided no argument on these points—only conclusory statements. In sharp contrast, the evidence at trial included documents describing the *specific* TVA requirements (such as the TVA/Jacobs contract and Jacobs' Site Wide Safety and Health Plan) and testimony from witnesses about the numerous ways Jacobs violated them. The Court need not—and should not—diverge from its well-reasoned analysis on these issues, or from the Phase I jury's determination that Jacobs violated the specific requirements applicable to it.

### III. TVA IMMUNITY FOR COAL ASH CLEANUP UNDER *THACKER* WOULD NOT PROVIDE JACOBS WITH DERIVATIVE IMMUNITY AS A CERCLA CLEANUP CONTRACTOR.

Even if the Court rules that TVA is immune from suit under *Thacker*,[5] Jacobs has no derivative immunity due to its role as a response action contractor, pursuant to CERCLA, 42 U.S.C. §§ 9601, *et seq.* Jacobs has cited no authority whatsoever for the proposition that it has any derivative immunity as a government contractor under CERCLA. In its previous reply brief, Jacobs

---

[5] For Plaintiffs argument as to why TVA enjoys no immunity under *Thacker*—and by extension why Jacobs is not immune—see Sections IV. and V. below.

disclaimed that it was attempting to establish derivative government contractor immunity as a CERCLA contractor, and instead argued that it was merely highlighting TVA's role to "illustrate the governmental, rather than commercial, function TVA was exercising in performing the cleanup" to support TVA's immunity under *Thacker*. Def.'s Reply Br. 3, ECF No. 559. Accordingly, to the extent that Jacobs' briefing now could be read as being based upon Jacobs' potential derivative immunity as a CERCLA contractor under TVA's oversight, Jacobs has *expressly waived* that argument. However, if the Court considers such an argument, then the Court would have to determine whether Jacobs' role as a CERCLA contractor would provide derivative immunity.

CERCLA itself contains a provision for limited immunity for "response action contractors," defined as "any person who enters into a response action contract with respect to any release or threatened release of a hazardous substance or pollutant or contaminant from a facility and is carrying out such contract." 42 U.S.C, § 9619(e)(2)(A)(i). In its contract with TVA for the removal actions at the Kingston site, Jacobs was a "response action contractor" operating under a "response action contract."[6]

Subsection (1) of § 9619 provides in relevant part:

A person who is a response action contractor with respect to any release or threatened release of a hazardous substance or pollutant or contaminant from a . . . facility shall not be liable under [CERCLA] or under any other Federal law to any

---

[6] The term "response action contract" means any written contract or agreement entered into by a response action contractor (as defined in paragraph (2)(A) of this subsection) with . . . (B) any Federal agency. . . to provide any . . . *removal* under this chapter, with respect to any release or threatened release of a hazardous substance or pollutant or contaminant from the facility or to provide any evaluation, planning, engineering, surveying and mapping, design, construction, equipment, or any ancillary services thereto for such facility" [emphasis added]. The work Jacobs performed under its TVA contract in which the Plaintiffs were exposed to fly ash and its hazardous constituents was *removal*, as designated by the EPA Administrative Order and Agreement on Consent. The Order requires both "time-critical removal actions" and "non-time-critical removal actions." Pls.' Trial Ex. 59-b, at 10.

9

person for injuries, costs, damages, expenses, or other liability (including but not limited . . . claims by third parties for death, personal injury, illness or loss of or damage to property or economic loss) which results from such release or threatened release.

Subsection (2) then qualifies this immunity by stating, "Paragraph (1) shall not apply in the case of a release that is caused by conduct of the response action contractor which is negligent, grossly negligent, or which constitutes intentional misconduct."

Subsections (1) and (2) of 42 U.S.C. § 9619 represent the only immunity explicitly provided by Congress for response action contractors. Accordingly, it is clear that Congress intended that response action contractors would remain liable under *state law* and liable for negligence, gross negligence, or intentional conduct. Where Congress expressly included several narrow and specific limitations on response action contractor liability, the natural inference is that it did not intend other limitations to be implied. *See, e.g.*, *Loeffler v. Frank*, 486 U.S. 549, 557 (1988). To make it clear that state common law still applies, Congress also enacted 42 U.S.C. § 9652(d) as part of CERCLA, which states, "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." The principal purpose of this saving clause "is to preserve to victims of toxic waste the other remedies they may have under federal or state law." *PMC, Inc. v. Sherwin-Williams Co*., 151 F.3d 610, 617 (7th Cir. 1998).

