# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

GREG ADKISSON, et al.,                    )
     Plaintiffs,                          )
v.                                        )    No.:  3:13-CV-505-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,           )
     Defendant.                           )
_____)  *Lead case consolidated with*

KEVIN THOMPSON, et al.,                   )
     Plaintiffs,                          )
v.                                        )    No.:  3:13-CV-666-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,           )
     Defendant.                           )
_____)  *as consolidated with*

JOE CUNNINGHAM, et al.,                    )
     Plaintiffs,                          )
v.                                        )    No.:  3:14-CV-20-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,           )
     Defendant.                           )
                              )

BILL ROSE,                                )
     Plaintiff,                           )
v.                                        )    No.:  3:15-CV-17-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,           )
     Defendant.                           )
_____)

CRAIG WILKINSON, et al.,                   )
     Plaintiffs,                          )
v.                                        )    No.:  3:15-CV-274-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,           )
     Defendant.                           )
_____)

ANGIE SHELTON, as wife and next of kin    )
on behalf of Mike Shelton, et al.,        )
     Plaintiffs,                          )
v.                                        )    No.:  3:15-CV-420-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,           )
     Defendant.                           )
_____)

JOHNNY CHURCH,                        )
      Plaintiff,                      )
v.                                    )     No.:   3:15-CV-460-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,       )
      Defendant.                      )
_____)
DONALD R. VANGUILDER, JR.,            )
      Plaintiff,                      )
v.                                    )     No.:   3:15-CV-462-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,       )
      Defendant.                      )
_____)
JUDY IVENS, as sister and next of kin, )
on behalf of JEAN NANCE, deceased,    )
      Plaintiff,                      )
v.                                    )     No.:   3:16-CV-635-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,       )
      Defendant.                      )
_____)


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendant Jacobs Engineering Group, Inc.'s ("Jacobs") "Renewed Motion for Judgment as a Matter of Law"[1] [Doc. 545].[2] Plaintiffs responded in opposition [Doc. 553], and defendant replied [Doc. 559]. Thereafter, the Court ordered supplemental briefing on the substantive merits of defendant's motion [Doc. 744]. Accordingly, plaintiffs filed a supplemental response [Doc. 748], and defendant filed a supplemental reply [Doc. 749]. This matter is now ripe for the Court's

---

[1] As discussed in further detail below, although Jacobs presents the instant motion as a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), the Court finds that the instant motion is more appropriately considered as a motion for reconsideration under Federal Rule of Civil Procedure 54(b).

[2] Unless otherwise indicated, all citations refer to the docket in *Adkisson, et al. v. Jacobs Engineering Group, Inc.*, 3:13-cv-505.

2

review. For the reasons below, Jacobs's motion is denied, but the Court will certify the order for interlocutory appeal under 28 USC § 1292(b).

## I. Background

At this stage of the litigation, the Court presumes familiarity with the facts of this case. Accordingly, the Court will not provide a comprehensive background of the entire case. Rather, the Court will provide a limited background on the issue of derivative immunity throughout this litigation, as is relevant to the present motion.

In 2014, this Court first addressed derivative immunity issues in these cases when it granted motions to dismiss filed in *Adkisson*, *Thompson*, and *Cunningham* [Doc. 39]. The Court found that there were no allegations that Jacobs exceed any scope of authority granted to it by the Tennessee Valley Authority ("TVA"), nor that any authority TVA granted was not validly conferred, as required to defeat derivative sovereign immunity [*Id*. at 20]. The Court noted that it could dismiss the action on this ground alone [*Id*. at 21]. Nevertheless, the Court also found that the derivative discretionary function immunity doctrine applied [*Id*.]. This Court held that plaintiffs' challenges are of the kind that the discretionary function exception to the Federal Tort Claims Act ("FTCA") was designed to protect [*Id*. at 24]. Moreover, the Court concluded that the directives that plaintiffs asserted were mandatory did not prescribe a specific course of action such that they eliminated the applicability of discretion [*Id*. at 33]. Rather, the Court found that the directives merely set forth general objectives or goals without any specific procedures [*Id*.]. Thus, after applying the discretionary function exception test, the Court concluded that

3

Jacobs was entitled to derivative immunity under that test and dismissed the relevant actions [*Id.* at 34].

Plaintiffs appealed [Doc. 41] and the Sixth Circuit reversed [Doc. 42]. In its opinion, the Sixth Circuit held that derivative immunity under *Yearsley*[3] is not jurisdictional, and thus, this Court erroneously dismissed the case under Federal Rule of Civil Procedure 12(b)(1) [*Id.* at 5]. Nevertheless, the Sixth Circuit continued on to discuss the merits of the derivative immunity argument. The Circuit noted that the *Yearsley* Court never explained the basis for the protection that it provided to contractors [*Id.* at 6]. The Circuit also noted that the FTCA explicitly excludes contractors from its scope [*Id.*]. The Sixth Circuit thus concluded that *Yearsley*'s sparse reasoning creates uncertainty regarding the scope of that decision [*Id.* at 7].

Nevertheless, the Sixth Circuit assumed, without deciding, that Jacobs could benefit from *Yearsley*'s protections on *Yearsley*'s terms [*Id.*]. The Sixth Circuit went on to say that, under Rule 12(b)(6), the complaints in these cases could plausibly be construed as alleging that defendant violated the scope of the agreement with TVA, such as allegations that Jacobs misrepresented the harmfulness of fly ash [*Id.* at 9]. With regard to whether Jacobs's conduct falls under the discretionary function exception, the Circuit noted that this Court had found that the regulations cited did not prescribe a specific course of action, but the Sixth Circuit stated that just because certain conduct fails to be specifically

---

[3] *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940) (recognizing that government contractors are entitled to derivative immunity while acting on the behalf of the government).

4

mandated does not necessarily mean a contractor is protected from liability [*Id*. at 10]. The Sixth Circuit stated that governmental conduct does not necessarily amount to an exercise of a discretionary function just because carrying out the general policy provided the opportunity for the negligent act [*Id*. at 10–11]. On remand, the Sixth Circuit instructed this Court to consider: (1) whether Jacobs was eligible for immunity under *Yearsley*; and (2) whether Jacobs's conduct would fall under the corollary of the discretionary function exception to the FTCA [*Id*. at 11].

On remand, Jacobs filed a motion to dismiss [Doc. 70] arguing that it was entitled to derivative discretionary function immunity. The motion was later converted to a motion for summary judgment [Doc. 99]. The Court denied the motion for summary judgment [Doc. 137]. Regarding derivative immunity, the Court noted that, under *Yearsley*, a government contractor could be entitled to derivative immunity, but only if the contractor executed the will of the government and did not exceed its authority [*Id*. at 26–27].