It is clear that Jacobs is not eligible for any immunity in this case under 42 U.S.C. § 9619, because the claims of Plaintiffs for death, personal injury, and illness are brought under state law—not Federal law—and the jury's verdict in the Phase I trial demonstrates that Plaintiffs proved Jacobs was negligent. Moreover, this Court reserved the issue of punitive damages—and thus, proof of Jacobs' intentional conduct—for Phase II, which is likewise expressly excluded from

coverage under 42 U.S.C. § 9619's immunity provision. The grant of limited immunity in this section does not contemplate derivative government contractor immunity at all. To the contrary, the structure of 42 U.S.C. § 9619 creates an independent contractor relationship which "contemplates that a response action contractor will be independently liable for negligence and other tortious behavior." *Amtreco, Inc., v. O.H. Materials, Inc.*, 802 F. Supp. 443, 446 (M.D. Ga. 1992).

*Amtreco* is instructive. There, a plaintiff, whose property was subject to a CERCLA cleanup by EPA and a private contractor, sued under state common law for property damages caused by the cleanup. *Id.* at 444-45. The private contractor raised both the government contractor defense under *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) and derivative government contractor immunity under *Yearsley* (the court called this "the government agency defense"). *Amtreco*, 802 F. Supp. at 445. The district court rejected the government contractor defense because it concluded *Boyle* only applies to products manufactured for the government. *Id.* The court rejected *Yearsley* immunity because 42 U.S.C. § 9619 makes it clear that response action contractors are *not* agents of the government. 42 U.S.C. § 9619 contemplates that a response action contractor will be independently liable for negligence or other tortious behavior and that the United States may assume the liability in certain circumstances. *Id.* at 446.

Similarly, this Court rejected the application of the *Boyle* government contractor defense to TVA contractors involved with the coal ash impoundment prior to the Kingston fly ash release. In *Chesney v. Tennessee Valley Authority*, 782 F. Supp. 2d 570 (E.D. Tenn. 2011), this Court found that manufacturing a product or an item pursuant to government specifications or a government design is very different from providing contractor services to TVA at the Kingston site and that the Supreme Court itself cautioned against extending *Boyle* beyond its facts. *Id.* at 581-82.

11

Accordingly, the Court concluded that *Yearsley* and derivative sovereign immunity was the appropriate analysis to apply in the *Chesney* case. *Id*. The Sixth Circuit has not extended *Boyle* to services contracts, declining the opportunity to do so in its decision in this litigation. *Adkisson*, 790 F.3d at 646. The *Chesney* case did not involve response action contractors, so 42 U.S.C. § 9619 was not considered. Nor was this section discussed by the parties in the *Adkisson* motion to dismiss.

Few courts have considered the immunity of governmental contractors in CERCLA cleanups, and those that have done so have analyzed the question based on *Boyle* after determining whether the EPA's actions were protected by discretionary function immunity so as to potentially extend derivative immunity to the contractor. For instance, in *Gadsden Industrial Park, LLC v. United States*, 111 F. Supp. 3d 1218 (N.D. Ala. 2015), the court established a three-part test under *Boyle* and found no derivative contractor immunity where the EPA did not establish reasonably precise cleanup procedures; where the contractors failed to follow the EPA procedures that were established; and where the contractors failed to perform tasks required by the government. *Id*. at 1230-31.[7] "The government contractor defense does not apply because, simply put, the government did not make" the contractors commit their tortious acts. *Id*. at 1231. The court did not consider the limited immunity of response action contractors under 42 U.S.C. § 9619.

In *New Mexico on behalf of New Mexico Environment Department v. United States Environmental Protection Agency*, 310 F. Supp. 3d 1230 (D.N.M. 2018), applying the three-part test from *Gadsden Industrial Park, LLC*, the Court held that the contractor must show that the EPA essentially "made [the contractor] do it" in order for the contractor to be protected from liability

---

[7] The sovereign immunity of the EPA is waived under the Federal Tort Claims Act, which contains the discretionary function exception. *See Gadsden Indus. Park, LLC*, 111 F. Supp. 3d at 1228. The court noted that the EPA, as the government actor—rather than the contractors—must have exercised discretion in order for the discretionary function exception to apply. *Id.* at 1229.

under *Boyle*. *Id.* at 1264. "The Court must be able to conclude that [the contractor] followed EPA's reasonably precise instructions." *Id.* at 1265. The court denied the contractor's motion to dismiss, because the complaint alleged that the contractor substantially deviated from written instructions and a work plan. *Id.* The *New Mexico* court acknowledged that 42 U.S.C. § 9619 might at least obviate analysis of the EPA's discretionary function immunity to decide whether a conflict exists between state law and a uniquely federal interest but did not decide this issue. *Id.* at 1260-61; *see also id.* 1260-61 nn.18-19.