The Court first analyzed Jacobs's potential contractor immunity under the discretionary function test [*Id*. at 29]. Following the Sixth Circuit's guidance, the Court stated that it was first required to determine whether Jacobs satisfied the prerequisites for *Yearsley* immunity and then whether the challenged conduct was protected as a discretionary function [*Id*.]. The Court stated that Jacobs was entitled to derivative discretionary function immunity "only if it adhered to the terms of its contract with the government" [*Id*. (quoting *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014))] and "executed the will of the government" [*Id*. (quoting *Chesney v. Tenn. Valley*

*Auth.*, 782 F. Supp. 2d 570, 582 (E.D. Tenn. Mar. 22, 2011))]. Ultimately, viewing the record in the light most favorable to plaintiffs, the Court found that a material question of fact existed as to whether Jacobs acted within the scope of its authority when performing the alleged acts that gave rise to plaintiffs' claims [*Id*. at 30].

Specifically, the Court found that there was evidence in the record that defendants would be acting contrary to the will of the government if it:

(1) did not randomly select workers for mobile monitoring;
(2) manipulated the monitoring results;
(3) did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash;
(4) did not honor prescriptions for dust masks or respirators;
(5) communicated to workers that fly ash was safe to consume; and/or
(6) threatened workers when they asked for dust masks or respirators

[*Id*.]. First, as to selection for mobile monitoring, the Court found that, according to TVA's former site safety manager, Tom Heffernan, workers should have been selected at random for mobile monitoring, but viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could determine that Jacobs at least influenced the selection of workers for mobile monitoring [*Id*. at 30–31]. Second, the Court noted that Mr. Heffernan indicated that any manipulation of air monitoring results would be outside the scope of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") order, and found that a reasonable jury could determine that defendant manipulated the air monitoring results and such manipulation was contrary to the will of the government [*Id*. at 31]. Third, the Court found that there was evidence that defendant acted outside the scope of its authority by failing to report safety concerns to TVA, again

6

citing to Mr. Heffernan's deposition testimony indicating that TVA expected that it would be informed of any repeated complaints of breathing problems due to fly ash or complaints regarding the lack of respirator protection [*Id*.]. Fourth, the Court stated that the record contained evidence that defendant should have informed TVA if a doctor prescribed a respirator for a worker and should have honored that prescription, but there was evidence that defendant did not honor such prescriptions [*Id*. at 32]. Fifth, the Court found that it would have been contrary to safety training for defendant to represent that fly ash was safe in a public meeting, and any communication that fly ash was safe to eat or drink would be outside the scope of the safety intentions under the TVA/Jacobs contract [*Id*.]. The Court concluded that a reasonable jury could find that defendant engaged in actions outside the scope of its contract by misrepresenting the safety of fly ash [*Id*.]. Sixth, the Court found that, although denying the use of personal protective equipment ("PPE") may have been acceptable under the TVA/Jacobs contract in certain circumstances, harassing or threatening a worker who asked for PPE would not [*Id*. at 32–33]. Thus, the Court found that a reasonable jury could conclude that defendant did not act in conformity with the will of the government if it threatened workers who asked for PPE [*Id*. at 33].

Accordingly, the Court concluded that there was a material question of fact as to whether Jacobs satisfied the prerequisites for *Yearsley* immunity, and therefore, whether Jacobs was entitled to derivative discretionary function immunity [*Id*. at 34]. The Court thus concluded that it need not reach the question of whether Jacobs's actions were protected as discretionary functions [*Id*. at 35–36].

The Court then turned to Jacobs's potential contractor immunity under the framework in *Campbell-Ewald*[4] [*Id.* at 29, 36]. The Court rejected Jacobs's proposed "within scope" test[5] for contractor qualified immunity under *Campbell-Ewald*, noting that Jacobs had not alleged that TVA would be entitled to any immunity other than discretionary function immunity, and applying the "within scope" test could result in a situation where a government contractor is entitled to immunity to which the government itself would not be entitled. [*Id.* at 36]. The Court noted that *Campbell-Ewald* addressed a circumstance where the federal government enjoyed absolute immunity to the claims, but here, TVA is not absolutely immune, but rather, "retains immunity only as its actions satisfy the discretionary function test." [*Id.* at 37]. The Court concluded that, because a defendant is only eligible for immunity that is derivative of the immunity to which the federal government would be entitled in the same situation, in order to benefit from immunity, defendant must satisfy the general principles of contractor immunity and must satisfy the discretionary function test [*Id.*]. Thus, the Court found that the "within scope" test set forth in *Campbell-Ewald* was not applicable [*Id.*]. Moreover, the Court concluded that, even if the "within scope" test applied, Jacobs could not satisfy it as there was a

---

[4] *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) (addressing government contractor immunity under *Yearsley*).

[5] Jacobs argued that, under Campbell-Ewald's "within scope" test, it was immune from third-party liability for work that it performed within the scope of the TVA contract, unless plaintiffs can establish that it acted contrary to specific or "clearly established" government requirements [Doc. 70, p. 28].

8

material question of fact as to whether Jacobs acted within the scope of its contract with the government [*Id*.].

While the parties were litigating the immunity issue, this Court granted a motion to bifurcate the trial proceeding into two phases: Phase I, to involve whether Jacobs owed plaintiffs a legal duty, whether Jacobs breached that duty, and whether the breach was capable of causing plaintiffs' collective alleged injuries, and Phase II, to involve specific causation with respect to individual plaintiffs, each individual plaintiff's alleged injuries, and the extent to which individual plaintiffs are entitled to damages [Doc. 136]. In 2018, these cases proceeded to Phase I trial.

At the close of evidence, Jacobs filed several motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) [Docs. 388–91]. In one of these motions, Jacobs, in a footnote, again raised the argument that it was entitled to derivative government immunity [Doc. 389, p. 8 n.2]. The Court denied each of Jacobs's Rule 50(a) motions [*See* Doc. 424]. The Court then instructed the jury as follows regarding the immunity issue:

> In rendering the services at issue, Defendant was required to comply with the requirements established in the contract between Defendant and TVA, which I will refer to as the contract, and in the Site Wide Safety and Health Plan for the Kingston site, which I will refer to as the safety and health plan.
>
> Defendant was not permitted to deviate from the requirements in the safety and health plan without express approval from TVA and the Environmental Protection Agency.
>
> Defendant is not immune from suit for such deviations. I have ruled that Defendant would be acting contrary to the will of the government and is not

9

immune from suit if Defendant, A, deliberately manipulated or tampered with any monitoring results or processes, B, did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash, C, failed to comply with the provisions of the safety and health plan with respect to the voluntary use of dust masks, D, threatened workers when they asked for dust masks or respirators, E, communicated to workers that fly ash was safe to consume, or, F, otherwise failed to train or warn workers about the dangers of excessive fly ash exposure.