In one case involving a CERCLA cleanup, the court applied *Boyle* and found the government contractor immune from suit where the plaintiff proffered no evidence to rebut the contractor's evidence that it had performed the cleanup according to the specifications issued by the EPA. *Richland-Lexington Airport Dist. v. Atlas Properties, Inc.*, 854 F. Supp. 400, 424 (D.S.C. 1994). In sharp contrast, the evidence here was overwhelming that Jacobs *failed* to adhere to the terms of its contract with TVA or the requirements in the Site Wide Safety and Health Plan for the Kingston site. This Court found not only that Plaintiffs presented sufficient evidence to support the jury's verdict on specific violations of the TVA contract and Site Wide Safety and Health Plan, but also that "Jacobs's conduct (as portrayed by plaintiffs) was actively detrimental to the purported policy aim of safety." ECF No. 462 at 28-31.

This evidence is more than sufficient to defeat derivative immunity if this Court applies *Yearsley* and *Campbell-Ewald*, rather than *Boyle*. First, 42 U.S.C. § 9619 casts doubt on whether *Yearsley* applies even if TVA is immune, because it establishes that the response action contractor is not an agent of TVA but is independently liable for negligence and other tortious behavior. *Amtreco*, 802 F. Supp. at 446. Second, applying *Yearsley*—as this Court has—Jacobs is not immune because it did not adhere to the terms of its contract with TVA and did not execute the

will of TVA. The Court's analysis of government requirements took CERCLA directives into account, because TVA's contract with Jacobs incorporated TVA's responsibilities under CERCLA, as did the Site Wide Safety and Health Plan. Both TVA and Jacobs were subject to the CERCLA Order, which, among other things, required the development of the Site Wide Safety and Health Plan pursuant to OSHA and EPA rules. Pls.' Trial Ex. 59-c, ¶ 35. The CERCLA Order required TVA to ensure that its contractors complied with this Order, *id.*, ¶ 7, and Jacobs' contract with TVA was amended to include the provisions of the CERCLA Order. Pls.' Trial Ex. 13, July 14, 2009, Amendment to Jacobs and TVA Contract, at 4-5.

## IV. BECAUSE TVA ENGAGED IN COMMERCIAL ACTIVITY AT THE KINGSTON SITE, THERE IS NO SOVEREIGN IMMUNITY HERE.

If the Court believes that *Thacker* would change the analysis of Jacobs' immunity by depriving TVA of discretionary function immunity, then Plaintiffs maintain that TVA does not have sovereign immunity at all based on the *Thacker* decision and the facts of this case. In *Thacker*, the Supreme Court clearly and significantly limited TVA's ability to shield itself from lawsuits under a claim of sovereign immunity. The Supreme Court found:

> The possibility of [TVA] immunity arises only when a suit challenges governmental activities—the kinds of functions private parties typically do not perform. And even then, an entity with a sue-and-be-sued clause may receive immunity only if it is "clearly shown" that prohibiting the "type[ ] of suit [at issue] is necessary to avoid grave interference" with a governmental function's performance. That is a high bar. But it is no higher than appropriate given Congress's enactment of so broad an immunity waiver—which demands, as we have held, a "liberal construction."

*Thacker*, 139 S. Ct. at 1443 (citations omitted). The Court found that the TVA Act's "sue and be sued clause" should be interpreted broadly and that "[w]hen the TVA or similar body operates in the marketplace as private companies do, it is as liable as they are for choices and judgments. The possibility of immunity arises only when a suit challenges governmental activities—the kinds of

14

functions private parties typically do not perform." *Id*. at 1443. Stated differently, "if the conduct is commercial—the kind of thing any power company might do—the TVA cannot invoke sovereign immunity." *Id*. at 1444.

Here, TVA's massive fly ash release at its Kingston plant, as well as its resulting cleanup of that fly ash, were part and parcel of TVA's operation of a coal-fired power plant used to generate electric power for paying consumers, exactly like any other power company. Such a function is indisputably a commercial activity. *See id*. at 1443 ("TVA acts like any other company producing and supplying electric power."). TVA's role in the ash cleanup, despite the EPA transferring the title "lead federal agency" in January 2009, was like any other responsible party for an environmental disaster. It was required by federal and state law under the supervision of the EPA and the State of Tennessee to remove the bulk of the ash and restore land and water to protect human health and the environment. Like any other private power company, it hired contractors to perform this task, placing Jacobs in the lead role for the cleanup, including ensuring cleanup worker health and safety.

Even if this Court found that such activities were governmental and not commercial, "the court [still] must find that prohibiting the type of suit at issue is necessary to avoid grave interference with that function's performance." *Id*. at 1444 (internal punctuation and citation omitted). Thus, even if the Court has occasion to consider this latter question—which Plaintiffs contend is unnecessary—Jacobs cannot demonstrate that Plaintiffs' suit poses a "grave interference" to the TVA's function.