Again, Defendant is not entitled to immunity for any of these acts or omissions which would be contrary to the will of the government and in violation of its obligations to TVA.

[*Id.* at 132–33]. Thereafter, the jury returned a verdict in plaintiffs' favor, specifically finding that plaintiffs had proven that defendant failed to adhere to the terms of its contract with TVA or the requirements set forth in the Site Wide Safety and Health Plan ("SWSHP") for the Kingston Site [Doc. 408].

After the Phase I trial ended, Jacobs filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) [Doc. 437]. In this motion Jacobs again argued that it was entitled to derivative governmental immunity [Doc. 438, pp. 10–15]. The Court denied Jacobs's Rule 50(b) motion [Doc. 462]. In denying this motion, the Court noted that the "ship has already sailed on Jacobs's . . . argument . . . that it is entitled to derivative governmental immunity—due primarily to the law of the case doctrine" [*Id.* at 22–23]. The Court also noted that Jacobs conceded that the lodestone for governmental contractor liability is whether the contractor exceeded its delegated authority, and the Court had explicitly held that there was evidence in the record that Jacobs would be acting

10

contrary to the will of the government if it engaged in six (6) acts or omissions [*Id*. at 23]. The Court noted that it had instructed the jury on these six (6) acts or omissions, and Jacobs did not object to the instruction [*Id*. at 23–24]. Nevertheless, the Court found that even if Jacobs had properly preserved this argument, it would fail because the prior ruling remained the law of the case, and under it the conduct at issue falls outside the discretionary function exception [*Id*. at 24]. In a footnote, the Court stated that the discretionary function exception "informs the scope of Jacobs's immunity under *Yearsley*" [*Id*. at 24 n.9].

Beyond the law-of-the-case doctrine, the Court also concluded that Jacobs's arguments did "not get the discretionary-function exception quite right," because even if Jacobs's conduct was discretionary, it must also be susceptible to policy analysis [*Id*. at 25]. The Court concluded that whatever decisions that preceded Jacobs's conduct at issue here were not the kind that the discretionary function exception was designed to shield because they were not susceptible to policy analysis [*Id*. at 27].

On June 4, 2020, Jacobs filed the instant "Renewed Motion for Judgment as a Matter of Law," purportedly under Rule 50(b), again raising the derivative immunity issue, and arguing that the Supreme Court's April 2019 decision in *Thacker v. Tennessee Valley Authority*, 139 S. Ct. 1435 (2019),[6] issued after the Court denied Jacobs's prior Rule 50(b) motion, materially changes the Court's analysis of the derivative immunity issue [Doc. 545].

---

[6] The Court discusses the Supreme Court's decision in *Thacker*, and the parties' resulting positions, in section III.B., *infra*.

## II.      Standard of Review

As an initial matter, the Court must determine the appropriate standard of review to apply in this unusual procedural posture.  Jacobs has presented the instant motion as a renewed motion for judgment as a matter of law under Rule 50(b).  However, Jacobs previously filed a renewed motion for judgment as a matter of law under Rule 50(b) [Doc. 437], raising the derivative immunity argument, which this Court denied [Doc. 462].  The instant motion essentially seeks reconsideration of the Court's denial of Jacobs's summary judgment and Rule 50(b) motions on the issue of derivative immunity, based on an intervening change of law.

In other circumstances, such a motion would properly be brought under Rule 59(e) of the Federal Rules of Civil Procedure, which allows for motions to alter or amend a judgment. Fed. R. Civ. P. 59(e).  Rule 59(e) motions generally may be granted if there is a clear error of law, newly discovered evidence, *an intervening change in controlling law*, or to prevent manifest injustice.  *GenCorp, Inc. v. American Intern. Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).  However, the plain language of Rule 59(e) allows such motions only to alter or amend a *judgment* and must be filed within 28 days of the entry of that *judgment*.  Fed. R. Civ. P. 59(e).  In this case, due to the bifurcated trial, although the jury returned a verdict in the Phase I trial, and the Court denied Jacobs's Rule 50(a) motion for judgment as a matter of law and Rule 50(b) renewed motion for judgment as a matter of law on the Phase I trial issues, no judgment has entered in this matter, as the Phase II issues remain pending.

12

Ultimately, the Court concludes that the instant motion is most properly considered a motion for reconsideration of an interlocutory order[7] under Rule 54(b) of the Federal Rules of Civil Procedure. Rule 54(b) states that

> any order or other decision, however designated, that adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). The Sixth Circuit has indicated that "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). Under this rule, the Court can grant such relief from interlocutory orders as justice requires. *Id*. "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest justice." *Id*. The moving party bears the burden of showing that reconsideration under Rule 54(b) is warranted, and that some harm or injustice would result if reconsideration were denied. *Powers v. United States*, No. 16-cv-13668, 2019 WL

---

[7] A renewed motion for judgment as a matter of law, which is one of the relevant orders on the immunity issue that Jacobs now raises for reconsideration, would typically be a final order, as it would resolve all issues in the case. However, given the procedural posture of this case, with a Phase II trial yet to be conducted, the Court finds that its order denying Jacobs's renewed motion for judgment as a matter of law [Doc. 462] is an interlocutory order. An interlocutory order is defined as "[a]n order that relates to some intermediate matter in the case; any order other than a final order." *Order*, Black's Law Dictionary (11th ed. 2019). Under these circumstances, the Court's denial of Jacobs's renewed motion for judgment as a matter of law was not a final order, as it related only to the issues raised in the Phase I trial, and not the remaining issues to be decided in Phase II.

13

1397239, at *2 (E.D. Mich. Mar. 28, 2019) (quoting *Adkins v. Kroger Ltd. P'ship*, No. 5:18-156, 2018 WL 6613786, at *3 (E.D. Ky. Dec. 18, 2018)). Thus, the Court finds that, if Jacobs can establish that *Thacker*, an intervening change of law, alters the Court's analysis of the derivative immunity issue, relief under Rule 54(b) would be proper.[8]

## III.  Analysis

### A.  Procedural Issues

Before addressing whether Jacobs's motion is meritorious, the Court must address several procedural challenges plaintiffs have raised. Specifically, plaintiffs argue that Jacobs's motion is untimely under Rule 50, because a Rule 50(a) motion must be made before the case is submitted to the jury and a Rule 50(b) motion must have been filed no later than 28 days after entry of judgment or 28 days after the jury is discharged [Doc. 553, pp. 3–4]. Plaintiffs also contend that Jacobs waived this issue by failing to raise it in a Rule 50(a) motion before the case was submitted to the jury [*Id.* at 4].