For these reasons, Jacobs' motion for reconsideration is still not well-taken and should be rejected on its merits.

15

**A.      Generation of Electricity for Sale to Consumers Is a Commercial Activity.**

"TVA generates electricity through a variety of methods that it then sells to 154 municipal and cooperative local power companies ("LPCs"), which then distribute it to residential, commercial, industrial, and governmental customers. TVA also sells electricity directly to some industrial and governmental customers with large or unusual power demands." *Ctr. for Biological Diversity v. TVA*, No. 3:18-cv-1446-LCB, 2020 U.S. Dist. LEXIS 180548, at *2-3 (N.D. Ala. Sep. 30, 2020). As the *Thacker* Court recognized, "much of what the TVA does could be done—no, *is* done routinely—by non-governmental parties. Just as the TVA produces and sells electricity in its region, privately owned power companies (e.g., Con Edison, Dominion Energy) do so in theirs. As to those commonplace commercial functions, the emphasis in the oft-used label 'public corporation' rests heavily on the latter word." *Thacker*, 139 S. Ct. at 1439 (emphasis in original).

At the outset, it is important to note that the *Thacker* Court strongly implied that when TVA functions in its capacity as a power company—which is the case at the Kingston Fossil Plant—its conduct is commercial, and immunity will not apply. *Id.* at 1444 ("[I]f the conduct is commercial— *the kind of thing any power company might do*—the TVA cannot invoke sovereign immunity." (emphasis added)).[8] There is a long judicial history of decisions uniformly concluding that TVA's power generation and sales are commercial.

---

[8] Although the *Thacker* Court left the determination of whether TVA's conduct there constituted commercial activity or a governmental function to the lower courts, 139 S. Ct. at 1443-44, the Court's language strongly suggests that where the TVA engages in power generation, its activities will be commercial by their nature and thus will enjoy no immunity, *id.* at 1443 ("[I]n other operations—and over the years, a growing number—*the TVA acts like any other company producing and supplying electric power*. It is an accident of history, *not a difference in function*, that explains why most Tennesseans get their electricity from a public enterprise and most Virginians get theirs from a private one." (emphasis added)). The district court in *Thacker* has not yet determined whether the circumstances of that case constituted commercial activity or a governmental function, as it appears TVA has abandoned that argument. *See, e.g.*, *Thacker, et al. v. Tennessee Valley Authority*, No. 5:15-CV-1232-AKK (N.D. Ala.), ECF No. 35 (Ans.); ECF

16

In *Grant v. Tennessee Valley Authority*, 49 F. Supp. 564 (E.D. Tenn. 1942), the district court distinguished between TVA's governmental and commercial activities, finding immunity in the former case and liability in the latter case. Liability was premised on the government "respond[ing] in damages for wrongs committed when it is engaged in the same activities as its citizens," which included "all wrongs committed for conduct pertaining to its generating, use and sale of electric energy made from the power created by its dams." *Id.* at 566. Over the years, courts have continued to draw a distinction between TVA's performance of government functions, such as flood control, where it is immune from suit, *see Edwards v. Tennessee Valley Authority*, 255 F.3d 318, 322 (6th Cir. 2001); *Peoples National Bank of Huntsville v. Meredith*, 812 F.2d 682, 685 (11th Cir. 1987); *Queen v. Tennessee Valley Authority*, 689 F.2d 80, 85-86 (6th Cir. 1982), and its commercial or non-governmental functions, where it has no immunity, *see Latch v. Tennessee Valley Authority*, 312 F. Supp. 1069, 1072 (N.D. Miss. 1970); *Adams v. Tennessee Valley Authority*, 254 F. Supp. 78, 80 (E.D. Tenn. 1966).

*Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 389 (2d Cir. 2009), rev'd on other grounds, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011); *N.C. ex rel. Cooper v. TVA*, 439 F. Supp. 2d 486, 492 (W.D.N.C. 2006) ("TVA has not established that its production of electricity through the operation of EGU's is a 'governmental function,' or, if so, that allowing the instant suit to proceed would 'gravely interfere' therewith."); *Smith v. Tennessee Valley Auth.*, 436 F. Supp. 151, 154 (E.D. Tenn. 1977); *Brewer v. Sheco Constr. Co.*, 327 F. Supp. 1017, 1019 (W.D. Ky. 1971) ("The activities for which the T.V.A. is here being sued are not related to its so-called governmental function, but are more closely akin to its work in the commercial field . . . . related to the T.V.A.'s use and sale of electrical energy."); *Latch v. Tennessee Valley Auth.*, 312 F. Supp. 1069, 1072, 1072 n.7 (N.D. Miss. 1970); *Grant v. Tennessee Valley Auth.*, 49 F. Supp. 564, 566 (E.D. Tenn. 1942) ("It is my judgment that Congress intended that the defendant can be sued for all wrongs committed for conduct pertaining to its generating, use and sale of electric energy made from the power created by its dams.").