However, as the Court previously discussed, the Court does not consider Jacobs's motion under Rule 50(b), but rather, finds that Jacobs's motion is more properly considered

---

[8]  Reviewing Jacobs's motion under Federal Rule of Civil Procedure 60(b)(6) would yield a similar analysis (and result). Rule 60(b)(6) allows for relief from "a final judgment, order, or proceeding" for "any [] reason that justifies relief." Fed. R. Civ. P. 60(b). Similar to the Court's analysis under Rule 54(b), *infra*, the Court finds that, *if* Jacobs can establish that *Thacker*, an intervening change of law, alters the Court's analysis of the derivative immunity issue, relief under Rule 60(b)(6) would be appropriate, particularly given the special circumstances that: (1) this bifurcated case remains pending as to Phase II, the trial(s) of which will involve a significant amount of time and resources, and (2) the instant issue may be dispositive of the entire case. *See GenCorp, Inc. v. Olin Corp.*, 477 F.3d 368, 373 (6th Cir. 2007) (holding that an intervening change of law alone is rarely sufficient to constitute the extraordinary circumstances required for relief under Rule 60(b)(6), but a change of law, coupled with some other special circumstance, is an appropriate ground for relief under Rule 60(b)(6)).

14

a motion for reconsideration under Rule 54(b). Rule 54(b) does not establish any time limit on seeking reconsideration pursuant to Rule 54(b). To the contrary, the plain language of Rule 54(b) provides that an interlocutory order may be revised "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).

Furthermore, even to the extent that any "reasonable time"[9] limitation applies to a motion under Rule 54(b), the Court finds that Jacobs filed the instant motion within a reasonable time from the *Thacker* decision. *Thacker* was decided on April 29, 2019. Jacobs filed the instant motion over a year later, on June 4, 2020 [Doc. 545]. However, these proceedings were stayed pending mediation from January 18, 2019 [Doc. 459] until April 28, 2020 [Doc. 519].[10] Thus, *Thacker* was decided while this case was stayed, and Jacobs filed the instant motion a mere 37 days after the stay was lifted. Given this short timeframe in which Jacobs filed the instant motion after the stay was lifted, the Court finds

---

[9]  Again, to the extent that Jacobs's motion could be construed as a Rule 60(b) motion, such must be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1). Thus, the Court would not find the instant motion untimely under Rule 60(b)(6).

[10]  On January 18, 2019, the Court ordered the parties to mediate this litigation in good faith within one hundred fifty (150) days and further provided for the magistrate judge to oversee the mediation [Doc. 459]. In May 2019, the parties jointly moved for an extension of time to mediate [Doc. 472], and the magistrate judge extended the mediation deadline to August 16, 2019 [Doc. 474]. When that deadline expired and no mediator's report had been filed, the magistrate judge again extended the mediation deadline until October 15, 2019 [Doc. 479]. After ruling on several motions regarding the conduct of mediation, in February 2020, the magistrate judge, after discussion with the parties and the mediator, again extended the mediation deadline to March 31, 2020 [Doc. 488]. The mediator's report was ultimately filed on April 13, 2020 [Doc. 502], and the Court lifted the stay on April 28, 2020 [Doc. 519].

that Jacobs was diligent in seeking relief in light of *Thacker*. Accordingly, even applying a "reasonable time" test, the Court does not find that the instant motion is untimely.[11]

As to plaintiffs' waiver argument, an effective waiver must be one "of a known right or privilege." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 143 (1967) (internal quotation marks omitted). "The intervening-change-in-law exception to our normal waiver rules . . . exists to protect those who, despite due diligence, fail to prophesy a reversal of established adverse precedent." *Olin*, 477 F.3d at 374. The Court finds that, regardless of which rule it applies, Jacobs has not waived the present argument because it is based on the intervening change of law in *Thacker*. Moreover, Jacobs has repeatedly and systematically raised the issue of derivative immunity at nearly every stage of this litigation. Accordingly, the Court finds that it would be unjust to deem Jacobs to have waived the arguments raised in the instant motion.

Finally, relying on this Court's prior order, denying Jacobs's first Rule 50(b) motion, plaintiffs contend that reargument of the derivative immunity issue is barred by

---

[11] Moreover, the Court also finds that Jacobs's motion is timely, even if Rule 50(b) were applied. Rule 50(b) allows for a renewed motion for judgment as a matter of law to be filed "[n]o later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged[.]" Fed. R. Civ. P. 50(b). As the Court noted previously, although the jury returned a verdict in the Phase I trial, because the trial of these cases has been bifurcated, no judgment has been entered. Accordingly, the 28 days from the entry of judgment have not begun, as no judgment has entered. Further, the derivative immunity issue raised in this motion is not a jury issue that was not decided by the verdict, as the Court explicitly instructed the jury that if it found that Jacobs committed any of six (6) enumerated acts or omissions, it would not be immune from suit. Accordingly, the second option for starting the 28-day time frame under Rule 50(b) does not apply, as the issue at hand was submitted to the jury, and the jury returned a verdict on the issue. Thus, the Court finds defendant's motion to be timely.

16

the law-of-the-case doctrine [Doc. 553, p. 6]. Defendant replies that even if the law-of-the-case doctrine was properly invoked in the first instance, it no longer applies because *Thacker* is an intervening change of law [Doc. 559, p. 15]. "The purpose of the law-of-the-case doctrine is to ensure that the *same* issue presented a second time in the *same* case in the *same* court should lead to the *same* result." *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (emphasis in original). However, a law-of-the-case finding may be disturbed based on an intervening change of law. *See Entertainment Productions, Inc. v. Shelby Cnty., Tenn.*, 721 F.3d 729, 742 (6th Cir. 2013) (discussing grounds for an appellate court to overturn a district court's law-of-the-case determination on appeal). For the same reasons discussed above with regard to waiver, the Court finds that applying the law-of-the-case doctrine to bar Jacobs from raising an intervening change of law that may materially impact the Court's analysis of a dispositive issue in this matter would be unjust. Accordingly, the Court does not find that Jacobs's instant arguments are barred by the law-of-the-case doctrine.

### B. Merits

#### 1. *Thacker*

Before further addressing the merits of the parties' arguments, the Court finds it necessary to provide an overview of the *Thacker* decision, on which defendant's motion for reconsideration relies.

The negligence claims at issue in *Thacker* arose after a boating incident that occurred while TVA was conducting work replacing a power line that ran across the

17

Tennessee River. 139 S. Ct. at 1440. During this work, a cable that TVA employees were using failed, causing the power line to fall into the water. *Id*. TVA immediately notified the Coast Guard, which announced that it was closing a portion of the river, and TVA positioned two (2) patrol boats near the downed line. *Id*. However, several hours later, as TVA workers began to raise the line, Gary Thacker drove his boat into the area at a high speed. *Id*. The boat and line collided, causing serious injury to Mr. Thacker and killing a passenger. *Id*. Mr. Thacker then sued TVA for negligence. *Id*. The district court granted TVA's motion to dismiss based on sovereign immunity, and the Eleventh Circuit affirmed. *Id*. The Supreme Court then granted certiorari to determine whether the waiver of sovereign immunity in TVA's sue-and-be-sued clause is subject to a discretionary function exception, of the kind in the FTCA. *Id*.