---

Nos. 97-98 (TVA's Mot. for Summ. J.); ECF No. 109 (TVA's Reply on Mot. for Summ. J.) (not raising sovereign immunity).

17

Plaintiffs are nevertheless mindful of this Court's reluctance to accept the commercial/governmental distinction. *Mays v. TVA*, 699 F. Supp. 2d 991, 1009 (E.D. Tenn. 2010) ("[T]his Court will not parse the conduct or activities of TVA into the distinct categories of commercial and governmental conduct because the application of such distinct categories are bound to lead to disparate and inconsistent results."); *Sherwood v. TVA*, 925 F. Supp. 2d 906, 916. (E.D. Tenn. 2013). The Court's concern appeared to stem from a lack of judicial guidance as to what standard should be used to distinguish commercial versus governmental acts by TVA. *Mays*, 699 F. Supp. 2d at 1009 n.30. *Thacker* resolved this dilemma. An activity is commercial if it is "the kind of thing any power company might do[.]" *Thacker*, 139 S. Ct. at 1444.

Here, it is clear that power generation is a commercial enterprise, rather than a purely governmental function. TVA's operation of coal plants, which function purely for the generation of electric power for sale to consumers, mirrors the activities and functions of privately owned corporations—not of a governmental entity. *See id.* at 1439. TVA's operation of a dam, for example, may present a closer question. Under those circumstances, the function is both to generate power and to maintain the public waterways. Such circumstances require a more nuanced analysis of where commercial activity ends and governmental function begins.[9]

However, here the Court need not wrestle with such a nuanced analysis. TVA explains that the purpose of the Kingston Fossil Plant—that at issue in this action—is purely for the generation of power. Kingston Fossil Plant, https://www.tva.com/energy/our-power-system/coal/kingston-fossil-plant (last accessed February 5, 2021) (explaining that the plant "generate[s] approximately

---

[9] Courts have, however, considered the distinction between commercial and governmental acts relating to TVA's operation of hydroelectric dams. For example, this Court previously determined that TVA could be sued "for all wrongs committed for conduct pertaining to its generating, use and sale of electric energy made from the power created by its dams." *Grant*, 49 F. Supp. at 566.

10 billion kilowatt-hours a year, which is enough electricity to power approximately 700,000 homes"). Thus, the question of the TVA's function is simple and the answer is clear: TVA's function in this case was purely to generate power for sale to consumers by burning coal at the Kingston Fossil Plant. This is a purely commercial activity, affording TVA no immunity.

**B.    TVA's Coal Ash Removal Activities Were Part and Parcel of Its Commercial Power Generation.**

TVA's coal ash removal activities were part and parcel of TVA's commercial operation of coal-fired power plants, no different than the generation of power for sale to consumers. Like any other responsible party for an environmental disaster, TVA was required by state and federal agencies to perform the cleanup resulting from damages created by its power generation activities. Shortly after the massive fly ash release, the State of Tennessee issued an Order to TVA to stabilize the site, assess the impacts, and prepare a Corrective Action Plan. Pls.' Trial Ex. 8. A few months later, the EPA designated the Kingston Site as a Superfund Site under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*, and entered into an Administrative Order and Agreement on Consent with TVA requiring TVA to perform removal actions under the supervision of EPA and the State of Tennessee. Pls.' Trial Ex. 59-a.

In enacting CERCLA, "Congress intended to impose the cost of cleanup on those who profited from transactions in hazardous waste." *Transp. Leasing Co. v. California*, 861 F. Supp. 931, 953 (C.D. Cal. 1992); *see also Lincoln v. Republic Ecology Corp.*, 765 F. Supp. 633, 635-36 (C.D. Cal. 1991) ("[A]n unmistakable purpose behind CERCLA's strict liability standard was to force Parties who *profit* from the use and generation of hazardous wastes, or directly cause or contribute to their release, to account, in the pricing of their products, for the environmental

externalities associated with improper disposal." (emphasis in original)); *United States v. New Castle Cnty.*, 727 F. Supp. 854, 858 (D. Del. 1989).