The Supreme Court noted that, in establishing TVA as a hybrid governmental and commercial entity, Congress provided that TVA could "sue and be sued in its corporate name." *Id*. at 1439 (citing 16 U.S.C. § 831c(b)). Without this clause, TVA would have enjoyed sovereign immunity from suit, like any other governmental entity. *Id*. Congress later enacted the FTCA to waive immunity from tort suits involving agencies across the government. *Id*. However, Congress carved out an exception to this waiver of immunity for federal employees performing a "discretionary function." *Id*. at 1439–40. In enacting the FTCA, Congress specifically excluded from the provisions of that statute, including the discretionary function exception to the waiver of sovereign immunity, "[a]ny claim arising

18

from the activities of the [TVA]." *Id.* at 1440 (quoting 28 U.S.C. § 2680(l)) (alterations in original).

The Supreme Court held that the waiver of sovereign immunity in TVA's sue-and-be-sued clause is not subject to a discretionary function exception of the kind in the FTCA. *Id.* at 1440. The Court noted that nothing in the statute establishing TVA expressly recognized immunity for discretionary functions, and the FTCA exception does not apply to TVA based on the plain language of that statute. *Id.* at 1440–41. The Court acknowledged that in *Federal Housing Administration v. Burr*, 309 U.S. 242, 245 (1940), it previously recognized that a sue-and-be-sued clause might contain "implied exceptions." *Id.* at 1441. However, the Court declined to use *Burr* to provide a governmental entity that was explicitly excluded from the FTCA with a replica of that statute's discretionary function exception, noting that Congress made a considered decision *not* to apply the FTCA to TVA. *Id.*

The Court concluded that its prior decisions establish that, barring special constitutional or statutory issues, suits based on a public corporation's commercial activity may proceed as they would against a private company, and only suits challenging the entity's governmental activity may run into an implied limit on its sue-and-be-sued clause. *Id.* at 1443. The Court continued on to state:

> When the TVA . . . operates in the marketplace as private companies do, it is as liable as they are for choices and judgments. The possibility of immunity arises only when a suit challenges governmental activities—the kind of functions private parties typically do not perform. And even then, an entity with a sue-and-be-sued clause may receive immunity only if it is 'clearly

19

shown' that prohibiting the 'type[] of suit [at issue] is necessary to avoid grave interference' with a governmental function's performance.

*Id*. at 1443 (quoting *Burr*, 309 U.S. at 245) (alteration in original). The Court cautioned that the grave interference standard is a "high bar." *Id*. The Court summarized that, in determining whether TVA is entitled to sovereign immunity, courts must first decide whether the conduct alleged to be negligent is commercial or governmental in nature. *Id*. at 1444. If the answer is commercial, TVA cannot invoke sovereign immunity. *Id*. If the answer is governmental, the Court must then ask whether prohibiting the type of suit at issue is necessary to avoid grave interference with that function's performance. *Id*. TVA is only entitled to sovereign immunity if the court answers this second question in the affirmative. *Id*.

### 2. Parties' Positions

Jacobs argues that, under *Thacker*, it is entitled to derivative governmental immunity [Doc. 546]. Jacobs contends that, under *Yearsley*, the key question is whether a contractor violated a government directive [*Id*. at 12]. Jacobs argues that there is no evidence that it violated any specific directives by TVA, and the analysis should stop there [*Id*. at 13]. However, the Court's prior analysis went further and found that Jacobs would not be entitled to immunity if it engaged in six (6) specific acts or omissions, which the Court believed were relevant to the issue of derivative immunity based on its holding that the discretionary function exception informed the scope of Jacobs's immunity under *Yearsley* [*Id*. at 14]. Jacobs contends that, after *Thacker*, whether an act falls outside the

20

discretionary function exception is irrelevant, and the only question is whether Jacobs violated federal law or the government's explicit instructions, which it did not [*Id.*].

Jacobs further contends that TVA would have sovereign immunity in this instance under *Thacker*. Jacobs asserts that TVA was performing a governmental function in its remediation efforts because, as the lead agency under CERCLA, it was required to plan and implement response actions and, in this capacity, TVA was not engaging in the same activities of its citizens or competing with a private company [*Id.* at 15–16]. Jacobs further argues that the instant lawsuits gravely interfere with the governmental activity of remediation [*Id.* at 16].

In response,[12] plaintiffs contend that *Thacker* does not provide a basis for reconsideration of this Court's prior orders on the issue of derivative immunity, because it does not change the controlling law [Doc. 553, p. 8; Doc. 748, p. 3]. Specifically, plaintiffs argue, *Thacker* does not address governmental contractor immunity at all [*Id.*]. Plaintiffs argue that the *Thacker* decision does not change the analysis in *Yearsley* on which the Court relied in determining whether Jacobs had derivative immunity previously [Doc. 748, p. 4].

---

[12] The Court notes that plaintiffs devote a significant portion of their initial and supplemental responses to addressing whether Jacobs is entitled to derivative immunity under CERCLA [Doc. 553, pp. 11–14; Doc. 748, pp. 8–14]. However, Jacobs makes clear in its briefing that it is not seeking derivative immunity under CERCLA, but rather, only highlighted TVA's status as lead federal agency under CERCLA to show that TVA was performing a governmental function when it engaged in remediation efforts at the Kingston site, which is a relevant consideration under *Thacker* [Doc. 559, p. 8]. Plaintiffs appear to recognize that Jacobs is not seeking derivative immunity under CERCLA, by arguing in their supplemental response that, based on Jacobs's statement in its reply brief, it should be deemed to have expressly waived any argument for derivative immunity under CERCLA [Doc. 748, pp. 8–9]. Because it is clear that Jacobs does not seek derivative immunity under CERCLA, the Court will not recount plaintiffs' arguments regarding this issue and will not address the matter in its analysis.

21

Plaintiffs note that, in its summary judgment ruling, this Court stated that it did not need to reach the question of whether Jacobs's actions were protected as discretionary functions, and thus, the Court's summary judgment decision was not based on whether TVA or Jacobs had immunity under the discretionary function exception [*Id.* at 5]. The Court, instead, answered the question of immunity in the negative on the first prong—whether Jacobs was entitled to derivative immunity under *Yearsley*—and had no occasion to, and still has no occasion to, reach the second prong—whether TVA was entitled to immunity [*Id.*].