Because the cleanup efforts arose from the TVA's commercial activity, TVA was responsible for the cleanup costs under CERCLA, just as a private power company would be responsible for cleaning up coal ash releases from private coal-fired power plants. For example, Duke Energy, a private power company, was "required to implement . . . restoration projects" under a CERCLA order to cleanup coal ash waste facilities. *United States v. Duke Energy Carolinas, LLC*, No. 1:19-cv-00707, 2020 U.S. Dist. LEXIS 207628, at *9 (M.D.N.C. Nov. 6, 2020).

Jacobs may point to the EPA's designation in January 2009 of TVA as the "lead federal agency" for the bulk of the removal activity. This was a mere formality, which did not transform TVA's removal of coal ash into a governmental activity. The EPA continued to oversee the operation after this transfer of title and entered into the Administrative Order requiring TVA to perform removal actions a few months after this transfer. Any plans had to be approved by the EPA, and the EPA maintained an active oversight role on the Site for most of the cleanup. Pls.' Trial Ex. 59-c. The Tennessee Department of Environment and Conservation ("TDEC") continued to supervise TVA's cleanup under its Commissioner's Order throughout implementation of a Corrective Action Plan developed by TVA and approved by TDEC. TVA's "lead agency" designation is irrelevant to a determination of whether the removal effort remained a commercial activity, because TVA was responsible for the removal of the coal ash it generated in its commercial capacity, and it was in this capacity that TVA hired Jacobs.

Finally, it makes no logical sense for TVA's power generation to constitute a commercial activity (as it clearly does under *Thacker*), but its cleanup and removal efforts, which are

inextricably linked to that power generation, could render it immune from liability. If simply engaging in remediation efforts constituted a governmental function, the unique situation would be created where TVA's commercial activities removed its immunity, while simultaneously allowing restoration of immunity in instances where it is required to remediate the consequences of its own wrongdoing. It would be as if a shopkeeper, who is under a duty to keep the premises in a reasonably safe condition, could avoid liability to a customer who slipped and fell due to a hazard the shopkeeper created merely by removing the hazard after an accident occurs. The law abides no such absurd result, and likewise the Court should not accept it here. Because TVA engages in commercial activity at the Kingston Fossil Plant—and did specifically in these circumstances—it may be sued; the fact that it was required to remediate the effects of a spill caused by that commercial activity does not change its role. TVA is not immune from suit by virtue of having to clean up its spill, and neither is Jacobs.

## V. EVEN IF THE COURT FINDS TVA'S CLEANUP ACTIVITIES WERE GOVERNMENTAL, THERE IS NO IMMUNITY HERE BECAUSE PLAINTIFFS' CLAIMS DO NOT "GRAVELY INTERFERE" WITH ANY GOVERNMENTAL FUNCTION.

### A. Plaintiffs' Claims Do Not "Gravely Interfere" With TVA's Functions.

Under *Thacker*, this Court must first analyze whether TVA's conduct constitutes commercial activity or a governmental function. Should the Court determine that TVA's activities here are commercial, the analysis ends there and sovereign immunity does not apply. *Thacker*, 139 S. Ct. at 1444. However, if the Court finds that TVA engaged in governmental conduct, the analysis shifts such that immunity applies only if "prohibiting the 'type of suit at issue is necessary to avoid grave interference' with that [governmental] function's performance." *Id.* (quoting *Fed. Housing Admin. v. Burr*, 309 U.S. 242, 245 (1940)) (internal marks omitted)). In the absence of grave interference, TVA remains subject to a lawsuit. *Id.*

21

The *Thacker* Court stated that the threshold for demonstrating "grave interference" sets a "high bar." *Id.* at 1443. Earlier decisions regarding a similar question determined that there must be a "clear showing" of interference in order to meet that high bar. *See, e.g.*, *Standard Oil Div., Am. Oil Co. v. Starks*, 528 F.2d 201, 204 (7th Cir. 1975) ("[T]o subject the Postal Service to garnishment proceedings for the possible debts of 750,000 employees would be to impose a 'grave interference with U.S. Postal Service's functions.' Yet there has been no 'clear showing' of interference. We cannot on the mere assertions made here imply that Congress did not intend the full consequences of what it said. Mere assertions that legal claims brought against a governmental entity would interfere with its governmental functions are insufficient."); *Ala. One Credit Union v. Hutto & Carver, P.C.*, No. 7:18-cv-02102-LSC-GMB, 2020 U.S. Dist. LEXIS 122129, at *9-10 (N.D. Ala. July 13, 2020) ("[T]his Court agrees with the Report and Recommendation's conclusion that the United States has not met the 'high bar' of clearly showing that immunity is necessary to avoid a grave interference with a government function."). Where there is "no basis in law or policy for blocking" the lawsuit, immunity will not exist and the lawsuit must be permitted. *Standard Oil*, 528 F.2d at 204.