Plaintiffs also argue that whether TVA is immune under *Thacker* is irrelevant because the jury unanimously found that Jacobs was negligent for the specific acts that the Court found to be outside the scope of Jacobs's authority under the contract [Doc. 553, p. 8; Doc. 748, p. 8]. Plaintiffs argue that the Court's list of six (6) acts or omissions that defeat derivative immunity is well supported by both *Yearsley* and *Campbell-Ewald*, and Jacobs now appears to rely on an alternative formulation of *Yearsley* by arguing that the instructions in the contract and SWSHP were not specific or explicit enough, but cites no support for this argument [Doc. 748, pp. 7–8].

Even assuming the *Thacker* test has application, plaintiffs contend that TVA is not entitled to sovereign immunity at all based on its remediation efforts at the Kingston site [Doc. 748, p. 14]. First, plaintiffs argue that TVA's remediation efforts at the Kingston site were part and parcel of its commercial function of generation of electricity for sale to consumers, not a governmental function [*Id.* at 16, 19]. Moreover, plaintiffs contend that

22

Jacobs cannot establish that their claims gravely interfere with TVA's governmental functions [*Id.* at 21].

In reply, Jacobs admits that *Thacker* does not address the issue of derivative immunity, but argues that it nevertheless fundamentally changes the Court's derivative immunity analysis, which rested on its holding that the discretionary function exception informed Jacobs's immunity under *Yearsley* [Doc. 559, pp. 10–11]. Jacobs notes that this Court explained in its summary judgment order that the discretionary function exception informed the scope of Jacobs's immunity under *Yearsley*, and this concept came directly from the Sixth Circuit, which expressly equated government contractor immunity under *Yearsley* with the discretionary function exception [Doc. 749, p. 6]. With regard to the jury instructions, the Court again explained that the six (6) theories fell outside of the discretionary function exception, again citing to the Sixth Circuit's opinion [*Id.* at 7]. Jacobs states that collapsing the analyses under *Yearsley* and the discretionary function exception made sense prior to *Thacker*, as, prior to that decision, the discretionary function exception was the determining factor for whether TVA was entitled to immunity [*Id.* at 7–8].

Jacobs contends that the six (6) theories presented to the jury are predicated on the discretionary function exception and do not turn on whether Jacobs violated both federal law and the government's explicit instructions, as required by *Campbell-Ewald* [Doc. 559, p. 11; Doc. 749 p. 8]. For example, Jacobs notes that the Court allowed the voluntary use of dust masks theory to go to the jury based on the belief that, under the old law, this

23

conduct was not the kind that the discretionary function exception was designed to shield, because it was not susceptible to policy analysis [Doc. 559, p. 12]. Jacobs contends that, now that the discretionary function exception has no role to play in this case, the Court's analysis of the six (6) theories and the evidence supporting them cannot still be valid [Doc. 749, p. 8]. Moreover, Jacobs contends that, even if some of the six (6) theories could be tied to federal law and the government's explicit instructions, it is impossible for anyone besides the Phase I jury to know which theories the jury agreed upon [Doc. 559, p. 12].

Jacobs contends that, absent the reliance on the discretionary function exception, derivative immunity under *Yearsley* boils down to the simple question of whether a government contractor disobeyed a government directive [Doc. 749, p. 9]. Jacobs states that it was tasked with helping develop and implement the SWSHP, and, although that document contained broad guidelines for safety programs, it did not set forth express directives from TVA, the violation of which would jeopardize *Yearsley* immunity [*Id*. at 10]. Jacobs argues that, while plaintiffs note that the Court heard extensive testimony at trial that demonstrated that Jacobs's acts did not comply with the directions in the contract or the SWSHP, plaintiffs have never attempted to connect any of the six (6) theories with any language in the contract or SWSHP [*Id*.]. Jacobs contends that those documents contain only broad guidelines, and none of the six (6) theories represent potential violations of an express directive that would negative derivative immunity under *Yearsley* [*Id*. at 10–11].

24

### 3.     Is Jacobs Entitled to Derivative Immunity Under *Yearsley*?

Both parties agree that nothing in *Thacker* directly addresses the *Yearsley* standard for derivative immunity [Doc. 553, p. 8; Doc. 559 pp. 10–11; Doc. 748, p. 3], which is the first step this Court must consider in deciding whether Jacobs is entitled to derivative immunity. However, Jacobs contends that *Thacker*'s holding that TVA is entitled to no immunity under the discretionary function exception is determinative on the issue of *Yearsley* immunity, because the Court's prior holding that it was not entitled to derivative immunity under *Yearsley* was "informed" by the discretionary function exception [Doc. 749, p. 6]. For the reasons explained below, the Court finds that, even re-evaluating whether Jacobs is entitled to derivative immunity under *Yearsley* without reference to the discretionary function exception, Jacobs is not entitled to immunity under *Yearsley* for any of the six (6) acts or omissions that the Court previously held would be contrary to the will of the government [Doc. 137, pp. 29–34].

In *Yearsley*, the United States Supreme Court considered whether a contractor that constructed dikes in the Missouri River pursuant to a contract with the federal government could be held liable for a taking of private property when the construction of the dikes produced artificial erosion and washed away part of the plaintiffs' riverside property. 309 U.S. at 19–20; *see also Chesney v. Tenn. Valley Auth.*, 782 F. Supp. 2d 570, 577 (E.D. Tenn. Mar. 22, 2011). The Supreme Court first noted that it was undisputed that the federal

25

government had authorized and directed the project and that the contract to build the dikes was authorized by an act of Congress. *Id*. The Supreme Court then concluded that the contractor could not be held liable for a Fifth Amendment taking under those facts, reasoning that when:

> [A]uthority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for *executing its will*.

*Id*. at 20–21 (emphasis added). The Supreme Court observed, however,

> Where an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred.

*Id*. at 21. The actual holding of *Yearsley* is narrow, stating that "in the case of a taking by the Government of private property for public use . . . the remedy to obtain compensation from the Government is as comprehensive as the requirement of the Constitution, and hence it excludes liability of the Government's representatives lawfully acting on its behalf in relation to the taking." *Id*. at 22.

This Court previously interpreted *Yearsley* as providing derivative immunity to a government contractor "*only* if the contractor executed the will of the government and did not exceed its authority." *Chesney*, 782 F. Supp. 2d at 582 (emphasis in original). In *Chesney*, the Court found that contractors were entitled to derivative immunity under *Yearsley* because there was no allegation that: (1) Congress lacked authority to give TVA the power to produce electricity; (2) TVA lacked the authority to engage in electric power

26

production through coal-fired plants at the Kingston plant; (3) TVA lacked the authority to retain contractors for consulting and other services; and (4) the contractor defendants exceeded the authority TVA gave to them under their respective contracts. *Id*. at 584, 586. Although *Chesney* was decided in the context of the discretionary function exception, the "contrary to the will of the government" test employed in that case followed directly from the language in *Yearsley*. *Id*. at 582 (citing *Yearsley*, 309 U.S. at 21).