Since *Burr*, where the test was first enunciated, "the Supreme Court and the majority of Circuit Courts of Appeals presented with this issue have concluded that the federal agency had not demonstrated grave interference." *Ala. One Credit Union*, 2020 U.S. Dist. LEXIS 122129, at *10 (analyzing cases). For example, courts have found that no "grave interference" exists—and that the entity enjoys no sovereign immunity from suit—where plaintiffs have sued governmental entities for interest awards, breach of contract claims, and garnishment proceedings. *Id.*

Of course, Plaintiffs here did not sue TVA. But if they had, TVA could not meet the high bar of demonstrating that their claims are of the type that would gravely interfere with any of

22

TVA's "governmental" activities during the coal ash removal activity at the Kingston Site. First, these lawsuits are all for damages, and none requested any type of injunctive relief that could have interfered with the cleanup activities. Such damages claims may make the ultimate cost of the cleanup more expensive, but this is not the kind of grave interference considered to support sovereign immunity. For example, there is no evidence that workers' compensation claims by TVA employees, pursuant to the Federal Employees' Compensation Act ("FECA"), gravely interfere with TVA's government functions. Plaintiffs' damages claims are certainly not the type of suit that could have gravely interfered with TVA's titular role as lead federal agency, because this role principally involved coordination among TVA, the EPA, and TDEC. Jacobs cannot meet the high bar of a clear showing of grave interference. Whatever arguments they could offer to the contrary are based on "mere assertions" that are ultimately insufficient to vitiate Plaintiffs' claims. *Ala. One Credit Union*, 2020 U.S. Dist. LEXIS 122129, at *10.[10]

Jacobs does not cite any case involving a private damages suit causing grave interference with a government agency's CERCLA cleanup responsibilities. The *Quapaw Tribe of Okla. v. Blue Tee Corp*. case on which Jacobs relies was a suit against the EPA and responsible parties for natural resources damages, and the question was whether the EPA was diligently conducting

---

[10] The Court must analyze whether Plaintiffs' claims pose a "grave interference" with TVA's remediation activities—and, as Jacobs argues, with Jacobs' management of the cleanup at the Kingston site under TVA's oversight—which Jacobs argues constitute a governmental function. Def.'s Br. 11. Here, remediation activities are now complete and had nearly fully completed by the time Plaintiffs first brought their claims. Specifically, these claims were filed after the conclusion of the ash removal by train to Alabama in December 2010, and most of the consolidated lawsuits heard in the Phase I jury trial were filed after the conclusion of the on-site ash disposal activities in November 2014. ECF No. 253-1 at 34. The pendency of Plaintiffs' claims have little to no effect on the cleanup and removal of the coal ash spill, which resulted from TVA's commercial conduct. Accordingly, Plaintiffs' claims pose no "grave interference" with TVA's governmental function in overseeing remediation activities—which Plaintiffs maintain are ultimately not governmental, but commercial, in nature. Simply put, Plaintiffs' claims will not hinder, slow, or stop the cleanup activities because they have already been completed.

remedial action when the case was filed. Def.'s Br. 11 (citing No. 03-CV-0846-CVE-PJC, 2008 U.S. Dist. LEXIS 51476 (N.D. Okla. July 7, 2008)). Jacobs also relies on *Doe v. Am. National Red Cross*, 847 F. Supp. 643 (W.D. Wis. 1994), where the plaintiffs sued the Red Cross, an instrumentality of the United States and the question was whether a jury trial and punitive damages were available. Finally, *Hendy v. Bello*, 555 F. App'x 224 (4th Cir. 2014), was a lawsuit against an employee of the U.S. Postal Service to restrain her from performing her duties, and was not a suit for damages for which immunity was waived under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). *Id.* at 226. None of these cases involved government contractor immunity, and thus are distinguishable and ultimately not relevant to the question now before this Court.

However, *Cadillac Fairview v. Dow Chemical Co*. is more instructive. 840 F.2d 691 (9th Cir. 1988). There, the court considered whether an action for recovery of costs under CERCLA, pursuant to 42 U.S.C. § 9607, could be initiated before a governmental entity initiated a response action. *Cadillac Fairview*, 840 F.2d at 695. The court ultimately determined that a claim for damages and declaratory relief were permitted, but not a claim for injunctive relief. *Id.* at 695-97. This case—far more so than those cited by Jacobs—illustrates for the Court here that a lawsuit raising claims for damages are permissible, and do not gravely interfere with the governmental entity's function in overseeing the response under CERCLA. Accordingly, Jacobs cannot maintain immunity from Plaintiffs' damages claims here.