More recently, the Supreme Court took up the issue of *Yearsley* immunity in *Campbell-Ewald*. In that case, the plaintiff filed suit under the Telephone Consumer Protection Act ("TCPA") against the Campbell-Ewald Company, as a result of Navy recruitment text messages that he received, despite never opting in to receipt of such messages. 577 U.S. at 666–67. Campbell-Ewald had contracted with the Navy to execute a recruiting campaign involving text messages sent to young adults, encouraging them to learn more about the Navy. *Id*. at 667. The Navy approved Campbell-Ewald's plan conditioned on Campbell-Ewald only sending the messages to individuals who had "opted in" to receipt of marking solicitations on topics that included service in the Navy. *Id*.

In addressing whether Campbell-Ewald was immune under *Yearsley*, the Supreme Court noted that it was undisputed that the government was absolutely immune from suit under the TCPA. *Id*. at 672. The Court noted that "'[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States.'" *Id*. (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S.

27

575, 583 (1943)) (alteration in original). However, the Court noted, a contractor's immunity, unlike the sovereign's, is not absolute. *Id*. The Court held that, when a contractor violates both federal law and the Government's explicit instructions, as was alleged in that case, no derivative immunity shields the contractor from suit by persons adversely affected by the violation. *Id*. The Court stated that plaintiff had presented evidence that the Navy authorized Campbell-Ewald to send text messages only to individuals who had "opted in" to receive solicitations, and the record revealed no basis for arguing that plaintiff's right to remain message free was in doubt or that Campbell-Ewald complied with the Navy's instructions. *Id*. at 673–74.

Before looking again at the six (6) acts or omissions, the Court must again decide the appropriate standard to apply in determining whether Jacobs would be entitled to derivative immunity under *Yearsley* for those acts or omissions. The Court previously determined that the six (6) acts or omissions fell outside any *Yearsley* immunity because they were contrary to the will of the government [Doc. 137, pp. 29–33]. Jacobs appears to argue that the correct standard is not whether it was acting contrary the will of the government, but rather, based on *Campbell-Ewald*, whether its actions violated federal law and the government's explicit instructions. The Court first notes that any argument regarding the appropriate standard under *Yearsley* is not properly raised, as the only premise for this motion to reconsider is the intervening change of law in *Thacker*, which both parties admit does not directly address derivative immunity under *Yearsley*. Accordingly, for this reason alone the Court concludes that the previously applied standard

28

of whether Jacobs's acts or omissions were contrary to the will of the government is the appropriate standard to apply.

However, even if Jacobs could argue at this stage that the Court's "contrary to the will of the government" test was incorrect in light of *Campbell-Ewald*, the Court rejects that argument, based on its reading of *Campbell-Ewald*. Defendant's supposed test comes from language in *Campbell-Ewald* that states: "[w]hen a contractor violates both federal law and the Government's explicit instruction, *as here alleged*, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." 577 U.S. at 166 (emphasis added). It appears to the Court that *Campbell-Ewald*'s statement regarding the violation of federal law and the government's explicit instruction was merely a statement regarding the specific facts of that case, not a new, heightened standard for defeating derivative immunity under *Yearsley*. Accordingly, the Court finds that the appropriate standard to apply in determining whether Jacobs's acts or omissions qualify for *Yearsley* immunity is the previously applied "contrary to the will of the government" test.

Applying this test, the Court finds that the six (6) acts and omissions that it previously determined would be contrary to the will of the government would remain contrary to the will of the government without any regard to the discretionary function exception. The Court will briefly overview why, based on the evidence submitted at the

summary judgment stage,[13] each of the six (6) acts or omissions would be contrary to the will of TVA.[14]

First, as to the claim that Jacobs did not randomly select workers for mobile monitoring, the Court concluded that workers should have been selected at random for mobile monitoring and a reasonable jury could find that defendant at least influenced the selection of workers for mobile monitoring [Doc. 137, pp. 30–31]. The Court based this on the deposition testimony of Tom Heffernan, TVA's former site safety manager, who stated that TVA's testing protocol for air monitoring would have been to take a random sample of workers that was representative of the work [Doc. 97; Heffernan Dep., p. 99]. Based on this testimony, the Court still finds that any failure to randomly select workers for mobile air monitoring would have been contrary to the will of TVA with regard to

_____

[13] The Court reviews the evidence submitted at the summary judgment stage, because it was at this stage that the Court previously determined that any of the six (6) acts or omissions would be contrary to the will of the government, and so, to the extent Jacobs is requesting reconsideration of that determination, it is seeking reconsideration of the Court's summary judgment order [Doc. 137].

[14] While the Court concludes that, even without application of the discretionary function exception, these six (6) acts or omissions remain contrary to the will of the government under the *Yearsley* analysis, the Court does note that such conclusion is a close call. The Court acknowledges that much of the presently available case law on this matter addresses *Yearsley* derivative immunity within the context of the discretionary function exception, i.e., the discretionary function immunity is the type that the government contractors in prior cases sought to apply derivatively. Indeed, the Sixth Circuit's prior decision in this case is one such example [Doc. 42]. Moreover, in that opinion, the Sixth Circuit explicitly adopted the Fifth Circuit's holding that *Yearsley* immunity is not sovereign immunity [*Id.*, p. 8]. However, in light of the decision in *Thacker*, it is unclear what immunity a government contractor could "derive" from TVA other than sovereign immunity. Accordingly, the Court acknowledges the potential that *Thacker* could alter the entire *Yearsley* analysis.

30

Jacobs's conduct of the remediation efforts, because such would have been inconsistent with TVA's air monitoring protocol.

Second, as to any manipulation of the air monitoring results, the Court concluded that such would be outside the scope of the CERCLA order, and therefore, contrary to the will of the government [Doc. 137, p. 31]. The Court based this conclusion on Mr. Heffernan's deposition testimony that air monitoring would indicate if limits on hazardous substances were exceeded, and, if the limits were not exceeded, then TVA was acting within the rules of the CERCLA agreement [Doc. 97; Heffernan Dep., p. 139]. Mr. Heffernan testified that if there was any alteration of the air monitoring levels, such was outside the scope of the permission in the CERCLA order [*Id.*, pp. 139–40]. Based on this testimony, the Court still finds that any manipulation of the air monitoring results would be contrary to TVA's will with regard to Jacobs's conduct of the remediation efforts, because such would exceed the permissions in the CERCLA order.