Put simply, the claims Plaintiffs assert here are not the type of claim that could or would interfere with TVA's governmental functions in the cleanup of the Kingston site. There is "no basis in law or policy for blocking" Plaintiffs' claims. *Standard Oil*, 528 F.2d at 204.

**B.** **Because Plaintiffs' claims do not interfere with the TVA's governmental functions, Jacobs is not immune from Plaintiffs' claims as a subcontractor.**

As explained above, even if the Court were to find that the TVA's power generating operations at the Kingston Fossil Plant do not constitute commercial activity, there is nevertheless no sovereign immunity because Plaintiffs' claims do not "gravely interfere" with TVA's governmental functions. Accordingly, there is no immunity to be derived by a subcontractor of TVA, such as Jacobs. Thus, just as if TVA would be subject to lawsuit on Plaintiffs' claims, Jacobs cannot block Plaintiffs' claims here.

<u>**CONCLUSION**</u>

For the reasons stated above, and in their original response, ECF No. 553, Plaintiffs respectfully request that the Court deny Jacobs' Renewed Motion for Judgment as a Matter of Law, ECF Nos. 545-46. Despite Jacobs' argument to the contrary, the Supreme Court's decision in *Thacker* does not affect this Court's determination that Jacobs is not immune from suit. The Court need not determine whether TVA is immune from suit to decide Jacobs' motion, because the Court fully and correctly analyzed Jacobs' derivative government contractor immunity claim under *Yearsley* in its prior decisions, including the charges to the jury.

However, if the Court believes that *Thacker* would change the analysis of Jacobs' immunity by depriving TVA of discretionary function immunity, then Plaintiffs would ask the Court to find that TVA does not have sovereign immunity, which would defeat any claim by Jacobs for derivative immunity. Pursuant to *Thacker*, TVA's coal ash disposal activities at the Kingston site, which ultimately caused the massive coal ash release and six-year cleanup, were part and parcel of the generation of electricity for sale to TVA customers, an indisputably commercial function.

Finally, even if the Court finds under *Thacker* that TVA's coal ash cleanup was a governmental function, then the Court should not find TVA immune from suit because a lawsuit for personal injuries to workers involved in the cleanup poses no grave interference with such a governmental function. Accordingly, Jacobs has no basis for derivative governmental immunity after *Thacker*.

Dated: February 5, 2021

**GREG COLEMAN LAW PC**

By:*/s/ Louis W. Ringger, III*
Gregory F. Coleman, TN Bar No. 14092
Louis W. Ringger, III, TN Bar No. 33674
Adam A. Edwards, TN Bar No. 23253
Mark E. Silvey, TN Bar No. 13415
Justin G. Day, TN Bar No. 33267
William A. Ladnier, TN Bar No. 34316
800 S. Gay Street, Suite 1100
Knoxville, TN 37902
T: (865) 247-0080
F: (865) 522-0049
greg@gregcolemanlaw.com
billy@gregcolemanlaw.com
adam@gregcolemanlaw.com
mark@gregcolemanlaw.com
justin@gregcolemanlaw.com
will@gregcolemanlaw.com

**DAVIS & WHITLOCK, P.C.**
Gary A. Davis, TN Bar No. 009766
James S. Whitlock NC Bar No. 34303
(admission *Pro Hac Vice*)
21 Battery Park Ave, Suite 206
Asheville, NC 28801
T: (828) 622-0044
F: (828) 398-0435
gadavis@enviroattorney.com
jwhitlock@enviroattorney.com

**MARKET STREET LAW, PLLC**
James K. Scott, BPR #16893
Keith D. Stewart, BPR #17574
John Tyler Roper, BPR #21927
625 Market Street, 14th Floor
Knoxville, TN 37902
T: (865) 888-9995
F: (866) 245-0989
jimscott264@gmail.com
keithdstewart@gmail.com
tylerroperlaw@gmail.com

**BRIDGEFRONT LAW GROUP PLLC**
John B. Dupree
616 W. Hill Ave, 2nd Floor
Knoxville, TN 37902
T: (865) 223-5184
john.dupree@knoxtnlaw.com

**FRIEDMAN, DAZZIO, ZULANAS &
BOWLING, PC**
Jeffrey E. Friedman, Ala. Bar No. asb-
6868-n77j
(admission *Pro Hac Vice*)
3800 Corporate Woods Drive
Birmingham, AL 35242
T: (205) 278-7000
F: (205) 278-7001
jfriedman@friedman-lawyers.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 5, 2021, a copy of the foregoing was filed electronically. Notice of filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access the filing through the Court's electronic filing system.

By: */s/ Louis W. Ringger, III*
Attorney for Plaintiffs