Third, as to any failure to report safety concerns to TVA, the Court found that such failure would be outside the scope of Jacobs's authority [Doc. 137, p. 31]. The Court relied in part on Mr. Heffernan's deposition testimony that, because of his role as safety manager at the Kingston plant, other safety managers were required to report to him regarding any systemic or recurrent health or safety issues at the site [Doc. 97; Heffernan Dep., p. 61]. Mr. Heffernan also testified that if there were repeated complaints of breathing problems or low testosterone from fly ash, he should have been informed [*Id.* at 61–62]. The Court

31

also relied on declarations of Mr. Heffernan and Chuck Proffitt, one of TVA's senior safety managers, which stated that, based on their roles as safety managers, safety personnel from TVA and other entities were required to report to them any concerns regarding systemic or recurrent health and safety issues at the site [Doc. 70-1, ¶¶ 4, 12; Doc. 70-2, ¶ 7]. Based on this evidence, the Court again finds that it would have been contrary to the will of TVA, with regard to Jacobs's conduct of the remediation efforts, for Jacobs to fail to report ongoing safety concerns.

Fourth, the Court concluded that it would be contrary to the will of TVA if defendant failed to honor a doctor's prescription for a dust mask or respirator [Doc. 137, p. 32]. The Court based this determination on Mr. Heffernan's deposition testimony that, if a doctor indicated that someone had a breathing disorder and needed a respirator, he should have been informed [Doc. 97; Heffernan Dep., p. 106]. Mr. Heffernan also testified that failure to provide a respirator in such circumstances would have been "noncompliance" on Jacobs's part [*Id.* at 106–07]. Moreover, Mr. Heffernan stated that if an employee brought a prescription for a dust mask or respirator to Jacobs, that prescription should have been honored [*Id.* at 107–08]. Based on this evidence, the Court still concludes that Jacobs would have been acting contrary to TVA's will with regard to the conduct of the Kingston remediation if it failed to honor a doctor's prescription for a dust mask or respirator.

Fifth, the Court found that it would have been contrary to TVA's safety training for Jacobs to represent that fly ash was safe in a public meeting, and outside the scope of TVA's safety intentions under the contract with Jacobs to communicate to workers that fly

32

ash was safe to eat or drink [Doc. 137, p. 32]. The Court based its opinion in part on Mr. Heffernan's deposition testimony that if there were misrepresentations of potential workplace hazards made to workers, such should have been brought to his attention, and information that coal ash was safe to eat or drink should not have been disseminated and would have been outside the scope of TVA's safety intentions [Doc. 97; Heffernan Dep., pp. 41–42]. The Court also relied on the deposition testimony of Dewayne Rushing, a temporary yard supervisor at the Kingston remediation site, that it would have been contrary to safety training to tell workers that fly ash was safe in a public meeting [Doc. 97; Rushing Dep., pp. 17–18; 41]. Based on this testimony, the Court still concludes that it would have been contrary to TVA's will with regard to the Kingston remediation site for Jacobs to communicate to workers that fly ash was safe to consume, because such conduct would have been contrary to TVA's safety training and would have been outside the scope of the safety intentions in the TVA/Jacobs contract.

Finally, the Court concluded that harassing a worker who asked for PPE would not have been acceptable under the TVA/Jacobs contract, and it would have been contrary to TVA's policies for Jacobs to threaten a worker who asked for PPE [Doc. 137, pp. 32–33]. The Court based this determination on deposition testimony from Jamie Keith, a TVA department manager of contracting managers and agents, that harassment for requests for PPE was not acceptable and not permissible under TVA's contracts [Doc. 97; Keith Dep., pp. 14, 97]. The Court also relied on Mr. Rushing's testimony that threatening someone's job for requesting a dust mask for their health would be improper and contrary to TVA's

33

zero tolerance policy [Doc. 97; Rushing Dep., pp. 35–36]. Again, based on this testimony, the Court still finds that Jacobs would have been acting contrary to TVA's will if it harassed or threatened any worker who requested PPE, because such conduct would be inconsistent with the TVA/Jacobs contract and would violate TVA policy.

Thus, the Court still concludes that, based on the evidence submitted at the summary judgment stage, and without any regard to the discretionary function exception, the six (6) acts or omissions that the Court initially determined would be contrary to TVA's will, would remain contrary to TVA's will, and therefore, not qualify for derivative immunity under *Yearsley*. Accordingly, the Court concludes that, even without reference to the discretionary function exception, Jacobs would not be entitled to derivative immunity under *Yearsley* for any of the six (6) acts or omissions that the Court submitted to the jury, because such acts or omissions would be contrary to the will of the government. Because the Court has concluded that Jacobs would not be entitled to derivative immunity under *Yearsley* for any of the six (6) acts or omissions, the Court need not address whether TVA would now be immune for the same actions under the *Thacker* test. Based on the determination above, Jacobs's "Renewed Motion for Judgment as a Matter of Law," [Doc. 545], which this Court has construed as a motion for reconsideration under Rule 54(b), will be denied.

## IV. Certification of Interlocutory Appeal

A court may certify an order for interlocutory appeal if it is of the opinion that three conditions exist: (1) the order involves a controlling question of law; (2) to which there is

34

substantial ground for difference of opinion; and (3) an immediate appeal may advance the termination of the litigation. *In re Trump*, 874 F.3d 948, 951 (6th Cir. 2017) (citing 28 U.S.C. § 1292(b)).

The Court finds that this order merits the extraordinary measure of certification for interlocutory appeal. First, this order involves a controlling question of law. Defendant has argued at length that, in light of the Supreme Court's decision in *Thacker*, this Court's prior decision finding that defendant is not entitled to derivative immunity for six specific acts or omissions is no longer valid. Although the Court finds that, under *Yearsley*, its prior analysis of the six acts or omissions was correct, the Court finds that defendant's legal argument in this motion is not entirely without merit, and specifically involves a controlling question of law. The Court also finds that there is substantial ground for a difference of opinion on whether defendant is entitled to derivative immunity in light of *Thacker*, and, while the Court declines to prejudge the issue, it notes that, should an appellate court determine that defendant is entitled to derivative immunity under *Yearsley*, defendant may very well be entitled to immunity in light of *Thacker*. Likewise, an immediate interlocutory appeal may advance the termination of this litigation, because, if defendant is indeed entitled to derivative immunity under *Yearsley* and *Thacker*, such determination would result in the termination of this litigation, and result in a substantial saving of time and resources of all involved. Accordingly, the Court finds that all of the conditions under Section 1292(b) are met to certify an interlocutory appeal of this order.

35

Because this Court has certified that this order is appropriate for an interlocutory appeal to the Sixth Circuit, any party wishing to so appeal **SHALL** file an application with the Sixth Circuit no later than ten (10) days from the entry of this order. *See* 28 U.S.C. § 1292(b).

## V.    Conclusion

For the reasons stated above, Jacobs's "Renewed Motion for Judgment as a Matter of Law" [Doc. 545], which the Court has construed as a motion for reconsideration under Rule 54(b), is **DENIED**. However, the Court will **CERTIFY** this order for interlocutory appeal under 28 U.S.C. § 1292(b). Any party wishing to file an appeal from this interlocutory order **SHALL** file an application with the Sixth Circuit **no later than ten (10) days** from the entry of this order.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

36